IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ISAAC A., by and through next friend, A.A.; ZACK B., by and through next friend, B.B.; LEON C., by and through next friend, C.C.; SAMUEL D., by and through next friend, D.D., on behalf of themselves and those similarly situated; and THE GEORGIA ADVOCACY OFFICE,<br><br>      Plaintiffs,<br><br>v.<br><br>RUSSEL CARLSON, in his official capacity as Commissioner of the Georgia Department of Community Health; KEVIN TANNER, in his official capacity as Commissioner of the Georgia Department of Behavioral Health and Developmental Disabilities; CANDICE L. BROCE, in her official capacity as Commissioner of the Georgia Department of Human Services,<br><br>      Defendants. | Civil Action No. _____<br><br><br><br>**COMPLAINT – CLASS ACTION** |

# TABLE OF CONTENTS

**Page #**

I.    OVERVIEW OF THE CASE ........................................................................1

II.   JURISDICTION AND VENUE .................................................................8

III.  PARTIES .....................................................................................................9

     A.    Individual Plaintiffs .........................................................................9

           1.     Plaintiff Isaac A. .................................................................9

           2.     Plaintiff Zack B. ...............................................................11

           3.     Plaintiff Leon C. ...............................................................14

           4.     Plaintiff Samuel D. ...........................................................16

     B.    The Plaintiff Class .........................................................................18

     C.    Plaintiff Georgia Advocacy Office ...............................................19

     D.    Defendants .....................................................................................20

           1.     Defendant Russel Carlson, Commissioner of the Department of Community Health ....................................................................20

           2.     Defendant Kevin Tanner, Commissioner of the Department of Behavioral Health and Developmental Disabilities .................21

           3.     Defendant Candice Broce, Commissioner of the Department of Human Services and the Director of the Division of Family and Children Services. ...................................................................22

IV.  STATUTORY BACKGROUND ................................................................22

     A.    The Federal Medicaid Act and its Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") Mandate ...............................22

     B.    Defendants' Obligations Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 ...27

           1.     Title II of the Americans with Disabilities Act ........................27

2.    Section 504 of the Rehabilitation Act of 1973 ........................29

V.    FACTUAL ALLEGATIONS .........................................................................30

A.    Georgia's System for Delivering Mental Health Services to Medicaid-Eligible Children is Fragmented and Ineffective. ...............................30

B.    Georgia Officials Have Repeatedly Acknowledged the Failure to Provide Intensive Home and Community-Based Services to the Children and the Systemic Consequences of Those Failures. ............35

C.    Defendants Fail to Provide Medically Necessary Remedial Services to the Children. .......................................................................................39

1.    Georgia fails to provide the First Remedial Service – Intensive Care Coordination – to the Children who need it. ....................40

2.    Defendants systematically fail to provide the Second Remedial Service – Intensive In-Home Services – to the Children who need it. ......................................................................................44

3.    Georgia does not offer the third Remedial Service—Mobile Crisis Response Services—timely and effectively to the Children who need it. ................................................................46

D.    Defendants' Failure to Provide the Remedial Services to the Children Leads to a Predictable Pattern of Repeated Out-of-Home Placement, Including Avoidable Institutionalization..............................................50

E.    Defendants' Methods of Administering Mental Health Services Subject the Children to Disability Discrimination. ............................52

VI.   CLASS ACTION ALLEGATIONS ..............................................................54

VII.  CLAIMS FOR RELIEF ................................................................................61

VIII. PRAYER FOR RELIEF ...............................................................................65

## I.    OVERVIEW OF THE CASE

1.    There is an acknowledged and ongoing crisis in Georgia's children's mental health system.  Every day, Medicaid-enrolled children with significant mental health needs are deprived of necessary services in their homes and communities and subjected to unnecessary institutionalization because responsible agencies systemically fail to provide three necessary services that they are entitled to under federal law – Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response Services (collectively, "the Remedial Services").[1]  This combination of services, provided in a highly coordinated and child-centered way, is widely recognized by professionals, States, and the Centers for Medicare & Medicaid Services ("CMS") as clinically effective, more cost-effective than institutional placements, and capable of preventing harmful out-of-home placement.

2.    Georgia's failure to provide these medically necessary Remedial Services causes children with significant mental health needs predictable,

---

[1] In 2013, the federal Center for Medicaid and CHIP Services ("CMCS") and the Substance Abuse and Mental Health Services Administration ("SAMHSA") defined these services in a joint informational bulletin (hereinafter the "2013 Informational Bulletin"). *See Cindy Mann, Informational Bulletin: Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions,* CMS & SAMHSA, at 1 (May 7, 2013) (available at: https://www.medicaid.gov/federal-policy-guidance/downloads/cib-05-07-2013.pdf).  Plaintiffs adopt the definitions of Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response set forth in the 2013 Informational Bulletin.

significant, and lasting harm.  Absent the Remedial Services, children experience unnecessary institutionalization as a result of worsening of symptoms, deterioration of their mental health conditions, increased treatment needs, avoidable trauma, repeated mental health crises and emergency room visits, relinquishment to child welfare systems, and juvenile justice involvement. The failure to provide the Remedial Services to children with significant mental health needs when and where they need them also results in damaging disruptions to their participation in family and community life, such as school, sports, hobbies, and community programs and activities.

3.      For decades, Georgia has repeatedly acknowledged the systemic failures in its children's mental health systems.  But the responsible agencies (the "Defendants") have not taken needed action. Thus, Plaintiffs seek to compel Defendants to provide or arrange for the Remedial Services necessary to treat the children's mental health conditions and to administer their systems to avoid the institutionalization and segregation of Georgia's most vulnerable children.

4.      Plaintiffs Isaac A., Zack B., Leon C., and Samuel D. (together, the "Individual Plaintiffs"), the class of children they represent, and the constituents of the Georgia Advocacy Office (collectively, the "Children") are victims of Georgia's mental health crisis.

5.     The Children have serious mental, behavioral, or emotional conditions that impact their ability to function at home, school, and in the community.  Their constellation of symptoms and needs are often categorized as "Serious Emotional Disturbance."  In 1993, SAMHSA defined childhood "Serious Emotional Disturbance" as "the presence of a diagnosable mental, behavioral, or emotional disorder that resulted in functional impairment which substantially interferes with or limits the child's role or functioning in family, school, or community activities."[2] Children with Serious Emotional Disturbance typically have clinical needs and conditions that cannot be effectively addressed with routine outpatient services.

6.     The Individual Plaintiffs are joined by the Georgia Advocacy Office ("GAO"), which also seeks to end this system-wide crisis on behalf of its constituents and to compel Defendants to comply with federal law by ensuring that the Children are able to obtain these Remedial Services.

---

[2] *See* Serious Emotional Disturbance (SED) Expert Panel Meetings, SAMHSA, (Sept. 7 & Nov. 12, 2014), https://www.samhsa.gov/data/sites/default/files/SED%20Expert%20Panels%20Summary%20Report.pdf. (last visited Dec 14, 2023).; Fed. Reg. Vol. 58, No. 96, pp. 29422, 29423 (May 20, 1993) (definition of childhood Serious Emotional Disturbance).  As a federally defined descriptor, "Serious Emotional Disturbance" was intended "to be broad enough so that States will be able to develop an accurate description of the population in need of mental health services."[2]  Georgia reports the number of children within the state to federal agencies annually and has adopted the SAMHSA definition when describing the needs of children with complex mental health conditions.

7.      Georgia does not provide any child with this constellation of Remedial Services.  Defendants administer a children's mental health system that offers some intensive services on paper, but it does not offer the intensive therapeutic interventions needed by the Children in their homes and communities.

8.      Instead, Georgia's administration of its children's mental health system relies heavily on a set of restrictive institutional settings that unlawfully segregate children with Serious Emotional Disturbance, including in various inpatient units,[3] psychiatric residential treatment facilities,[4] crisis stabilization units,[5] and congregate childcare institutions[6] (collectively, "Psychiatric Institutions").  As a consequence,

---

[3] Residential treatment facilities for children experiencing psychiatric crises or receiving inpatient psychiatric treatment.

[4] "Psychiatric Residential Treatment Facility" (PRTF) means a facility that provides comprehensive mental health and substance abuse treatment to children, adolescents and young adults twenty-one (21) years of age or younger who, due to severe emotional disturbance, are in need of quality active treatment that can only be provided in an inpatient treatment setting and for whom alternative, less restrictive forms of treatment have been tried and found unsuccessful or are not medically indicated[.]" Ga. Comp. R. & Regs. 82-4-1-.03(38). PRTFs are a type of inpatient unit.

[5] "Crisis Stabilization Unit (CSU) means a medically monitored short-term residential program that is licensed by the Department [of Behavioral Health and Developmental Disabilities] under these rules and designated by the Department as an emergency receiving and evaluating facility to provide emergency disability services that include providing psychiatric and behavioral stabilization and detoxification services twenty-four hours a day, seven days a week[.]" Ga. Comp. R. & Regs. 82-4-1-.03(14).

[6] "Child Caring Institutions" include any institution, society, agency, or facility . . . which either primarily or incidentally provides full-time care for children through 17 years of age outside of their own homes." Ga. Comp. R. & Regs. 290-2-7-.01(h).

the Children are subjected to repeated, prolonged, and unnecessary institutionalization in these settings, in violation of the Americans with Disabilities Act.

9.      Illustratively, between 2019 and 2023, over 12,000 Medicaid-enrolled children in Georgia were admitted into Psychiatric Institutions, often multiple times within the same year.  For example, the Individual Plaintiffs have each experienced numerous institutionalizations in recent years, including over the last twelve months.

10.      In 2022, the Children's Hospital of Atlanta encountered more than 4,000 children who were experiencing a mental health crisis.[7]  The lack of intensive community-based services resulted in these children remaining hospitalized 3.5 times longer than those seeking only medical care.  From 2015 to 2020, more than half of the children seeking mental health care were eventually transferred to a psychiatric facility, and over 12% returned to Children's Hospital emergency departments within 30 days.[8]

---

A Child Caring Institution provides such care to six or more children.  Ga. Comp. R. & Regs. 290-2-5-.03(e).

[7]      *Behavioral and Mental Health*, Child's Healthcare Atl., https://www.choa.org/medical-services/behavioral-and-mental-health. (last visited Dec. 13, 2023).

[8] Children's Healthcare of Atlanta, *Patients with Behavioral & Mental Health (BMH) Needs Presenting to a Children's Emergency Department (ED)*, GA. H.R., (Nov. 19, 2020), https://www.house.ga.gov/Documents/CommitteeDocuments/2020/BehavioralHealth/SubcommitteeDocuments/Hospital_and_Short_Term_Care_Sub_Committee_Children%27s_BMH.pdf.

11.    Through their actions and inactions, including their administration, planning, and funding of the children's mental health system, Defendants are denying the Children access to the Remedial Services and failing to maintain a provider network with adequate capacity to deliver those services Statewide.

12.    In addition, Defendants' existing policies and procedures systematically deprive the Children of necessary mental health services by failing to: (a) provide information about home and community-based mental health services to which they are entitled, and how to receive them; (b) assess their chronic mental health needs and evaluate whether those needs can be met in community-based settings; (c) ensure the creation and implementation of clinically appropriate discharge plans, and (d) monitor the timely provision of medically necessary services when the Children exit Psychiatric Institutions.

13.    Defendants' existing service eligibility criteria also impermissibly exclude many of the Children who have both mental health conditions and developmental or intellectual disabilities, which subjects them to disability discrimination, and violates their right to medically necessary treatments.

14.    These systemic failures in Defendants' administration of Georgia's mental health system for children violate Title II of the Americans with Disabilities Act of 1990 (the "ADA") and Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act").  These federal statutes require Defendants to provide mental

health services in the most integrated setting appropriate to the Children's needs and prohibit discrimination on the basis of disability. Defendants' discriminatory methods of administration and failure to provide the Remedial Services to the Children who need them have resulted in their unnecessary and recurring institutionalization and segregation from their communities, in violation of the ADA and the Rehabilitation Act.

15.     Under the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") provisions of the Medicaid Act (the "EPSDT Mandate"), the single state Medicaid agency, the Georgia Department of Community Health, must provide or arrange for the Remedial Services for Medicaid-eligible children under age twenty-one when necessary to correct or ameliorate their conditions. Ongoing failures by the Commissioner Russell Carlson, the Department of Community Health, and its agents to provide Remedial Services to the Children violate the Medicaid Act's EPSDT Mandate. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(A)-(C), 1396d(a)(4)(B), 1396d(r)(5).

16.     The Plaintiffs seek declaratory and injunctive relief to compel Defendants to comply with the Medicaid Act, the ADA, and the Rehabilitation Act by requiring Defendants to provide timely access to the Remedial Services so that the Children can receive the services necessary to effectively treat their mental health conditions and avoid unnecessary institutionalization.

7

## II.    JURISDICTION AND VENUE

17.    This is an action for declaratory and injunctive relief for violations of the Federal Medicaid Act, under 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act.

18.    Jurisdiction is based on 28 U.S.C. §§ 1331, 1343, and 1443, and 42 U.S.C. § 1983.

19.    Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201 and 2202.  At all relevant times, Defendants have acted under the color of state law.

20.    Venue is proper in the Northern District of Georgia (the "District") pursuant to 28 U.S.C. § 1391(b) because the Defendants are sued in their official capacity and perform their official duties by and through offices within the District and thus reside therein, and a substantial part of the events and omissions giving rise to the claims herein occurred in this District.

21.    This Court has authority to grant Plaintiffs' claims for declaratory and injunctive relief, as well as "further necessary or proper" relief, pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Federal Rules of Civil Procedure 57 and 65.

III.    PARTIES

    A.    Individual Plaintiffs

        1.    Plaintiff Isaac A.

22.    Isaac is a bi-racial, 9-year-old boy from Fulton County, Georgia, who is enrolled in Medicaid. He brings this action through his mother, A.A.

23.    Isaac enjoys rollerblading, painting, puzzles, and movies.

24.    Isaac has been diagnosed with multiple mental health conditions that significantly impair his day-to-day functioning at home, school, and in the community, and meets the criteria for Serious Emotional Disturbance.

25.    Isaac's mental health conditions first became evident as a young child when he struggled with developmental milestones and sleep. He was first hospitalized for mental health reasons at the age of 6, when he was diagnosed with Bi-polar Disorder. Since that time, Isaac received additional diagnoses including Obsessive Compulsive Disorder, Attention Deficit Hyperactivity Disorder, Disruptive Mood Dysregulation Disorder, and Oppositional Defiant Disorder.

26.    Isaac has a long and growing history of mental health crises. He struggles with a range of symptoms, including suicidal ideation and aggression towards himself and others. Isaac has experienced repeated emergency room visits, and admissions to Psychiatric Institutions. This pattern of institutionalization has disrupted his connections with school, community, peers, and family.

27.    By the time he was 8 years old, Isaac had experienced approximately

11 placements in Psychiatric Institutions.  At the time of discharge from these institutions, Isaac's treating clinicians determined that he could return to his family home.  However, Isaac was only provided with basic outpatient services such as medication management and individual/family therapy.  He was not provided with the Remedial Services necessary to treat his mental health conditions.

28.     In the spring and summer of 2022, Isaac was sent from one Psychiatric Institution to another. Although Isaac was referred to an existing service called Intensive Family Intervention (further defined in Paragraphs 145 and 163 through 165), his frequent institutionalization meant that service was delivered intermittently, if at all.

29.     Despite Isaac's significant mental health needs, and his recurring institutionalization, Georgia failed to provide the Remedial Services needed to treat his conditions.  Without them, Isaac's mother was unable to support his return to her care.  As a result, the Georgia Division of Family and Children Services ("DFCS") (further defined in Paragraph 77) obtained temporary custody of Isaac in July of 2022.

30.     Isaac's mother hoped that entering state custody would result in increased access to community mental health services.  However, Isaac's longest period of institutionalization—more than 8 months in duration—came after he entered DFCS custody and despite being recommended for discharge.  This

prolonged institutionalization was due to repeated failures by DFCS to arrange for services in the community.  During this time, Isaac remained segregated from his family, and suffered numerous instances of physical and chemical restraints.

31.    When DFCS finally did place Isaac in the community it was without the Remedial Services.  As a result, he continued to move between institutional placements and short-term foster care settings.  Isaac is currently in a Georgia-funded out-of-state Psychiatric Institution more than 800 miles away from his family.

32.    Despite these obstacles, Isaac's mother still wishes to bring her son home with services that are necessary to treat his mental health conditions.

33.    Isaac currently needs, but is not receiving, the Remedial Services. Without these Services, his ability to reunify with his family has been delayed, he remains segregated from his community, and he is very likely to continue to experience repeated and prolonged institutionalization.

### 2.    Plaintiff Zack B.

34.    Zack is a Black, 15-year-old from Fulton County, Georgia, who is enrolled in Medicaid.  He brings this action through his mother, B.B.

35.    Zack enjoys cooking, video games, football, and listening to music.

36.    Zack has been diagnosed with multiple mental health conditions that significantly impair his day-to-day functioning at home, school, and in the

community, and meets the criteria for Serious Emotional Disturbance.

37.    Zack's mental health conditions first became evident when he was a young child. At age 6, he was diagnosed with Attention Deficit Hyperactivity Disorder. Over time, he received additional diagnoses of Bi-polar Disorder and Disruptive Mood Dysregulation Disorder.

38.    For much of Zack's childhood, he received only basic mental health services such as outpatient counseling and medication management.  However, these services were insufficient to meet his needs.  As a result, Zack's conditions worsened over time, as evidenced by his suicidal ideation, auditory hallucinations, self-harm, and emotional instability.  These symptoms resulted in multiple mental health crises, emergency department visits, and admissions to Psychiatric Institutions to obtain needed mental health care, affecting Zack's relationships with family and friends, segregating him from his community, and negatively impacting his ability to learn at school.

39.    Despite repeated Psychiatric Institutionalizations, and his mother's continuing requests for more intensive services in the community, Zack was routinely discharged home without the Remedial Services necessary to treat his mental health conditions.

40.    Between 2018 and 2020, Zack received an existing service called Intensive Customized Care Coordination ("IC3") (as defined in Paragraphs 145

and 150), as well as Intensive Family Intervention ("IFI"), individual counseling, and family and peer supports.  While still not sufficient to meet his needs, he experienced fewer psychiatric admissions, demonstrating that he can be appropriately served in the community.

41.     However, when these services were discontinued in 2021, Zack again began to experience repeated mental health crises.  In 2022, he was admitted to the emergency room over 18 times and had 16 admissions to Psychiatric Institutions. Despite these repeated mental health crises, and the increasing severity of his mental health conditions, Defendants did not provide Zack with the Remedial Services.  Nor did they refer him back to IC3 or IFI services during this time.

42.     Finally, in December of 2022, his mother refused to accept a facility discharge plan because it did not include the provision of the services Zack needed to be safely cared for at home.

43.     As a result, DFCS obtained temporary custody of Zack.  His mother hoped that this state agency involvement would result in improved access to mental health services.  However, DFCS has failed to provide the intensive mental health services that Zack needs in an integrated community setting.  Instead, over the last year DFCS placed him in a Child Care Institution, a staffed hotel room, and a Psychiatric Residential Treatment Facility.  He remains institutionalized at the time of this filing.  B.B. wants Zack to come home so that he can live with his family

and be the big brother he wants to be.

44.    Zack currently needs, but is not receiving, the Remedial Services. Without these Services, Zack is unable to reunify with his family, and will very likely continue to experience repeated and prolonged institutionalization.

### 3.    Plaintiff Leon C.

45.    Leon is a Black, 14-year-old from Henry County, Georgia, who is enrolled in Medicaid.  He brings this action through his adoptive mother, C.C.

46.    He enjoys all sports, and particularly basketball, as well as playing with Legos and computer games.  He is detail-oriented, takes pride in his appearance, and has an incredible memory.

47.    Leon has been diagnosed with multiple mental health conditions that significantly impair his day-to-day functioning at home, school, and in the community, and meets the criteria for Serious Emotional Disturbance.  He has been diagnosed with Disruptive Mood Dysregulation Disorder, Generalized Anxiety Disorder, Attention Deficit Hyperactivity Disorder, and Autism.

48.    Leon experienced abuse and neglect at an early age and was removed from the care of his biological mother.  He later came to live with his adoptive mother and seven siblings. As a young child, he began to experience a range of symptoms including emotional dysregulation, impulsivity, aggression, auditory hallucinations, and enuresis.

49.     Leon was first hospitalized at the age of 11.  Between November 2020 and January 2022, Leon experienced three Psychiatric Institutionalizations precipitated by threats, aggression, property destruction, and other maladaptive behaviors.  After each admission, his treating clinicians recommended that he return to the family home.  However, his discharge plans typically only contained referrals to basic outpatient services such as medication management and counseling.

50.     During one institutional stay, Leon's treating clinicians suggested that his mother contact IFI providers in an effort to obtain the service.  However, after numerous calls, she was repeatedly told that they could not serve him due to his concurrent Autism diagnosis.  Leon was not offered nor did he receive the Remedial Services necessary to treat his condition.

51.     In February of 2022, after threatening to harm himself and his adopted mother, Leon was again hospitalized.  Two months later, because of the chronicity of his behaviors, he was transferred to that facility's psychiatric residential treatment program.

52.     At the time of transfer, Leon's estimated length of stay was 90 days, and his preliminary discharge plan was to return home with referrals to intensive in-home services.  More than 18 months later, these services still have not been arranged.

53.     In October of 2022, Leon's treatment team concluded that he was ready

for discharge and that his behaviors no longer required psychiatric institutionalization.  However, his mother was reluctant to accept any transition plan that did not provide intensive home and community-based services, prompting the institution to recommend placement with DFCS.  C.C.  refused to relinquish her son to DFCS custody and continued to insist on the provision of services in his home and community.  Leon was later transferred to another segregated setting and remains institutionalized.  C.C. wants her son to come home with his family, but he cannot do so safely without the necessary Remedial Services.

54.     Leon currently needs, but is not receiving, Remedial Services.  Without these Services, he is very likely to continue to experience repeated and prolonged institutionalization.

### 4.     Plaintiff Samuel D.

55.     Samuel is a white, 11-year-old who is enrolled in Medicaid.  He brings this action through his adoptive mother, D.D.

56.     Samuel lives with his adoptive parents and siblings in Oconee County, Georgia. He loves to play games and listen to music.

57.     Samuel has been diagnosed with multiple mental health conditions that significantly impair his day-to-day functioning at home, school, and in the community, and meets the criteria for Serious Emotional Disturbance.  Samuel has been diagnosed with Reactive Attachment Disorder, Disruptive Mood

Dysregulation Disorder, and Attention Deficit Hyperactivity Disorder.

58.     Samuel experienced abuse and neglect as an infant and young child, and he was ultimately removed from the care of his biological mother. At age 5, Samuel was legally adopted by his grandparents.

59.     Samuel's mental and behavioral health conditions first became evident when he was a young child. At age 6, Samuel was transported by police to the emergency room due to self-harm.  He was discharged home from the ER without the Remedial Services.  Samuel continued to engage in self-harming behaviors and was eventually admitted to a Psychiatric Institution.

60.     Samuel's parents tried calling the existing Georgia Crisis Line ("GCAL") for assistance (as defined in Paragraphs 177 through 179), but typically received a police response instead of the Mobile Crisis Services.  GCAL did not provide connections to any services other than a recommendation that his family take Samuel to the emergency room.

61.     Since his first hospitalization at the age of 6, Samuel has been hospitalized approximately 10 times without receiving the Remedial Services. Despite the increasing acuity and severity of his mental health conditions, he was routinely discharged home from these institutional placements with only basic services including outpatient therapy and medication management.

62.     Samuel was eventually referred to IFI services.  However, the IFI

17

provider advised his family that Samuel needed to be in a home with no other children and encouraged them to place him in DFCS custody.

63.    Samuel's mother has repeatedly sought intensive mental health services in order to keep her son safely at home.  She has described his repeated transitions from Psychiatric Institutionalization to home as abrupt and difficult due to a lack of discharge planning and necessary services.  Without the Remedial Services, Samuel's mental health condition has continued to deteriorate, and he is unable to participate in family life and social activities.  Out of concern for his safety, and to monitor his behaviors, his family has been forced to keep Samuel at home when not at school and to place an alarm on his bedroom door.

64.    Samuel needs, but is not receiving, the Remedial Services.  Without these Services, he will remain segregated in his own home and is very likely to continue to experience repeated and prolonged institutionalization.

### B.    The Plaintiff Class

65.    The Individual Plaintiffs represent a class of similarly situated children, defined as all Medicaid-eligible children under the age of 21 residing in the State of Georgia with Serious Emotional Disturbance for whom the Remedial Services have not been provided and who (a) during the 12 month period before the filing of the Complaint or thereafter were admitted to a Psychiatric Institution, as defined in Paragraph 8, to obtain mental health care; or (b) visited a hospital emergency room

seeking mental health care at least twice during the 12 month period before the filing of the Complaint, or within any span of 12 months thereafter.

### C.   Plaintiff Georgia Advocacy Office

66.   GAO is a private, non-profit Georgia corporation.  GAO has been designated by the State of Georgia since 1977 as its statewide protection and advocacy system to protect the legal rights of individuals with disabilities in the State of Georgia pursuant to the Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801, the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041, and the Rehabilitation Act of 1973, 29 U.S.C. § 794e.

67.   Under federal law, GAO has the authority and obligation to pursue such legal remedies as may be necessary to protect the rights of individuals with disabilities, including the rights of children with disabilities.  *See* 42 U.S.C. §§ 15041, 10801; 29 U.S.C. § 794e.

68.   GAO maintains a governance structure that ensures its work is informed by and responsive to the needs of the disability community, including a Board of Directors and advisory councils that include individuals with disabilities and their families. *See, e.g.*, 42 U.S.C. § 15043; 42 U.S.C. § 10805; 34 C.F.R. § 381.10(a) (detailing program requirements).

69.    The Individual Plaintiffs and members of the proposed class are constituent members of GAO.  They have suffered harms that result from, and are traceable to, the alleged actions and inactions of the Defendants.  They have standing to sue in their own right.

70.    Georgia federal courts have found that GAO has standing to sue on behalf of its constituent members.  *See, e.g.*, *GAO v. Jackson*, No. 1:19-CV-1634-WMR-JFK, 2019 WL 12498011, at *2 n.1 (N.D. Ga. Sept. 23, 2019), *order vacated*, *appeal dismissed by* 4 F.4th 1200 (11th Cir. 2021), *appeal dismissed as moot*, 33 F.4th 1325 (11th Cir. 2022); *GAO v. Reese*, No. 1:15-CV-03372-AT, 2015 WL 12749290 (N.D. Ga. Dec. 11, 2015).

### D.    Defendants

#### 1.    Defendant Russel Carlson, Commissioner of the Department of Community Health

71.    Defendant Carlson, sued in his official capacity, is the Commissioner of the Department of Community Health ("DCH"), the single state agency responsible for administering the Georgia Medicaid Program. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; Ga. Code Ann. § 49-4-14.

72.    Defendant Carlson is charged with directing and overseeing DCH's operations in its administration of the Georgia Medicaid program.  In this capacity,

Defendant Carlson is responsible for ensuring the program's compliance with the Medicaid Act, including its EPSDT Mandate.

73.    Defendant Carlson also is responsible for ensuring that the Georgia Medicaid program fully complies with the ADA and the Rehabilitation Act, and their respective implementing regulations.

### 2.    Defendant Kevin Tanner, Commissioner of the Department of Behavioral Health and Developmental Disabilities

74.    Defendant Kevin Tanner, sued in his official capacity, is the Commissioner of the Department of Behavioral Health and Developmental Disabilities ("DBHDD"), Georgia's public agency responsible for providing treatment and support services to children and adults with mental illnesses, addictive diseases, and developmental and intellectual disabilities. Ga. Code Ann. § 37-1-20.

75.    As DBHDD Commissioner, Defendant Tanner directs and oversees the provision of publicly funded mental health services for both children and adults.

76.    Defendant Tanner is responsible for ensuring that DBHDD's programs and services for children and youth with mental health and co-occurring developmental disabilities fully comply with the ADA and Rehabilitation Act, and their respective implementing regulations.

**3.    Defendant Candice Broce, Commissioner of the Department of Human Services and the Director of the Division of Family and Children Services.**

77.    Defendant Candice Broce, sued in her official capacity, is the Commissioner of the Georgia Department of Human Services and the Director of the Georgia Division of Family and Children Services (collectively, "DFCS"), Georgia's child welfare agency.  Ga. Code Ann. § 49-5-8.

78.    Defendant Broce is responsible for managing the care and treatment provided to youth in DFCS custody, all of whom are Medicaid eligible, and many of whom have a Serious Emotional Disturbance.

79.    In her direction and oversight of DFCS, Defendant Broce is responsible for ensuring that the Children in DFCS custody receive care and treatment in accordance with the requirements of the ADA and the Rehabilitation Act, and their respective implementing regulations.

## IV.   STATUTORY BACKGROUND

**A.    The Federal Medicaid Act and its Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") Mandate**

80.    The Medicaid program, authorized and regulated pursuant to Title XIX of the Social Security Act (the "Medicaid Act"), is a cooperative federal-state

medical assistance program for certain groups of low-income persons.  *See* 42 U.S.C. § 1396a-1396w-7.

81.    Medicaid's central purpose is to enable States to furnish medical assistance, rehabilitation, and other services to help low-income families and individuals attain or retain capability for independence of self-care. 42 U.S.C. § 1396-1.

82.    CMS is the federal agency charged with oversight of the Medicaid Act.

83.    Participation by States in the Medicaid program is voluntary.  All states, including Georgia, have opted to participate.

84.    States are reimbursed by the federal government for a significant portion of the cost of providing Medicaid benefits.

85.    States must comply with all requirements of the federal Medicaid Act and its implementing regulations and mandatory guidelines.

86.    States must submit a Medicaid plan to the Secretary of Health and Human Services ("HHS") for approval.  The State plan describes the administration of the Medicaid program and identifies the services the State will provide to eligible beneficiaries.  42 U.S.C. § 1396a(a).

87.    States must designate a single state agency to administer or supervise the administration of the Medicaid program and to ensure the program complies with all relevant laws and regulations.  *See* 42 C.F.R. § 431.10(e).

88.     The single state Medicaid agency "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters."   42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(e).

89.     While States may contract with care management entities to oversee the delivery of Medicaid services, and to arrange services through provider networks, the single State Medicaid agency remains responsible for ensuring compliance with all relevant Medicaid requirements, including the mandates of the Medicaid program.  42 U.S.C. §§ 1396a(a)(5), 1396u-2.

90.     The State must ensure that its managed care entities offer the full range of necessary and appropriate preventive and primary services for all enrolled beneficiaries.  42 U.S.C. §1396u-2(b)(5).

91.     States must arrange for or provide certain mandatory services in their State Medicaid plans. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).  Mandatory services include early and periodic screening, diagnostic and treatment services for beneficiaries under age twenty-one.  42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396a(a)(4)(B), 1396d(r).

92.     The purpose of EPSDT is to ascertain children's physical and mental health conditions as early as possible and ensure children receive services needed "to correct or ameliorate defects and physical and mental illnesses and conditions."

42 U.S.C. § 1396d(r)(5). Under EPSDT, States are required to provide screening services to identify health and mental health conditions and illness. *Id.* § 1396d(r)(1).

93. EPSDT requires that the services that are coverable under 42 U.S.C. §1396d(a) must be provided to beneficiaries under age twenty-one if they are "necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions . . . [regardless of] regardless of whether or not such services are covered" for adults. 42 U.S.C. § 1396d(r)(5). Services must be covered if they correct, compensate for, improve a condition, or prevent a condition from worsening, even if the condition cannot be prevented or cured.

94. Even when a particular service or treatment for youth is not included in a State's Medicaid plan, a State must nevertheless provide that service or treatment if it is listed in section 1396d(a) and necessary to correct or ameliorate the child's condition. 42 U.S.C. § 1396a(a)(43)(C); 42 C.F.R. § 441.57.

95. States must establish and implement an EPSDT program in their state Medicaid plan that:

a. informs all persons in the State who are under the age of 21 and eligible for medical assistance of the availability of EPSDT as described in 42 U.S.C. § 1396d(r);

b.      provides or arranges for the provision of such screening services in all cases where they are requested (42 U.S.C. § 1396a(a)(43)(B)); and

c.      provides or arranges for corrective treatment, the need for which is disclosed by such child health screening services.  42 U.S.C. § 1396a(a)(43).

96.    The Medicaid Act requires States to "mak[e] medical assistance available" to Medicaid beneficiaries when medically necessary, with "reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8), (10)(A).

97.    States must "set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice . . . and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services."  42 C.F.R. § 441.56(e).

98.    States are obligated to "design and employ methods to assure that children receive . . . treatment for all conditions identified as a result of examination or diagnosis."  CMS, *State Medicaid Manual*, Pub. 45, Ch. 5, § 5310 (Rev. 3).

99.    States must "make available a [wide] variety of individual and group providers qualified and willing to provide EPSDT services."  42 C.F.R. § 441.61(b).

**B.     Defendants' Obligations Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973**

**1.     Title II of the Americans with Disabilities Act**

100.    On July 12, 1990, Congress enacted the ADA, 42 U.S.C. § 12101-12181, "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

101.    In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).

102.    Among the forms of "discrimination" recognized by Congress and prohibited in the ADA is the needless segregation of persons with disabilities.   *See* 42 U.S.C. § 12101(a)(3).

103.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

104.    The United States Supreme Court has held that the ADA prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999). The Court explained that its holding "reflects two evident judgments." *Id.* "First, institutional placement of persons who can

handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id*. at 601.

105.   In promulgating regulations to implement the ADA, the U.S. Department of Justice ("DOJ") has required that Georgia and other States "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  As defined by the Attorney General, an "integrated setting" is one which, for example, "enables individuals to interact with non-disabled peers to the fullest extent possible."  28 C.F.R. pt. 35, app. A (citation omitted).

106.   ADA regulations also prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "that substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3).

107.   The regulations also require States to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability, unless the state can demonstrate that making the modifications would fundamentally alter the nature of the service program or activity.  28 C.F.R. § 35.130(b)(7).

### 2.   Section 504 of the Rehabilitation Act of 1973

108.   Similar to the ADA, the Rehabilitation Act prohibits discrimination on the basis of disability, 29 U.S.C. § 794(a) and 28 C.F.R. § 41.51(a), requires the provision of services in the most integrated setting, 28 C.F.R. § 41.51(d), and makes it a violation of the Rehabilitation Act to use methods of administration that subject individuals to discrimination.  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

109.   The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

110.   Under the Rehabilitation Act, "program or activity" means "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1).

111.   The Rehabilitation Act defines an "individual with a disability" as "any person who has a disability as defined in [the ADA]."  29 U.S.C. § 705(20)(B).

112.   Under the Rehabilitation Act, programs or activities that receive federal funding may not deny or otherwise "[a]fford a qualified [individual with a disability]

an opportunity to participate in or benefit from the aid, benefit, or service" that is not

"equal to" or "as effective as that [afforded or] provided to others."  45 C.F.R. § 84.4

(b)(1)(i)-(iii); *see also* 28 C.F.R. § 41.51.

113.   In addition, such programs must "afford [individuals with disabilities]

equal opportunity to obtain the same result, to gain the same benefit, or to reach the

same level of achievement, in the most integrated setting appropriate to the person's

needs." 45 C.F.R. § 84.4(b)(2); *see also* 28 C.F.R. § 41.51(d).

114.   For nearly all relevant purposes, the ADA and Rehabilitation Act are

construed co-extensively.  *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)

(holding that, because cases involving the Rehabilitation Act are governed by the

same standard as cases involving the ADA, the Rehabilitation Act cases are

precedent for ADA cases and *vice versa*).

## V.   FACTUAL ALLEGATIONS

### A.   Georgia's System for Delivering Mental Health Services to Medicaid-Eligible Children is Fragmented and Ineffective.

115.   As the Medicaid single state agency for the State of Georgia, DCH must

ensure that Medicaid-enrolled children have access to a comprehensive system of

mental health care within the community.

116.   DCH tasks other Georgia agencies with specific implementation and

oversight responsibilities for the provision of medically necessary mental health

services to Medicaid-eligible children, including DBHDD and DFCS.

117.   DCH also contracts with managed care entities, known as Care Management Organizations ("CMOs"), and delegates certain responsibilities for the delivery of Medicaid reimbursable mental health services to these entities.

118.   Despite the delegation of these tasks to DBHDD, DFCS, and CMOs, DCH administers Georgia's Medicaid program, including the claims and reimbursement process, and retains the ultimate responsibility, under federal law, to implement Georgia's program in compliance with the Medicaid Act and its implementing regulations.

119.   DBHDD has "primary responsibility for planning, developing, and implementing the coordinated system of care for severely emotionally disturbed children." Georgia's General Assembly allocated primary responsibility for the coordinated system of care to DBHDD "[i]n recognition of the fact that services to these children are provided by several different agencies, each having a different. . . mandate, and a different source of funding." Ga. Code Ann. § 49-5-220(b).

120.   The General Assembly mandated creation of a coordinated system of care "so that children and adolescents with [S]evere [E]motional [D]isturbance and their families will receive appropriate educational, nonresidential and residential mental health services, and support services, as prescribed in an individualized plan." Ga. Code Ann. § 49-5-220(a)(6).

121.   Georgia's General Assembly "recognize[d] that to enable severely emotionally disturbed children to develop appropriate behaviors and demonstrate academic and vocational skills, it is necessary that . . . [DBHDD] provide mental health treatment."  Ga. Code Ann. § 49-5-220(b).

122.   DBHDD oversees the delivery of a set of "specialty" services described on the DBHDD website and listed in Georgia's Medicaid plan, including Intensive Customized Care Coordination, Intensive Family Intervention, and crisis services (collectively, "Specialty Services").  These Specialty Services are geared towards children with serious mental health conditions, including the Children with Serious Emotional Disturbance.  They are not, however, the Remedial Services.

123.   DBHDD creates policies and manuals for Community Behavioral Health Providers that set eligibility for, scope, and delivery of, these Specialty Services.

124.   DBHDD identifies and contracts with providers of Specialty Services to children.

125.   For children and youth in DFCS custody and care, DFCS is charged with ensuring access to timely, comprehensive medical and mental health screening and assessments and arranging services necessary to promote their well-being.

126.   DFCS case workers are expected to coordinate with other child-serving agencies, including DCH and DBHDD, to provide effective service referrals and continuity of care to children in the agency's custody.

127.   Though all children in DFCS custody are eligible for Medicaid, DFCS routinely fails to refer children with Serious Emotional Disturbance to the intensive home and community-based mental health services they need, including the Remedial Services.  Instead, DFCS often places children with Serious Emotional Disturbance in Psychiatric Institutions.

128.   DFCS also is responsible for ensuring appropriate service referrals and planning for institutionalized children whose treating physicians have recommended discharge to the community because the child no longer needs institutional care and those who are exiting institutional placements.  Instead, DFCS often decides to extend these segregated placements, and regularly uses non-Medicaid funds to maintain the institutionalization of Medicaid-eligible children.

129.   As of October 2022, DFCS had over 10,000 children in its care and custody, more than 2,200 of whom had mental health conditions.

130.   In 2022, 475 children and youth with disabilities were relinquished to DFCS custody by their parent or caretaker because of unmet mental health needs. Many, if not most, of these children have utilized emergency rooms or other Psychiatric Institutions because of the seriousness of their mental health conditions.

131.   By August of 2023, of the 2,236 children with disabilities in DFCS care, over 25% were housed in institutions.

132.   At any given time, hundreds of children in DFCS custody remain in overly restrictive Psychiatric Institutions because of the agency's failure to secure more integrated alternatives, such as the Remedial Services.

133.   The Georgia Assembly has recognized that several different agencies provide services to children with Serious Emotional Disturbance, based on different philosophies, mandates, and funding streams.  Yet "only a portion of the children needing services are receiving them."  Ga. Code Ann. § 49-5-220 (b).  For this reason, they called for the creation of a coordinated system of care to serve youth with Serious Emotional Disturbance, and to "[p]revent the unnecessary removal of children and adolescents with . . . [S]evere [E]motional [D]isturbance from their homes." Ga. Code Ann. § 49-5-220 (a)(3).

134.   Notwithstanding DCH's, DBHDD's, and DFCS's separate and collective responsibility for the administration of Georgia's children's mental health system, this system lacks the oversight, accountability, and interagency coordination necessary to ensure that the Children receive the mental health services they need, including the Remedial Services, in the most integrated setting.

**B.      Georgia Officials Have Repeatedly Acknowledged the Failure to Provide Intensive Home and Community-Based Services to the Children and the Systemic Consequences of Those Failures.**

135.   For decades, various State commissions and task forces convened to evaluate Georgia's service system for children with mental health conditions have confirmed its failures.  However, despite repeated systemic findings of unmet mental health needs among Georgia's children, acknowledgement of harm caused by unmet needs and recommendations for the development and expansion of intensive home and community-based mental health services, Defendants have failed to provide necessary Remedial Services to children with Serious Emotional Disturbance.

136.    Between 2001 and 2008, the Office of the Child Advocate's ("OCA")[9] Annual Report repeatedly found that services for children with mental health conditions were fragmented, underfunded, and difficult to access.  The OCA also concluded that the State failed to implement a system that identifies a child's needs through a comprehensive diagnostic assessment and provides timely referrals to necessary intensive home and community-based mental health services. *See, e.g.*, DeAlvah Hill Simms, *Annual Report 2002*, Ga. Off. Child Advoc., at 12 (2002); DeAlvah Hill Simms, *Annual Report 2003-2004*, Ga. Off. Child Advoc., at 12

---

[9] The Office of the Child Advocate, a state agency, oversees Georgia's Child Welfare System by providing case evaluation and assistance, policy and practice consulting, education and advocacy.

(2004); DeAlvah Hill Simms, *Annual Report 2004-2005*, Ga. Off. Child Advoc., at 17 (2005).

137.   In 2017, the Governor's Commission on Children's Mental Health, the Interagency Directors Team, and the Center of Excellence for Children's Behavioral Health[10] issued a report finding that "Georgia's community-based provider system is not prepared to address the behavioral health challenges that are present in the home, school, and community—a deficiency dating back decades for children and youth age 4-26 who need crisis respite, specialized foster care centered around care coordination, increased crisis stabilization capacity for individuals dually diagnosed with S[evere] E[motional] D[isturbance] and I[ntellectual]/D[evelopmental] D[isabilities], and other unique and individualized support and services[.]"[11]   The Commission urged Georgia to expand access to community-based mental health services and to better coordinate their delivery.

---

[10] Report commissioned pursuant to Ga. Code Ann. § 49-5-220.

[11] Frank Barry, *et al*., *Children's Behavioral Health Report, Gov.'s Comm'n on Child.'s Mental Health*, Off. Gov. Ga., (December 11, 2017); *see also* Michael Polacek, *et al*., *Georgia Behavioral Health Reform and Innovation Commission, First Year Report*, Ga. DCH, (Jan. 2021), https://opb.georgia.gov/ohsc/bhric. (last visited Dec 15, 2023); Grant Thomas, *et al*., *Georgia Behavioral Health Reform and Innovation Commission 2022 Annual Report*, Ga. DCH, (2022), https://www.house.ga.gov/Documents/CommitteeDocuments/2022/Behavioral_Health/Annual_Report_2022_BHRIC_FINAL_Exec_Summary.pdf. (last visited Dec 15, 2023).

138.   In 2018, Georgia's Interagency Directors Council recommended service delivery and coordination, specifically, by increasing utilization of Georgia's pilot intensive care coordination services (called High-Fidelity Wraparound) and addressing gaps in the crisis continuum. The Council's recommendation was not implemented.

139.   Current and former Georgia officials have spoken publicly about the harms experienced by children and youth with unmet mental health needs in Georgia's child welfare system.  In 2020, DFCS Director Tom Rawlings observed that "[t]o keep children with their families and out of state custody and deep-end behavioral health facilities, Georgia needs a better system for managing the needs of children and adolescents with significant symptoms from their behavioral health and developmental disability issues."  Director Rawlings specifically pointed to the need to expand access to Medicaid services.

140.   A 2021 report titled Mental Health Reform Action Plan, authored by Accenture, as a DBHDD contractor[12] observed that "[a]ccess to [mental health] care is a crippling issue across Georgia." This further noted that "the Departments of Juvenile Justice and Families and Children are 'points of last resort' when families

---

[12] Accenture is a Fortune 500 consulting firm that provides consulting services to public sector agencies to "transform service delivery and achiev[e] high-impact outcomes." *See* Accenture, "High impact public sector consulting," https://www.accenture.com/us-en/services/public-service/public-service-consulting.

simply surrender their children to the State because they cannot get them adequate care." Accenture, *Mental Health Reform Action Plan*, Ga. Gov.'s Off. of Health Strategy and Coordination (OHSC) 4, (Dec. 2, 2021), https://opb.georgia.gov/document/document/final-mental-health-reform-action-planpdf/download.

141.   In August 2022, Defendant Broce wrote the Commissioner for the Department of Community Health asserting that, "the State's most vulnerable children cannot access the physical, mental or behavioral health treatment they need—and deserve—in custody or through post-adoptive care. . . ." Defendant Broce explained that children do not receive case coordination, do not have access to providers, and otherwise are unable to access needed services in a timely manner.

142.   Defendant Broce's August 2022 letter also highlights the harm caused by the lack of discharge planning and access to services for children exiting institutional placements where care givers are "unequipped" to meet the needs of the children after crises.  She emphasizes that "[w]hen a family cannot access mental health and autism-specific care for their children through Georgia's safety net, parents often abandon their children to foster care. . ."  Candice L. Broce, Response to eRFI 41900-DCH0000127, Ga. DFCS, (Aug 12, 2022), https://www.documentcloud.org/documents/23728366-dhs-amerigroup-letter.  (last visited Dec 15. 2023).

38

143.   In testimony before the Georgia Legislature in 2023, Audrey Brannon, another DFCS representative, reported that over 500 youth in State care and custody were cycling in and out of Psychiatric Residential Treatment Facilities, Crisis Stabilization Units, Child Care Institutions, and hotels without access to appropriate community supports.  Hearing before the Ga. S. Comm. on Health & Human Serv. & Ga. S., Comm. on Child. & Fams., *Hoteling of Foster Children*, 155th Assembly, (January 25, 2023) (Statement of Audrey Brannon).

144.   Systemic deficiencies in the delivery of children's mental health services have also been repeatedly raised by family organizations and stakeholders. Georgia Voices, a prominent, well-respected organization reported that 45% of Georgia's children age 3-17 have trouble accessing the mental health treatment they need,[13] a 5% increase from 2019-2020.[14]

## C.   Defendants Fail to Provide Medically Necessary Remedial Services to the Children.

145.   Although Georgia's Medicaid State Plan includes three Specialty Services – Intensive Customized Care Coordination ("IC3"), Intensive Family

---

[13] *See Whole Child Primer, Third Edition*, Voices for Ga.'s Child., (2023), https://georgiavoices.org/2023-whole-child-primer/. (last visited Dec 13, 2023). This same report states that Georgia has the fifth highest childhood uninsured rate in the nation, and 56 % of children who die before the age of 18 are Black, despite making up only 1/3 of the state's child population.

[14] *See, e.g.*, *Behavioral Health Workforce Analysis*, Voices for Ga.'s Child. (Jan. 2020), https://georgiavoices.org/wp-content/uploads/2020/02/25.-BHWF-Analysis-2020.pdf?9d7bd4&9d7bd4. (last visited Dec. 13, 2023).

Intervention ("IFI"), and Mobile Crisis, these services are not the Remedial Services and, in any event, Defendants have failed to provide them to all of the Children who need them.  The IFI service covered in Georgia is not the functional equivalent of Intensive In-Home Services as defined by CMS and recommended for State programs implementing the EPSDT Mandate to effectively treat youth with complex mental health needs in the community.  Instead, IFI is a short-term, crisis-focused intervention that specifically excludes some children based upon diagnosis.  For these reasons, and as discussed in detail below, Georgia's Medicaid program is not meeting the treatment needs of the Children, resulting in the deterioration of their mental health conditions, and repeated out-of-home placement, including admission to institutional settings.

> ### 1. Georgia fails to provide the First Remedial Service – Intensive Care Coordination – to the Children who need it.

146.   For more than a decade, CMS and SAMHSA have advised States that Intensive Care Coordination is clinically indicated to correct or ameliorate Serious Emotional Disturbance in children.

147.   Intensive Care Coordination is a "team-based, collaborative process for developing and implementing individualized care plans for children and youth with complex needs and their families."   2013 Informational Bulletin, at 3. A care coordinator leads the process and is charged with coordinating a team that includes the child, family members, providers, and other key members of the child's support

network. Together, this team develops, implements, and monitors a child and family-centered individual care plan. Intensive Care Coordination includes all the following components: "assessment and service planning"; "accessing and arranging for services"; "coordinating multiple services"; ensuring "access to crisis services"; "advocating for the child and family"; and "monitoring progress." *Id.*

148. Intensive Care Coordination is necessary to effectively coordinate and oversee service delivery for children with Serious Emotional Disturbance who need or receive services from multiple providers or are involved with multiple child-serving systems.

149. Georgia is well-acquainted with the efficacy of Intensive Care Coordination. In 2006 it received a federal demonstration grant designed to reduce over-reliance on Psychiatric Residential Treatment Facilities and expand Medicaid home and community-based alternatives.[15] Georgia reported providing intensive care coordination (piloted under the name "High Fidelity Wraparound") services to

---

[15] *See* Kathleen Sebelius, *Report to the President and Congress Medicaid Home and Community-Based Alternatives to Psychiatric Residential Treatment Facilities Demonstration*, CMS, (July, 2013), https://www.medicaid.gov/sites/default/files/2019-12/prtf-demo-report.pdf; *see also* IMPAQ International, LLC, National Evaluation of the Medicaid Demonstration Waiver Home- and Community-Based Alternatives to Psychiatric Residential Treatment Facilities, CMS, (May 30, 2012, Amended Apr. 2, 2013), https://www.medicaid.gov/sites/default/files/2019-12/cba-evaluation-final.pdf.

over 500 youth during the demonstration[16] and achieving "a per capita savings close to $50,000, 38 percent of the comparable service costs associated with P[sychiatric] R[esidential] T[reatement] F[acilities]."[17]

150.   At that time, Georgia had two Care Management Entities ("CMEs") providing Georgia's intensive care coordination service—IC3—which together reportedly served approximately 4,240 youth.  Four years later, they only provided IC3 to approximately 400 children—less than one-tenth of that number.[18]

151.   IC3 is intended to benefit children and families who need Intensive Care Coordination to address their needs and to identify and coordinate other intensive services.

152.   Currently only a tiny fraction of Georgia's Medicaid-enrolled children with Serious Emotional Disturbance receive IC3, far below the number of children who need it.  Moreover, the number of children receiving IC3 has steadily declined in recent years.

153.   Despite the increasingly acute mental health needs seen in the Children during and after the COVID-19 pandemic, utilization of IC3 continues to decline.

---

[16] Final Evaluation Report at 25.

[17] *Id*. at 47.

[18] Frank Barry, *et al*., *Children's Behavioral Health Report*, Gov.'s Comm'n on Child.'s Mental Health, Off. Gov. Ga., at 8 (Dec. 11, 2017).

154.   As of November 2022, only 225 children and youth were enrolled in IC3.

155.   Although two additional IC3 providers were finally added to the State's service network in early 2023, the number of children served remains under 350.

156.   Most of the Children and their families face structural barriers to accessing IC3—including barriers that directly result from the State's failure to comprehensively assess and refer children in need of Intensive Care Coordination.

157.   IC3 services are overseen and contracted by DBHDD. Because many of the Children access Medicaid through Care Management Organizations under contract with DCH, CMOs must obtain single case agreements for their members to receive IC3 services resulting in yet another bureaucratic barrier to accessing services.

158.   While some CMOs purport to offer benefits coordination, these Case Coordination Teams are not equivalent to, or delivered consistent with, evidence-based Intensive Care Coordination.

159.   Overly restrictive diagnostic exclusions also prevent the Children with both Serious Emotional Disturbance and co-occurring disabilities from accessing IC3. DBHDD's provider manual explicitly excludes children who have mental health conditions and mild intellectual or developmental disabilities, including "autistic disorder," among others, unless there is "clearly documented evidence that

a psychiatric diagnosis is the foremost consideration for this psychiatric intervention." *Provider Manual for Community Behavioral Health Providers, Fiscal Year 2024, Quarter 3*, DBHDD, at 89 (Dec. 1, 2023).

160. In practice, these diagnostic exclusions prevent children with Serious Emotional Disturbance who need and would benefit from IC3 from accessing—or even being referred to—the service, simply because they also have a co-occurring condition.

## 2. Defendants systematically fail to provide the Second Remedial Service – Intensive In-Home Services – to the Children who need it.

161. Intensive In-Home Services are coverable under Medicaid as a rehabilitative service. *See* 42 U.S.C. § 1396d(a)(13); 42 C.F.R. § 440.130(d).

162. As set forth by CMS and SAMHSA, "[i]ntensive in-home services are therapeutic interventions delivered to children and families in their homes and other community settings to improve youth and family functioning and prevent out-of-home placements." 2013 Informational Bulletin, at 4. This service is "developed by a team that can offer a combination of therapy from a licensed clinician and skills training and support from a paraprofessional." *Id.* The service should include both "individual and family therapy," as well as "behavioral interventions" and "skills training." *Id.*

163.   Although Defendants offer a service called "Intensive Family Intervention" ("IFI"), IFI does not provide the medically necessary treatment required to correct or ameliorate a youth's Serious Emotional Disturbance. Accordingly, IFI is not the functional equivalent of Intensive In-Home Services.

164.   Instead, IFI, is designed to be time-limited for all children, regardless of their ongoing need for intensive In-Home Services. *See, e.g.*, *Intensive Family Intervention, Georgia Region*, New Pathways Youth & Adult Serv.'s, http://www.npysinc.com/georgia-region.html (last visited Dec 13, 2023) ("IFI teams work intensively with your family for a limited time period").

165.   IFI is solely focused on "[defusing] the current behavioral health crisis[.]"

166.   By providing IFI only when children are at "immediate risk of out-of-home placement," Defendants fail to make Intensive In-Home Services available to the Children when needed to prevent the worsening of their mental health conditions. This limitation also increases the likelihood that services are delivered too late to prevent the behavioral health crises that can lead to out of home placement, including unnecessary institutionalization.

167.   Overly restrictive clinical exclusions prevent many of the Children with Serious Emotional Disturbance and co-occurring conditions, who would benefit from IFI for treatment of their mental health condition, from accessing IFI due to

their co-occurring condition.  Similar to the restrictive eligibility criterion for IC3, (*see* ¶ 159 *supra*) youth with Autism Spectrum Disorders including Asperger's Disorder, Intellectual/Developmental Disabilities, Neurocognitive Disorder; or Traumatic Brain Injury are denied access to IFI, "unless there is clearly documented evidence of an acute psychiatric/substance use disorder episode overlaying the diagnosis." *Provider Manual for Community Behavioral Health Providers, Fiscal Year 2024, Quarter 3*, DBHDD, at 89 (Dec. 1, 2023).

168.   In practice, these diagnostic exclusions prevent the Children with mental health conditions and co-occurring disorders from being referred to, or considered for, IFI.

169.   Ultimately, even this limited IFI service is not readily available to the Children who are at serious risk of, or regularly experiencing, out-of-home placements.  In 2021, IFI was provided to only 700 children Statewide, while over 8,000 youth experienced admissions to Psychiatric Institutions.

>      **3.    Georgia does not offer the third Remedial Service—Mobile Crisis Response Services—timely and effectively to the Children who need it.**

170.   Defendants fail to provide Mobile Crisis Response when needed to de-escalate and resolve the mental health crises the Children experience at home and in

the community, and which lead to restrictive out of home placements, including institutionalization, when unaddressed.

171.   CMS and SAMHSA have explained that "Mobile Crisis Response [services] are instrumental in defusing and de-escalating difficult mental health situations and preventing unnecessary out-of-home placements." 2013 Informational Bulletin, at 5.

172.   Mobile Crisis Response services are covered under Medicaid as rehabilitative services.  *See* 42 U.S.C. § 1396d(a)(12); 42 C.F.R. § 440.130(d) (rehabilitative services include any medical or remedial service recommended by a physician or other licensed practitioner of the healing arts for maximum reduction of physical or mental disability and restoration of beneficiary to best possible functional level).

173.   Mobile Crisis Response should be "available 24/7" and "provided in the home or any setting where a crisis may be occurring," including the child's school or in the community.  2013 Informational Bulletin, at 5.  "In addition to assisting the child and family to resolve the immediate crisis, the team works with them to identify potential triggers of future crises and learn strategies for effectively dealing with potential future crises that may arise," and connect them with needed services.  *Id*.  "[M]obile crisis services are effective at diverting people in crisis from psychiatric hospitalization…"  *Id*.

174.   SAMHSA has continued to define successful Mobile Crisis Response systems as ones that: "helps individuals experiencing a crisis event experience relief quickly and resolve the crisis situation when possible; meets individuals in an environment where they are comfortable; and provides appropriate care/support while avoiding unnecessary law enforcement involvement, ED use and hospitalization."  CMS letter to State officials #21-008 re: Medicaid Guidance on the Scope of and Payments for Qualifying Community-based Mobile Crisis Intervention Services, December 2021; https://www.medicaid.gov/sites/default/files/2021-12/sho21008.pdf.

175.   Yet Mobile Crisis Response in Georgia is not delivered consistent with these essential service elements.  Nor is it available in a timely way to the Children who need it.

176.   In testimony presented to the Joint Committee on Health and Human Services in 2023, Dr. Michelle Zeannah of Behavioral Pediatricians of Rural Georgia, stated:

> [C]risis intervention services are rarely available.  All of our state has access to the Georgia crisis and access line … families report that often no one actually comes to do an evaluation … or they come more than six hours later and their child's already asleep … often families are told that they should call law enforcement, but law enforcement doesn't have any training on how to manage those situations.

Hearing before the Ga. S. Comm. on Health & Human Serv. & Ga. S., Comm. on Child. & Fams., *Hoteling of Foster Children*, 155th Assembly, (January 25, 2023) (Statement of Michelle Zeannah).

177.   Georgia operates an emergency crisis intervention and referral service for youth and adults.  The Georgia Crisis and Access Line ("GCAL") is supposed to serve as the single gateway to behavioral health services and providers, including Crisis Stabilization Units.

178.   GCAL is also charged with providing telephonic crisis intervention services, dispatching mobile crisis teams, and linking individuals with urgent appointment services 24 hours a day, 7 days a week, 365 days a year.

179.   Families of Medicaid-enrolled children with Serious Emotional Disturbance consistently report that when calling GCAL, the service is not available in a timely way and that families often wait hours for a mobile crisis response, directly contravening the purpose of the service and the State's own standards for timely access which require that "[t]he Mobile Crisis team is to: Respond and arrive on site with 59 minutes of the dispatch by GCAL." *Provider Manual for Community Behavioral Health Providers, Fiscal Year 2024, Quarter 3*, DBHDD, (December 1, 2023).

180.   Georgia's GCAL disposition data for calls received between July 1, 2019 and January 15, 2023 reveals that only 18.79% of calls involving a child or

youth under 21 resulted in the dispatch of a mobile crisis team to the child or youth's location.

181.   Georgia's failure to provide timely, community-based Mobile Crisis Response, as defined by both CMS and SAMHSA, leads to increased emergency room visits for mental health reasons, and avoidable out-of-home placements.

**D.   Defendants' Failure to Provide the Remedial Services to the Children Leads to a Predictable Pattern of Repeated Out-of-Home Placement, Including Avoidable Institutionalization.**

182.   Defendants' failure to provide timely, statewide access to the Remedial Services has cascading negative consequences for the Children with Serious Emotional Disturbance and their families, including increasing acuity of mental health symptoms, more frequent and intense mental health crises, and an overall functional decline in their day-to-day lives negatively impacting family and social connections as well as academic performance and community engagement.

183.   As demonstrated by the experiences of the Individual Plaintiffs and constituents of GAO, Defendants' consistent and ongoing failure to provide these services to the Children makes it extremely likely that they will experience deterioration in their mental health conditions and repeated, prolonged, and unnecessary institutionalization, avoidable out-of-home placement and harm.

184.   In 2020, Children's Healthcare of Atlanta, reported that mental health visits to their three hospitals had increased by 116% since 2015 with more than half of those visits resulting in admission to a Psychiatric Residential Treatment Facility.

185.   Psychiatric Institutions for children and youth are consistently at capacity, indicative of Defendants' overreliance on these and other restrictive settings, and a corresponding failure to provide the Remedial Services needed to correct or ameliorate the Children's mental health conditions in integrated settings.

186.   Institutionalized children can also experience a worsening of the symptoms and behaviors for which they were originally admitted, and if that segregation persists, a loss of skills associated with living in the community.

187.   Defendants' failure to ensure that institutions engage in timely and effective discharge planning exacerbates this problem, resulting in prolonged unnecessary institutionalization and associated harm.

188.   Providing timely, statewide access to the Medicaid-funded Remedial Services is a reasonable and readily achievable modification to Georgia's mental health system.  Providing these services to Medicaid-eligible children for whom they are medically necessary is required by the Medicaid Act's EPSDT Mandate.

189.   Governor Kemp has repeatedly acknowledged the efficacy of home and community-based mental health services, and their ability to support children with complex needs in the community.  In an August 2019 proclamation for Children's

Freedom Initiative Month, the Governor observed that these services were a cost-effective alternative to institutionalization.

190.   In 2022 and 2023, Governor Kemp entered proclamations noting that, "A disproportionate number [of] children and adolescents with mental disorders do not receive mental health treatment which increases the risk of out of home placement … and/or other negative outcomes."

191.   These same proclamations acknowledged that, "[w]ith early intervention and access to appropriate resiliency-building services, support and treatment, children and youth of all ages and races can go on to live productive and satisfying lives…"

192.    Defendants have maintained their focus on the funding of institutional settings and shifted much of the responsibility for youth with unmet mental health needs onto the child welfare system.

### E.   Defendants' Methods of Administering Mental Health Services Subject the Children to Disability Discrimination.

193.   In their administration of Georgia's mental health service system, Defendants have failed to implement policies, procedures, and practices to (a) ensure that the Children can obtain necessary intensive home and community-based

services; (b) avoid excluding the Children from services arbitrarily; and (c) reasonably and effectively accommodate their needs in integrated settings.

194.   Defendants administer existing home and community-based services in a manner that artificially limits service access through diagnostic criteria and exclusions and favors the provision of short-term, crisis-focused interventions rather than arranging for necessary Remedial Services.

195.   Defendants' service criteria and administrative methods prevent Children with co-occurring conditions from obtaining these services when and where they need them, and results in a "fail first" policy that predictably leads to the worsening of their mental health conditions, and unnecessary institutionalization or other out-of-home placement.

196.   As set forth in detail above, Defendants' discriminatory administrative methods include:

(a)   failing to provide the Children and their families effective notice and information about their rights to receive medically necessary intensive home and community-based services and information about how to access them;

(b)   failing to evaluate the Children's chronic mental health needs and develop service plans to meet those needs in the most integrated setting, including their need for the Remedial Services;

(c)     failing to initiate timely referrals to the Remedial Services;

(d)     failing to monitor whether the Children receive the medically necessary mental health services recommended for them, including by failing to systematically monitor the performance of the care management organizations and to enforce contractual obligations for the delivery of mental health services to Medicaid-eligible children;

(f)     failing to ensure the adequacy of statewide provider networks, and to track the extent to which geographic disparities in provider access are resulting in unmet demand for intensive home and community-based services among the Children;

(g)     adopting overly restrictive eligibility criteria which deprive the Children with mental health conditions and co-occurring disorders of medically necessary mental health services; and

(h)     adopting arbitrary limits regarding the amount, duration and scope in the provision of medically necessary mental health services to the Children.

## VI.   CLASS ACTION ALLEGATIONS

197.   Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the Individual Plaintiffs bring this class action on behalf of themselves and the following class of children:

> all Medicaid-eligible children under the age of 21 residing in the State of Georgia with Serious Emotional Disturbance for whom the Remedial Services have not been provided and who (a) during the 12 month period before the filing of the Complaint or thereafter were admitted to a Psychiatric Institution, as defined in Paragraph 8, to obtain mental health care; or (b) visited a hospital emergency room seeking mental health care at least twice during the 12 month period before the filing of the Complaint, or within any span of 12 months thereafter.

198.   Defendants' administrative policies and practices, as well as the manner in which they operate and oversee the Medicaid-funded mental health system in Georgia, harms the Children by depriving them of timely assessments as required by law and failing to provide and arrange for meaningful access to the Remedial Services required to correct or ameliorate their mental health conditions and to avoid their unnecessary segregation and institutionalization.

199.   The class is numerous and geographically diverse, such that joinder of all members is impracticable.

200.   Due to severe deficiencies in Defendants' data collection and public reporting, precise figures for the number of Medicaid-eligible children and youth with Serious Emotional Disturbance under age 21 who have been institutionalized in Psychiatric Institutions or visited hospital emergency rooms twice within twelve months are not presently available to Plaintiffs.  Georgia's data indicates that there

were approximately 85,000 children and youth with Serious Emotional Disturbance age 18 or under enrolled in Medicaid in 2022.[19]   The class includes the subset of those 85,000 children and youth who were admitted to Psychiatric Institutions or who twice visited hospital emergency rooms to obtain behavioral health care within twelve months, which could be as few as one-half of the 85,000.   The class also includes Medicaid-eligible youth with Serious Emotional Disturbance aged 18 to 21 who were similarly admitted to Psychiatric Institutions or twice visited emergency rooms for behavioral health care within twelve months.   Based on the data cited herein regarding the number of youth institutionalized in Psychiatric Institutions annually, the cohort aged 18 to 21 could number in the thousands.

---

[19]   In 2021, Georgia reported an 8% prevalence rate of Serious Emotional Disturbance for children aged 9 to 17 to SAMHSA.   *See* GA Community Health Services Block Grant Application to SAMHSA (2021) (reporting 8% prevalence rate for serious emotional disturbance); *see also* URS Table 1: Number of Adults with Serious Mental Illness (SMI), age 18 and older, by State, 2021, SAMHSA, https://www.samhsa.gov/data/sites/default/files/reports/rpt39369/adult_smi_child_ sed_prev_2021_508.pdf. (last visited Dec. 15, 2023).   The 85,000 figure above represents roughly 8% of the total number of children aged 0 to 18 enrolled in Georgia Medicaid in 2022, which was 1,069,900.   *See* Kaiser Family Foundation, Health   Insurance   Coverage   of   Children   0-18,   KFF.org https://www.kff.org/other/state-indicator/children-0- 18/?dataView=1&currentTimeframe=0&selectedDistributions=medicaid&sortMod el=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D   (last visited Dec. 15, 2023) (reporting 1,069,900 children aged 0 to 18 covered by Medicaid in 2022).

201.  Members of the class would face difficulty pursuing their own individual legal claims because of limited financial resources and the demands associated with their care.  Even if such individual claims could be brought, they would be unable to remedy underlying systematic violations of federal law without the benefit of class treatment.

202.  Defendants' systemic failures, which arise from the implementation of their own internal policies and procedures, give rise to a number of common factual questions including, but not limited to:

      i.      Whether Defendant Carlson systemically fails to provide class members and their families with statutorily required notice that they are entitled to EPSDT services and information on how to access those services;

      ii.      Whether Defendant Carlson systemically fails to assess class members' need for the Remedial Services;

      iii.      Whether Defendant Carlson fails to provide or arrange reasonably prompt delivery of the Remedial Services on a Statewide basis;

      iv.      Whether Defendant Carlson systemically fails to provide the Remedial Services with the frequency, intensity, and duration that class members need to correct or ameliorate their mental health conditions;

      v.      Whether Defendants Carlson, Tanner, and Broce have failed to implement administrative policies and procedures necessary to ensure class

members receive mental health services in integrated settings and avoid their unnecessary or prolonged institutionalization;

     vi.    Whether the Defendants' administrative policies, procedures, and practices, or absence thereof, systemically deprive class members of the Remedial Services they need to correct of ameliorate their mental health conditions;

     vii.    Whether the Defendants' failure to ensure adequate discharge and treatment planning contributes to class members' prolonged and repeated institutionalization;

     viii.    Whether Defendant Carlson fails to provide the Remedial Services on a Statewide basis to all class members who need them;

     ix.    Whether Defendants' procedures for monitoring and oversight of the children's mental health system fail to ensure that class members receive medically necessary care and treatment.

203.   Class members' allegations also raise many common questions of law that make the requested injunctive relief applicable to the class as a whole, including, but not limited to:

     i.    Whether Defendant Carlson systemically fails (x) to diagnose and assess class members, and (y) to refer class members to the Remedial Services, in violation of 42 U.S.C. §1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r)(1);

ii.     Whether Defendant Carlson systematically fails to provide the Remedial Services that class members need to correct or ameliorate their mental health conditions, in violation of 42 U.S.C. §1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r)(5).

iii.     Whether the Defendant Carlson fails to provide the Remedial Services to class members with reasonable promptness, in violation of 42 U.S.C. §1396a(a)(8) and 42 C.F.R. §435.930(a).

iv.     Whether the Defendants administer Georgia's mental health system in a way that subjects class members to disability discrimination, in violation of 42 U.S.C. § 12132, 29 U.S.C. § 794(a), and 28 C.F.R §§ 35.130(b), (d), 41.51(b)(3), (d).

v.     Whether Defendants are violating the ADA and the Rehabilitation Act by failing to serve class members in the least restrictive, most integrated setting appropriate for their needs.  42 U.S.C. § 12131; 29 U.S.C. § 794(a); 28 C.F.R. §§ 35.130(d), 41.51(d).

vi.     Whether Georgia's existing Intensive Family Intervention service is the functional equivalent of Intensive In-Home Services as defined by CMS/SAMHSA for purposes of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r)(5).

204.   The claims of the Individual Plaintiffs are typical of the claims of the proposed class.  The Individual Plaintiffs possess the same interests as the members of the class, suffer the same injury, and raise legal claims arising out of the same course of governmental conduct.

205.   The Individual Plaintiffs will fully and vigorously prosecute this action, and they can adequately and fairly represent the interests of the class. They seek injunctive relief that will inure to the benefit of the class as a whole.

206.   The Individual Plaintiffs are represented by attorneys experienced in federal class action litigation and disability law, including the federal Medicaid program.

207.   Class certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act in ways that are applicable to the class as a whole.

208.   The alleged systemic deficiencies are reflected in the administrative, operational, and funding decisions described within the Complaint, embody a common course of conduct towards the class, and result in a common injury to class members.  That injury can be remedied through a single injunctive order requiring the Defendants to: 1) provide and arrange for the Children's timely access to the Remedial Services; 2) deliver the Remedial Services with the intensity and duration required to avoid unnecessary or prolonged institutionalization; 3) ensure that the

Children have access to an adequate statewide network of Remedial Service providers; and 4) deliver the Remedial Services in the most integrated setting as required by law.

## VII.  CLAIMS FOR RELIEF

### COUNT I
### Violations of the EPSDT Mandate of the Medicaid Act
### <u>Against Defendant Carlson</u>

209.  Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

210.  Defendant Carlson, while acting under color of state law, has failed to provide or otherwise arrange for the Remedial Services for the Children, who need such services to treat or ameliorate their mental health conditions, in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(1)(A).

211.  Defendant Carlson, while acting under the color of state law, has failed to set standards for the timely provision of EPSDT services which meet reasonable standards of medical practice and to employ processes to ensure timely initiation of treatment, as required by 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(1)(A).

212.  Defendant Carlson's failure to provide statutorily mandated, comprehensive assessments violates 42 U.S.C. § 1983 by depriving the Children of their statutory rights under the Medicaid Act to receive necessary services.

213.   The Children are entitled to declaratory and injunctive relief to remedy Defendant Carlson's violations of the Medicaid Act.

**COUNT II**
**Violations of the Reasonable Promptness Provisions of the Medicaid Act**
**Against Defendant Carlson**

214.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

215.   Under the Medicaid Act, Defendant Carlson must ensure that medical assistance is "furnished with reasonable promptness to all eligible individuals" 42 U.S.C. § 1396a(a)(8).

216.   Defendant Carlson, while acting under the color of state law, has engaged in the continuous and ongoing failure to ensure the provision of medically necessary Remedial Services to the Children with "reasonable promptness" in violation of 42 U.S.C. § 1396a(a)(8).

217.   The Children are entitled to declaratory and injunctive relief to remedy Defendant Carlson's violations of the Medicaid Act.

## COUNT III
## Violations of the Americans with Disabilities Act
## Against Defendants Carlson, Tanner and Broce

218.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

219.   The Individual Plaintiffs are "qualified individuals with a disability" who are protected under Title II of the ADA.  42 U.S.C. §§ 12102, 12131(2).

220.   Defendants, sued in their official capacity, are "public entities" within the meaning of Title II of the ADA.

221.   Defendants have utilized criteria and methods of administration that subject the Children to discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(3).

222.   The Defendants' administrative policies, practices, and procedures have the effects of: (1) impermissibly segregating the Children in institutions, hospitals and other segregated settings; (2) placing them at a serious risk of segregation; or (3) impermissibly excluding them from medically necessary services based on the existence of co-occurring disabilities.  28 C.F.R. § 35.130(b)(3), (d).

223.   Defendants' actions and inactions, and their failures to make reasonable modifications to the mental health service system necessary to provide and arrange for timely access to the Remedial Services, subject the Children to unnecessary and

prolonged institutionalization and constitute unlawful discrimination under the ADA.

224.   The Children are entitled to declaratory and injunctive relief to remedy Defendants' violations of Title II of the ADA.

225.   The relief sought by the Children would not require a fundamental alteration of Defendants' programs, services, or activities.  Defendants are already required by federal law to provide the Remedial Services to the Children, and compliance with the ADA would not impose unreasonable costs on Defendants' service systems.

**COUNT IV**
**Violations of Section 504 of the Rehabilitation Act of 1973**
**Against Defendants Carlson, Tanner, and Broce**

226.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

227.   The Defendants, sued in their official capacity, are recipients of federal funds under the Rehabilitation Act.

228.   The Children are qualified individuals with a disability under Section 504 of the Rehabilitation Act.  29 U.S.C. § 705(20)(8).

229.   Defendants' actions constitute unlawful discrimination under 29 U.S.C. § 794(a) and violate the integration mandate of the regulations implementing this statutory prohibition.  28 C.F.R. § 41.51(d).

230.   Defendants have utilized criteria and methods of administration that subject the Children to discrimination on the basis of disability. 28 C.F.R § 41.51(b)(3).

231.   The Children require the Remedial Services to avoid unnecessary segregation. Defendants' failure to arrange for corrective treatment in integrated settings violates the Rehabilitation Act and its implementing regulations.

232.   The Children are entitled to declaratory and injunctive relief to remedy Defendants' violations of the Rehabilitation Act.

233.   The relief sought by the Children would not require a fundamental alteration of Defendants' programs, services, or activities.  Defendants are already required by federal law to provide the Remedial Services to the Children, and compliance with the Rehabilitation Act would not impose unreasonable costs on Defendants' service systems.

## VIII.  PRAYER FOR RELIEF

234.   WHEREFORE, Plaintiffs request that the Court order the following relief and remedies on behalf of themselves and others similarly situated:

235.   Certify the class of Children defined in Paragraph 197 above.

236.   Issue a Declaratory Judgment finding that Defendant Carlson has violated Medicaid Act by failing to provide the Remedial Services to the Children;

237.   Issue a Declaratory Judgment finding that Defendants Carlson, Tanner, and Broce have violated the Americans with Disabilities Act and the Rehabilitation Act with respect to their failure to provide the Remedial Services to the Children in integrated settings.

238.   Issue Permanent Injunctive relief enjoining Defendants Carlson, Tanner, and Broce from subjecting the Children to practices that violate their rights under the Medicaid Act, the ADA, and the Rehabilitation Act;

239.   Issue Permanent Injunctive relief requiring Defendants to:

a.   Provide and arrange for the Children's timely access to medically necessary Remedial Services;

b.   Conduct professionally-adequate assessments of the Children who reside in or have experienced repeated admissions to Psychiatric Institutions to determine whether the Remedial Services are necessary to treat or ameliorate their conditions in the community;

c.   Provide meaningful notice and information to the Children and their families of the availability of the full range of Medicaid-funded mental health services available under Georgia's program implementing the EPSDT Mandate, including the Remedial Services;

d.   Establish and implement policies, procedures, and practices that are sufficient to ensure that the Children promptly receive the Remedial Services;

e.      Remove administrative barriers which prevent the Children from receiving the Remedial Services with the frequency, intensity and duration required to meet their needs;

f.      Establish and implement administrative policies, procedures and practices required to avoid subjecting the Children to unnecessary segregation or the serious risk of segregation;

g.      Establish and implement administrative policies, procedures, and practices required to ensure that the Children receive comprehensive discharge planning and connection to the Remedial Services upon discharge from a Psychiatric Institution;

h.      Ensure sufficient provider network capacity to deliver the Remedial Services to the Children on a statewide basis;

i.      Provide sufficient information on a quarterly basis to allow the Plaintiffs and the Court to monitor compliance with the Court's injunction and with the requirements of federal law.

240.   Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 42 U.S.C. § 1988.

241.   Any other relief as the Court deems just and appropriate.

Dated:  January 3, 2024                    Respectfully submitted,

*/s/ Devon Orland*                         */s/ D. Clay Holloway*
Devon Orland                               D. Clay Holloway
Georgia Bar No. 554301                     Georgia Bar No. 363296
**Georgia Advocacy Office**                James F. Bogan III
One West Court Square, Suite 625           Georgia Bar No. 065220
Decatur, GA 30030                          Tamara S. Caldas
Tel: (404) 885-1234                        Georgia Bar No. 617053
dorland@thegao.org                         Alfred S. Lurey
                                           Georgia Bar No. 461500
                                           Kathryn C. Ederle
                                           Georgia Bar No. 940539
*/s/ Michele Floyd*                        **Kilpatrick Townsend & Stockton LLP**
Michele Floyd*                             Suite 2800
Samuel Z. Hyams*                           1100 Peachtree Street
**Kilpatrick Townsend & Stockton LLP**     Atlanta, Georgia 30309
Two Embarcadero Center, Suite 1900         Tel: (404) 815-6500
San Francisco, CA USA 94111                Fax: (404) 815-6555
Tel: (415) 576-0200                        cholloway@kilpatricktownsend.com
Fax: (415) 576-0300                        jbogan@ktslaw.com
mfloyd@ktslaw.com                          tcaldas@ktslaw.com
shyams@ktslaw.com                          alurey@ktslaw.com
                                           kederle@ktslaw.com

/s/ *M. Geron Gadd**
M. Geron Gadd*
**National Health Law Program**
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
Tel:  984) 278-7660
Fax: (919) 968-8855
gadd@healthlaw.org

Kimberly Lewis*
**National Health Law Program**
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
Tel: (310) 204-6010
Fax: (213) 368-0774
lewis@healthlaw.org

/s/ *Cathy E. Costanzo*
Cathy E. Costanzo*
Kathryn L. Rucker*
Mona Igram*
**Center for Public Representation**
5 Ferry Street, Suite 314
Easthampton, MA 01027
Tel: (413) 586-6024
Fax: (413) 586-5711
ccostano@cpr-ma.org
krucker@cpr-ma.org
migram@cpr-ma.org

* *Pro Hac Vice applications forthcoming*

/s/ *Catherine G. Lucas*
Catherine G. Lucas
Georgia Bar No. 567369
Zeke Van Keuren
Georgia Bar No. 332582
**Duane Morris LLP**
1075 Peachtree Street, NE, Suite 1700
Atlanta, GA 30309
Tel: (404) 253-6912
Fax: (404) 253-6901
klucas@duanemorris.com
zvankeuren@duanemorris.com

*Counsel for Plaintiffs*
*Isaac A., Zack B., Leon C., Samuel D.,*
*and the Georgia Advocacy Office*