**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

ISAAC A., et al.,

  Plaintiffs,

  v.

RUSSEL CARLSON, et al.,

  Defendants.

Civil Action No. 1:24-cv-00037-AT

**DEFENDANTS' REPLY IN SUPPORT OF**
**THE MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Contents ............................................................................................. i

Introduction ..................................................................................................... 1

Argument ......................................................................................................... 1

I.     Plaintiffs fail to rebut the shotgun-pleading argument. ............................ 1

II.    Sovereign immunity bars Plaintiffs' Medicaid Act and ADA claims. ...... 2

    A.    The State is immune from Plaintiffs' Medicaid claims. .................. 2

    B.    The state is immune from Plaintiffs' ADA claims. ......................... 2

    C.    Plaintiffs confirm that their request for affirmative relief
operates against the state. ........................................................... 3

III.   Plaintiffs lack standing. .......................................................................... 7

    A.    The individual Plaintiffs lack standing. ........................................ 7

    B.    The proposed class lacks standing. ............................................. 13

    C.    GAO lacks associational standing. ............................................. 13

IV.   Plaintiffs' requested relief will violate the anticommandeering
principle. ............................................................................................... 16

V.    Plaintiffs fail to state Medicaid Act claims. .......................................... 16

    A.    Plaintiffs fail to show a private right of action ............................ 16

    B.    Even if there were private causes of action to enforce the
Medicaid Act, Plaintiffs failed to allege their elements. ............. 21

VI.   Plaintiffs fail to state ADA and Rehabilitation Act claims. .................... 28

    A.    Plaintiffs abandoned the Rehabilitation Act claims by failing
to address the sole-causation requirement. ................................. 28

    B.    Plaintiffs' ADA and Rehabilitation Act claims fail because
they seek new benefits. ............................................................... 28

    C.    Plaintiffs fail to state an *Olmstead* claim. .................................. 30

    D.    Plaintiffs fail to state an at-risk claim. ........................................ 34

    E.    Plaintiffs fail to state any other discrimination claims. ............... 36

    F.    Plaintiffs seek to fundamentally alter Georgia's mental-health
program. .................................................................................... 38

Conclusion ..................................................................................................... 38

## INTRODUCTION

At heart, Plaintiffs seek to enlist this Court to massively revamp the services Georgia provides to tens of thousands of Medicaid-eligible children. To do so, they ignore the substantial authority the state has in providing Medicaid services, as well as numerous jurisdictional and pleading failures in their complaint. To be clear, the state currently operates programs in which customized care, in-home services, and mobile crisis services are made available to qualified children when a provider prescribes them as medically necessary and appropriate. Plaintiffs may desire that these programs be overhauled and expanded, but Medicaid does not give them that right, the ADA and Rehabilitation Act do not require it, and Plaintiffs' opposition brief cannot overcome the deficiencies in their allegations and the law governing their claims. The complaint should be dismissed.

## ARGUMENT

### I.   Plaintiffs fail to rebut the shotgun-pleading argument.

This Court has explained that "'factual and legal claims to which there is no response should be treated as unopposed'" and "failure to respond … constitute[s] abandonment." *Coyote Portable Storage, LLC v. PODS Enters., Inc.*, 2012 WL 12948862, at *34 (N.D. Ga.) (Totenberg, J.). Defendants presented four reasons why the complaint should be dismissed as a shotgun pleading. Mot. 8-10. Plaintiffs' one-paragraph response fails to address these arguments and fails to explain why their pleading error should be excused. *See* Opp. 49-50. And the United States doesn't even try to argue against the shotgun-pleading violations. *See* U.S.-Br. 3-4

n.2. Although Plaintiffs attempt to re-plead their allegations in their opposition, "a complaint may not be amended by briefs in opposition to a motion to dismiss." *McKally v. Perez*, 87 F. Supp. 3d 1310, 1317 (S.D. Fla. 2015). The complaint itself—which is all that matters—is confusing and vague. Mot. 8-10. The Eleventh Circuit "'flatly'" prohibits such shotgun pleadings. *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021).

## II.  Sovereign immunity bars Plaintiffs' Medicaid Act and ADA claims.

### A.  The State is immune from Plaintiffs' Medicaid claims.

Plaintiffs don't argue that Georgia waived its sovereign immunity for their Medicaid claims. Opp. 15-19. They also concede that Congress didn't expressly abrogate Georgia's immunity in the Medicaid Act. Opp. 15-19. Plaintiffs' claims are thus barred if they operate against Georgia. Mot. 11.

### B.  The state is immune from Plaintiffs' ADA claims.

*United States v. Georgia*'s three-factor "claim-by-claim" approach shows that sovereign immunity bars Plaintiffs' ADA claims. 546 U.S. 151, 159 (2006). First, Plaintiffs failed to allege a Title II violation. Mot. 12-13, 43-50; *infra* 28-38. Second, Plaintiffs' claims aren't based on Fourteenth Amendment violations. *See* Opp. 15 n.6. Finally, Plaintiffs don't argue that this case involves a fundamental right, suspect class, or the right to education or to participation in the democratic process. *See* Mot. 12-13. Title II therefore doesn't validly abrogate Georgia's sovereign immunity.

**C.    Plaintiffs confirm that their request for affirmative relief operates against the state.**

Although *Ex Parte Young* sometimes permits actions for injunctive relief only against state officials charged with enforcing a challenged law or policy, it cannot help Plaintiffs here. Defendants lack the relevant enforcement authority. And Plaintiffs' suit in reality operates against Georgia. Plaintiffs' response fails to rebut Defendants' immunity arguments, and the United States says nothing to help them. *See* U.S.-Br. 3-4 n.2.

**1.** Plaintiffs cannot point to officials with the relevant enforcement authority. Although Plaintiffs cite (at 17) *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1998), that decision says only that the "proper defendant" must have "sufficient enforcement power to remedy the plaintiff's alleged harm," *City of South Miami v. Governor of Fla.*, 65 F.4th 631, 644 (11th Cir. 2023) (distinguishing *Luckey*). Plaintiffs still must "direct this Court to any enforcement authority" "that a federal court might enjoin." *WWH v. Jackson*, 595 U.S. 30, 45 (2021). They can't do so here.

Start with DHS Commissioner Broce. Plaintiffs say that her relevant enforcement authority is laid out in O.C.G.A. §49-5-8(a)(9). Opp. 17-18. But that provision only says that, "within the limits of funds appropriated therefore," DHS will provide "all medical, hospital, psychiatric, surgical, or dental services … as may be considered appropriate and necessary by competent medical authority to those children subject to the supervision and control of [DHS]." *Id.* Again, C and D are

not under DFCS / DHS custody, ¶¶53, 63, so Commissioner Broce is not a proper defendant for C's and D's claims. Mot. 16. And nothing in the cited statute suggests that she has the broad authority to order the inclusion of heretofore unprovided Remedial Services in Georgia's Medicaid plan, change the eligibility requirements for existing services (IC3 and IFI) that DHS does not oversee, ensure that children receive services no treating professional has found medically necessary, or unilaterally relocate children under DHS's care into outpatient care without input from "competent medical authority." Commissioner Broce isn't a proper defendant for Counts III and IV. *See* Mot. 16.

Next, Plaintiffs argue that DBHDD Commissioner Tanner's relevant enforcement authority is laid out in "O.C.G.A. §37-1-20(a)(11)"—which appears to be a typo and a reference to legislative intent in §37-1-2(a)(11). Opp. 17. But §37-1-2(a)(11) is simply a statement of DBHDD's purpose—to use the funds "appropriate[ly]" to provide quality services. *Id.* Nothing there gives Commissioner Tanner any authority to create new services in the Georgia's Medicaid plan, order the relocation of A, B, and C out of inpatient care, or dictate what services treating professionals find medically necessary for children. *See* Mot. 15-16. As Defendants explained, DBHDD only provides oversight and funding of certain services for children enrolled in the aged, blind, and disabled Medicaid program. *See* Mot. 15-16. Plaintiffs don't even allege that they are enrolled in Medicaid programs overseen by DBHDD. *See* Mot. 15-16. And nothing about DBHDD's collaboration with

providers in Georgia through the Georgia Collaborative Administrative Service Organization establishes that DHBDD wields the power over Georgia's Medicaid program or Plaintiffs' treating professionals. Commissioner Tanner is not a proper defendant for Counts III and IV. *See* Mot. 15-16.

Finally, Plaintiffs say that various provisions show DCH Commissioner Carlson's enforcement authority. Opp. 17. Not so. Start with O.C.G.A. "§49-4-14." Opp. 17. This provision pertains to handling records held by *DHS* and has nothing to do with DCH. *See* O.C.G.A. §49-4-2(1) ("'Department' means the Department of Human Services."). Next, it's true that federal law requires states to designate "a single agency to administer" Medicaid. 42 U.S.C. §1396a(a)(5); *see also* 42 C.F.R. §431.10. But DCH still lacks authority to provide EPSDT services unless they are "recommended as medically necessary by a physician," O.C.G.A. §§49-4-169.1(4)-(5), 49-4-169.2, 49-4-169.3(c), consistent with the Medicaid Act, 42 U.S.C. §1396r(a)(13). And Plaintiffs did not allege that any of the Remedial Services were found medically necessary by a physician or other licensed clinician; they only alleged they thought the services were necessary in conclusory summary statements, which the United States confuses as alleging *medical* necessity. Because Plaintiffs didn't allege that any treatment professional has prescribed the Remedial Services for any plaintiff, it is not plausible (nor did Plaintiffs allege in the complaint) that DCH can ensure Plaintiff's treatment professionals begin to choose Plaintiffs' preferred services in lieu of the current array of intensive home and

crisis services currently in the state's Medicaid Plan to the extent they may be medically necessary and appropriate for Plaintiffs. Mot. 14-15. Commissioner Carlson is thus an improper defendant for Plaintiffs' claims.

**2.** Plaintiffs don't respond directly to Defendants' four arguments that *Young* doesn't apply. Mot. 17-19. Instead, they only assert that *Young* allows suits for prospective relief. Opp. 16-19. But the two decisions Plaintiffs rely on are inapt. The first is a mootness case about injunctive relief for the voluntary cessation of allegedly unlawful conduct. *See Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents*, 633 F.3d 1297, 1308-12 (11th Cir. 2011). The second confirms that *Young* "does not apply where the equitable relief sought 'implicates special sovereignty interests.'" *Med. Assocs. v. Pryor*, 180 F.3d 1326, 1337-41 (11th Cir. 1999). That decision says nothing about ordering state officials to promulgate rules or implement policies, which Plaintiffs say is necessary to get them the relief they want. ¶¶234-39. That kind of prospective relief *does* implicate Georgia's sovereignty interests. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1257 (11th Cir. 2020) (declining to "orde[r] the Secretary to promulgate a rule" because of "serious federalism concerns" under *Young*); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 469-70 (5th Cir. 2020) (similar). Plaintiffs have no response. Opp. 16-19.

Plaintiffs' cursory response likewise forfeits arguments against Defendants' exceptions to *Young*. *See* Mot. 17-19. Their relief would require specific performance of a contract between sovereigns. *See Comm'n of N.Y. Harbor v. Governor of*

6

*N.J.*, 961 F.3d 234, 241 (3d Cir. 2020). Plaintiffs also don't dispute that the relief they seek "would require [Defendants'] official affirmative action, affect the public administration of government agencies," and cause "the disposition of property admittedly belonging to the" state. *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963). And they don't dispute that the relief would "control … discretion." *Young*, 209 U.S. at 158-59; *Moore v. Reese*, 637 F.3d 1220, 1238, 1255-56 (11th Cir. 2011) (officials "retain discretion to design and administer their Medicaid programs"). For these reasons, the Eleventh Amendment bars Plaintiffs' Medicaid and ADA claims.

## III.   Plaintiffs lack standing.

Plaintiffs fail to rebut Defendants' standing arguments. And the United States offers no help for Plaintiffs on standing. *See* U.S.-Br. 3-4 n.2.

### A.   The individual Plaintiffs lack standing.

Plaintiffs argue that they have standing simply because cases involving other plaintiffs were not dismissed. *See* Opp. 1-2. This is wrong for two reasons.

For one, it is irrelevant that different plaintiffs making different allegations may have had standing in different cases. What matters is what *these* Plaintiffs alleged. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (no standing if the plaintiff "'demonstrated none'" (cleaned up)). For another, five of the six cases Plaintiffs cite (at 2) didn't even discuss standing or injury in fact. *See Wilkins v. United States*, 598 U.S. 152, 160 (2023) (no "'drive-by jurisdictional rulin[g]'" permitted). And the one case that did include a standing analysis

addressed standing arguments not presented here, such as disputes about whether the plaintiffs were eligible for the requested services or had already refused them. *See M.J. v. District of Columbia*, 401 F. Supp. 3d 1, 8-10 (D.D.C. 2019).

### 1.    No injury in fact.

Plaintiffs' response makes clear that their alleged injury is the denial of "all three" "Remedial Services." Opp. 3. But Plaintiffs haven't shown an "'invasion of a legally protected interest'" in all three Remedial Services that is "'concrete and particularized'" and "'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up).

*First*, Plaintiffs haven't shown "a legally protected interest" in the Remedial Services. *Id.* The relevant statutes grant covered individuals a "legally protected interest" *only* in services that are "medically necessary" or "appropriate." Mot. 21. Because Plaintiffs didn't properly allege medical necessity or appropriateness, *infra* 21-27, 30-33, they never alleged an invasion of "legally protected" interests.

*Second*, Plaintiffs' alleged injuries are not particularized. Plaintiffs wrongly contend than an injury is particularized unless shared by "*all members of the public.*" Opp. 4. But an injury shared by a "large class of citizens"—such as the alleged 85,000 or more in this case—qualifies as a generalized grievance under longstanding Supreme Court precedent. *Wood v. Raffensperger*, 981 F.3d 1307, 1315 (11th Cir. 2020); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) (explaining that an asserted

harm is a "generalized grievance" if it is "shared in substantially equal measure by all *or a large class of citizens*" (emphasis added)); *see also* Mot. 20-21.

*Third*, because "injunctions regulate future conduct," Plaintiffs must make "an additional showing" to satisfy the injury-in-fact requirement: They must show "'a real and immediate—as opposed to a merely conjectural or hypothetical— threat of *future* injury.'" *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013). Plaintiffs have not done so. They frame their alleged *future* injury as an "impending risk of acute mental health crises that lead to unnecessary insti- tutional care." Opp. 3. But they failed to allege that threat is "immediate." *Houston*, 733 F.3d at 1329. Plaintiffs A, B, and C are *currently* in residential care. *See* ¶¶31, 43, 53. They thus suffer no "immediate threat of *future*" institutionalization or placement in residential care. *Houston*, 733 F.3d at 1328-39 (emphasis added). Plaintiff D alleged he is "likely" to need crisis or residential care again at some point in the future. ¶64. But he failed to allege that this is an "immediate" threat. *See* ¶63. Relatedly, C's asserted injury of "institutionalization," Opp. 3, is "self- imposed," *South Miami*, 65 F.4th at 638. C's doctors recommended discharge home, but C.C. refused to bring him home without her preferred "services" or to release him to DFCS custody, which also would have enabled his discharge based on C.C.'s refusal to take C home. ¶53. But it's not even clear what types of services C.C. specifically requested: The complaint fails to allege that C.C. requested the Remedial Services or the existing services (Intensive Customized Care

Coordination or Intensive Family Intervention). ¶53. Besides, Plaintiffs seem to concede that no treatment professional has recommended such "services" as medically necessary. *See* ¶53.

What's more, Plaintiffs do not dispute that Mobile Crisis Services apply only to emergencies. Nor do they dispute that they never alleged such an emergency is certainly impending. *See* Mot. 20; Opp. 3. Even if Plaintiffs were unable to access Mobile Crisis Services in the past, those past experiences do not establish a "real and immediate threat" that the Plaintiffs will be denied access to these services if and when a future emergency arises. *See J.W. ex rel Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264-65 (11th Cir. 2018). For these reasons, Plaintiffs have not shown an injury in fact sufficient to support the injunctive relief they seek.

### 2.     No traceability.

Plaintiffs cite *Walters v. Fast AC, LLC*, for the proposition that traceability is not an "exacting standard." 60 F.4th 642, 650 (11th Cir. 2023). But as that case confirms, "[a] plaintiff must at least demonstrate *factual* causation" and thus "lacks standing to sue over a defendant's action if an independent source would have caused him to suffer the same injury." *Id.* at 650-51 (cleaned up); Mot. 22-23.

Here, an "independent source" caused the alleged injuries: Namely, the physicians who declined to find the Remedial Services medically necessary. The individual Plaintiffs' treatment teams must first find medically necessary the intensive, home-based services provided to them by the state, including the existing

services (IC3 and IFI) or any other services. O.C.G.A. §49-4-169.1(4)-(5). Likewise, any admissions to Crisis Stabilization Unit services or Psychiatric Residential Treatment Facility (PRTF) would also require parental consent and medical-necessity determinations from clinicians. *See* ¶8; O.C.G.A. §§37-3-20(a), §49-4-169.1(4)-(5). Plaintiffs assert—without explanation—that "[t]he actions of treating professionals do *not* sever the connection" between Defendants and the alleged harms. Opp. 8. But that assertion is belied by the way the state plan operates: If physicians deem the services "medically necessary," the state must provide them, even if those services are not otherwise in the State plan. *See* Mot. 22-23. Because the state's obligation hinges on a physician's medical-necessity recommendation, "an independent source would have caused [plaintiffs] to suffer the same injury," and "traceability [is] lacking." *Walters*, 60 F.4th at 650-51.

### 3.    No redressability.

Plaintiffs' redressability arguments also miss the mark. Plaintiffs do not deny that, for them to receive the Remedial Services, a physician must prescribe them. *See* Mot. 23-24; Opp. 9; *infra* 21-27. A judgment in Plaintiffs' favor will have no effect: Because the physicians are non-parties, the judgment will not bind them, and the Plaintiffs will be no closer to obtaining the Remedial Services than they were before this litigation.

To get around this problem, Plaintiffs suggest that (1) their physicians might have hesitated to prescribe services outside the state's Medicaid plan, and (2)

adding the Remedial Services to the plan now will increase the likelihood that their physicians will prescribe them in the future. But this creates more problems for the Plaintiffs: For one, it is an implicit admission that no physician has yet made the required medical-necessity determination. Second, Plaintiffs allege that they have all received multiple instances of the highest intensity of services offered by providers, including crisis and residential admissions. It strains credulity to argue that the treating clinicians believed or will believe the Remedial Services would be more clinically appropriate or effective than services they have actually been prescribing, and that it is only the failure of the state to include the Remedial Services in the Medicaid plan that has prevented them being prescribed across multiple years and multiple treatment providers. Indeed, Plaintiffs haven't made any allegations supporting their theory of redressability. *See* Mot. 24.

What's more, Plaintiffs misunderstand *Moore*, 637 F.3d at 1220. *See* Opp. 9-10. Plaintiffs highlight *Moore*'s statement that the State cannot "refuse to provide a required service." 637 F.3d at 1259-60; Opp. 10. But as *Moore* itself recognizes, whether a service is "required" depends on whether a physician determines that it is medically necessary. Here, as in *Moore*, the state's role would arise only *after* a treating physician recommended the Remedial Services for the Plaintiffs. *See id.* at 1260. Because Plaintiffs have not alleged that their physicians recommended the Remedial Services as medically necessary (and now implicitly admit that no physician has done so), *Moore* does not solve Plaintiffs' redressability problem here.

####    4.    No prudential standing as to A and B.

It is undisputed that state courts have transferred temporary legal custody of A and B from A.A. and B.B. to DFCS. And it is also undisputed that DFCS has "'the same rights and powers with regard to'" A and B as A.A. and B.B. do. *See* Mot. 25; Opp. 11-12. This is precisely the sort of "domestic relations issue" the Supreme Court instructs lower courts to avoid. *Elk Grove Unified Sch. Dist. v. Newdow*. 542 U.S. 1, 13 (2004). Plaintiffs respond only that "*Newdow's* vitality [is] suspect." Opp. 11. But this Court would "clearly err[]" by adopting that view: "If a precedent of [the Supreme] Court has direct application in a case," as *Newdow* does here, "a lower court should follow the case which directly controls, leaving to the Court the prerogative of overruling its own decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (cleaned up); *cf. Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1264 (11th Cir. 2023) (applying prudential limitations).

###    B.    The proposed class lacks standing.

Plaintiffs do not dispute that standing for the proposed class is dependent on the named Plaintiffs' standing. *See* Mot. 26. Since the named Plaintiffs lack standing, *see supra* 7-12. the proposed class does, too.

###    C.    GAO lacks associational standing.

####    1.    GAO waived associational standing by disclaiming that it sued on behalf of the identified members.

GAO cannot simply assert that "its members have standing to sue." Opp. 12. It must "identify members who have suffered the requisite harm" and "make

specific allegations" establishing the harm with respect to those identified members. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).

GAO identified four members: A, B, C, and D. Defendants explained why these individuals lack standing and can't support GAO's associational standing. Mot. 19-27. In response, GAO now *disclaims* that it sued on behalf of these individuals. *See* Opp. 12 & n.2 ("The Complaint is filed by four children 'by and through' their next friend *and* GAO … Defendants are wrong that 'the Georgia Advocacy Office filed this lawsuit on behalf of four individuals and unidentified "children."'"). With this statement, GAO has waived associational standing based on A, B, C, and D. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (discussing waiver); *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived."); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (similar).

Without relying on allegations about A, B, C, and D, GAO's associational-standing argument crumbles. *See* Mot. 26-27. GAO failed to include "specific allegations" that show that its unidentified members have standing to sue on their own. *Summers*, 555 U.S. at 498. GAO's standing argument boils down to impermissible statistical probability—precisely what *Summers* prohibits. *See* Mot. 27.

### 2. This suit requires GAO constituents' individual participation.

GAO's own framing makes clear the need for individualized proof: GAO argues their goal is to make "*necessary* services promptly available to children who need them." Opp. 13 (emphasis added). But whether these services are in fact *medically* necessary for particular children is an unavoidably individualized inquiry — the children have different conditions, different home environments, and different family situations. *See* Mot. 27-28. For these reasons, "the individual participation of each injured party" is "indispensable to proper resolution of the case." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs' "requested systemic relief" is inappropriate, Opp. 13, and GAO lacks associational standing. Plaintiffs ask this Court to ignore the third *Hunt* prong because it's not an "Article III" requirement. Opp. 14. But courts routinely dismiss associations for lack of standing if they fail at the third prong. *See, e.g.*, *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019); *cf. Disability Rts. Fla., Inc. v. Palmer*, 2019 WL 11253085, at *6 (N.D. Fla.). If assessing whether members satisfied administrative-exhaustion requirements can't be done without member participation, *see Parent/Pro. Advoc. League*, 934 F.3d at 35; Opp. 14 n.5, assessing GAO constituents' medical conditions can't be done without their individual participation either.

**IV.    Plaintiffs' requested relief will violate the anticommandeering principle.**

Plaintiffs don't dispute that Congress may not command state officials to administer a federal regulatory program. *Printz v. United States*, 521 U.S. 898, 935 (1997); Mot. 28-29. Plaintiffs simply argue that there were "no surprises" that the Medicaid Act imposes certain requirements. Opp. 26-27. Medicaid creates a federal-state agreement, but that's vastly different from a federal takeover of the state's Medicaid program. No state would have thought that participating in Medicaid (substantial-compliance statute) meant being directly regulated under §1983 for every alleged failure to comply. Plaintiffs' reading of §1983 requires transforming a federal-state agreement into direct regulation of the states. Mot. 28-29; *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 192-93 (2023) (Gorsuch, J. concurring) (reserving anticommandeering issue).

**V.    Plaintiffs fail to state Medicaid Act claims.**

**A.    Plaintiffs fail to show a private right of action.**

**1.  The state is not a "person" under §1983.**

Plaintiffs assert that state officials are "persons" under §1983 because Plaintiffs sued them in their official capacities. Opp. 19-20. But, as explained above (at 3-7), Plaintiffs' suit is really one against the *state*. *See* Mot. 10-19, 29. So, it's irrelevant that §1983 allows official-capacity suits for injunctive relief that aren't really against the state. *See* U.S.-Br.16 n.8.

16

### 2. Rights in Spending Clause legislation are not "secured" as against the state.

The Medicaid Act doesn't "secur[e]" rights held against the state. §1983. Plaintiffs miss their target by asserting that the Act is a "la[w]" under §1983. Opp. 20. The point is that that law doesn't secure their asserted rights: If the state chooses not to accept federal funds, Plaintiffs have no rights. Mot. 30. Plaintiffs say "the Supreme Court" rejected that argument. Opp. 20. But the Court left "for another day" "whether legal rights provided for in spending power legislation like the Act are 'secured' as against States." *Talevski*, 599 U.S. at 192 (Gorsuch, J., concurring). They aren't. Mot. 28-30.

### 3. The Medicaid provisions Plaintiffs cite do not unambiguously create private rights.

The Medicaid provisions Plaintiffs cite don't "unambiguously confer individual federal rights." *Talevski*, 599 U.S. at 180. Plaintiffs concede that some don't. For example, they don't dispute that §1396d doesn't confer any rights. Mot. 31. The dispute, then, is whether §§1396a(a)(8), (10), (43) clearly confer such rights. But "Congress has not enacted liability language for any failure of a State to include in its Medicaid plan any required provision listed in § 1396a(a)." *Martes v. CEO of S. Broward Hosp. Dist.*, 683 F.3d 1323, 1327 (11th Cir. 2012). So, Plaintiffs must prove that an unambiguous intent to impose liability is lurking implicitly in the statute. *See id.*

17

Plaintiffs argue that *Doe v. Chiles*, 136 F.3d 709 (11th Cir. 1998), remains binding. Opp. 21-22. But *Chiles* "was decided prior to *Gonzaga*." *Cf. Martes*, 683 F.3d at 1326 n.2. *Chiles* asked whether "Congress has 'intended that the provision in question benefit the plaintiff," 136 F.3d at 715, while *Gonzaga* held "it is *rights*, not the broader or vaguer 'benefits' … that may be enforced," 536 U.S. 273, 282-83 (2002). Even if *Gonzaga* weren't clear on that point, *Armstrong* explained that *Gonzaga* "plainly repudiate[d] the ready implication of a § 1983 action that *Wilder* exemplified." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330 n.* (2015). That "'*Armstrong* isn't a § 1983 case'" is irrelevant, Opp. 22 n.11—it held that "*Wilder*" could not "establish[h] precedent for a private cause of action in th[at] case" because it had been "repudiated," *Armstrong*, 575 U.S. at 330 n.*. *Chiles* relied extensively on *Wilder*. Mot. 35-36.

The United States tries and fails to show that the relevant provisions in §1396a(a) create enforceable rights. It argues that each refers to "'individuals'" and, citing non-binding authority, asserts that that language is "precisely the sort of rights-creating language identified in *Gonzaga*." U.S.-Br.19-21 (cleaned up). But the Eleventh Circuit has held that Medicaid's "use of the term 'individual' is not sufficient." *Martes*, 683 F.3d at 1329. The United States next says that "these provisions … 'lack an enforcement mechanism' for" individuals. U.S.-Br.20. But the Eleventh Circuit has held that the lack of an "enforcement scheme for aggrieved

individuals" in §1396a(a) means that "it is unlikely that Congress intended for this statute to be privately enforced." *Martes*, 683 F.3d at 1329 n.6.

*Talevski* also doesn't help Plaintiffs. *Talevski* held that two provisions of the Federal Nursing Home Reform Act satisfied the *Gonzaga* test because they "expressly" create "rights." 599 U.S. at 184. By contrast, Plaintiffs' provisions don't have that express, rights-creating language. *Compare* 42 U.S.C. §1396r(c) ("[r]equirements relating to residents' rights"), *with* §1396a(a)(8), (10), (43) ("A state plan … must … provide …."). And in any event, other "text and structure" can create an ambiguity that defeats Plaintiffs' claims. *Talevski*, 599 U.S. at 193 (Barrett, J., concurring) (quoting *Gonzaga*, 536 U.S. at 283).

Plaintiffs' reply on that score ignores Supreme Court precedent. Section 1396a tells "[t]he Secretary" what "conditions" state plans must "fulfil[l]" before he "shall approve" them. §1396a(a), (b). A focus on the requirements for the Secretary's approval "does not confer the sort of '*individual* entitlement' that is enforceable under § 1983." *Gonzaga*, 536 U.S. at 287. Plaintiffs say that "*Talevski* forecloses th[at] argument." Opp.24. But *Gonzaga* deployed it, 536 U.S. at 287, and *Talevski* approved *Gonzaga*, 599 U.S. 183. *Talevski* said only that reference to nursing homes in provisions that create "rights" for "nursing-home residents" does not, by itself, remove "the focus" on residents. 599 U.S. at 184-85. By contrast, §1396a goes another step away from beneficiaries by focusing "on the agenc[y] that will do the regulating." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). It "speak[s] only

to the Secretary" by "directing that '[n]o funds shall be made available'" absent substantial compliance with the conditions in §1396a(a). *Gonzaga*, 536 U.S. at 274; *Martes*, 683 F.3d at 1329 (holding that a provision of §1396a(a) doesn't create rights because it focuses "'on the person regulated'"); *Doe v. Gillespie*, 867 F.3d 1034, 1045 (8th Cir. 2017) (statute is "focus[ed] on a federal regulator who is two steps removed from individual patients"). The United States has no response to this argument.

Plaintiffs incorrectly dismiss another obstacle. Opp. 25. The Act doesn't require that Georgia perfectly comply with §§1396a(a)(8), (10), (43). It says that Georgia need only "comply substantially." §1396c(2). Plaintiffs and the United States ignore *Gonzaga*'s holding that substantial-compliance statutes "have an 'aggregate' focus." 536 U.S. at 288. And they ignore binding decisions that have "repeatedly held 'substantial compliance' provisions in Spending Clause legislation are inconsistent with individually enforceable rights." *Arrington v. Helms*, 438 F.3d 1336, 1346 (11th Cir. 2006). Instead, Plaintiffs cite (at 25) a non-binding decision that says the statute in *Talevski* also has a substantial-compliance provision. But that statute says that the Secretary can "deny … payments" for a "facility," §1396r(h)(3)(C), and can restore funds to that *facility* if it "is in substantial compliance," §1396r(h)(4). By contrast, §1396c takes away *all* funding from "the State" only for substantial noncompliance. Unlike §1396r(h), §1396c is "'a yardstick for

the Secretary to measure the *systemwide* performance of a State's … program.'" *Gonzaga*, 536 U.S. at 281-82.

Plaintiffs' and the United States' remaining arguments don't work either. Against Plaintiffs' assertion (at 25), "[s]ection 1320a-2 does not show that … the Medicaid Act creates an enforceable right." *Gillespie*, 867 F.3d at 1044-46. It says only that it "cannot be deemed individually unenforceable *solely* because of its situs in a larger regime 'requiring a State plan[.]'" *Id.* (emphasis added). The United States argues (at 20) that "the EPSDT provisions are not" vague, but it doesn't address *Armstrong*. It fails to explain, for example, how "reasonable standards of medical … practice," medical necessity, "best possible functional level," etc., §§1396a(a)(8), (43), 1396d(a)(13), (r), are less vague than "'efficiency, economy, and quality of care,'" *Armstrong*, 575 U.S. at 328-29; Mot.33-34.

**B.    Even if there were private causes of action to enforce the Medicaid Act, Plaintiffs failed to allege their elements.**

**1.    Plaintiffs failed to allege that the Remedial Services are medically necessary for their ongoing conditions.**

"[E]ven if a category of medical services or treatments is mandatory under the Medicaid Act, participating states must provide [them] only if they are 'medically necessary.'" *Moore*, 637 F.3d at 1232-33. Plaintiffs nowhere dispute that the state gets to "adopt a definition of medical necessity." *Id.* at 1255. Nor do they challenge Georgia's definition requiring that EPSDT services be "recommended as medically necessary by a physician." O.C.G.A. §49-4-169.1(4)-(5); *accord*

§1396d(a)(13)(C). And they also don't dispute that the Medicaid Act itself imposes a similar requirement. §1396d(a)(13)(C) ("remedial services … recommended by a physician or other licensed practitioner"); §1396d(r)(5) ("necessary … services … described in subsection (a)); Mot. 2-4, 39, 41-42. Those omissions operate as concessions. *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014). To state a Medicaid claim, Plaintiffs had to allege that a physician recommended the Remedial Services as currently medically necessary. Mot. 37-40; *accord* Opp. 32 ("Plaintiffs need to allege facts showing that they … have been found to need the Remedial Services.").

Plaintiffs failed to allege that "essential element." *Middlebrooks v. City of Eustis*, 563 F. Supp. 1060, 1061 (M.D. Fla. 1983). Plaintiffs assert that "clinicians recommended intensive home and community-based services." Opp. 29. But noticeably not the *Remedial Services*. The allegations Plaintiffs refer to say that persons recommended discharge (¶30), with basic services (¶¶27, 39, 42, 49, 61), existing services (¶¶28, 40, 41, 50), or placement in DFCS custody (¶¶52-53, 62). No allegation says that (1) a physician (2) recommended any of the Remedial Services as (3) currently medically necessary.

Plaintiffs all but concede that no physician recommended the Remedial Services. Plaintiffs instead attempt to "explain[] why." Opp. 31. They speculate that "'clinicians hesitate to prescribe … services for Medicaid patients that are not specifically listed in billing codes.'" *Id.* Plaintiffs didn't allege that their physicians

hesitated for that reason or any other. *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 n.5 (11th Cir. 2016) ("[F]acts contained in a … brief 'cannot substitute for missing allegations in the complaint.'"). And it misses the point: Georgia will provide "[m]edically [n]ecessary [s]ervices" "whether or not such services are in the state plan." O.C.G.A. §§49-4-169.1(4), 49-4-169.2, 49-4-169.3. But if a physician doesn't say services are medically necessary, Georgia needn't provide them. *See Moore*, 637 F.3d at 1255; *accord Rosie D. v. Romney*, 410 F. Supp. 2d 18, 26 (D. Mass. 2006) (must provide EPSDT services "so long as a competent medical provider finds *specific* care to be 'medically necessary'" (emphasis added)); *C.A. v. Garcia*, 673 F. Supp. 3d 967, 978 (S.D. Iowa 2023) (similar). Plaintiffs would make the state hostage to the private motivations of physicians over whom it has no control.

For its part, the United States also doesn't assert that Plaintiffs alleged medical necessity under Georgia's definition. U.S.-Br.25. Instead, it argues irrelevantly that medical necessity "is a factual issue that is inappropriate for resolution in a motion to dismiss." *Id.* But Defendants' argument is that Plaintiffs failed to allege that factual issue *at all*. And that contention *is* appropriate for resolution on a motion to dismiss. *See, e.g., Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1208, 1211 (11th Cir. 2020) ("If a plaintiff fails to adequately plead any of these elements, she has failed to state a claim[.]"). The United States has no response to binding precedent confirming that Georgia's definition controls. *Moore*, 637 F.3d at 1248, 1255. Nor does the United States respond to Medicaid's requirement that "remedial services" be

23

"recommended by a physician or other licensed practitioner." §1396d(a)(13)(C); §1396d(r)(5); U.S.-Br.24 (quoting the requirement). And the non-binding decisions they cite are either consistent with that requirement or else irrelevant.[1] Plaintiffs could have easily avoided this pleading defect by alleging that a professional said the Remedial Services are medically necessary. That they deliberately chose not to do so is telling.

The remaining allegations are conclusory. Plaintiffs and the United States repeatedly say that the Remedial Services are "'necessary.'" Opp. 28-29; USA.Br.25. But this Court must "discard" that conclusion. *McCullough v. Finley*, 907 F.3d 1324, 1334 (11th Cir. 2018). Plaintiffs say that they have "mental health conditions" and that past treatment hasn't "m[e]t their needs." Opp. 28-31. They also say that "federal agencies" have recommended the Remedial Services. Opp. 31. But having a condition that hasn't been ameliorated is ''merely consistent with'" a proposed service being medically necessary to treat it. *Doe v. Samford Univ.*, 29 F.4th 675, 685 (11th Cir. 2022). And a federal agency saying that a service

---

[1] *See, e.g., J.E. v. Wong*, 125 F. Supp. 3d 1099, 1100, 1108 (D. Haw. 2015) ("[t]he sole issue raised by Defendant's Motion to Dismiss is whether Plaintiffs have a private right of action" and "whether … treatment is, in fact, medically necessary … [was] not before the Court"); *Murphy v. Minn. Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084, 1107 (D. Minn. 2017) (not discussing Georgia's definition of medical necessity but noting that "whether an individual has a right to receive a certain service 'is dependent on a finding that the individual needs the service, based on appropriate assessment criteria that the State develops'"); *Katie A. v. Los Angeles Cnty.*, 481 F.3d 1150, 1154 (9th Cir. 2007) (not discussing Georgia's definition of medical necessity but noting that states must provide certain services "to eligible children when such services are found to be medically necessary").

is "effective" in the abstract, ¶1, doesn't mean that it is *medically necessary* for a particular individual. To cross "'the line between possibility and plausibility,'" *Doe*, 29 F.4th at 685, Plaintiffs had to allege that *their* physicians reached that conclusion. *E.g.*, §1396d(a)(13)(C). But they didn't. Mot. 37-40.

Finally, Plaintiffs and the United States largely ignore *Moore*. Opp.32; USA.Br.23-25 & n.11. They assert that *Moore* (but not this case) was about "whether or not a service is medically necessary for an individual child." Opp.32. Plaintiffs eventually backtrack and concede that they needed to allege that they "have been found to need the Remedial Services." *Id. Moore* couldn't be clearer: (1) Georgia needn't provide services to Plaintiffs unless they're medically necessary, 637 F.3d at 1233; (2) Georgia gets to define medical necessity, *id.* at 1248, 1255; and (3) even then, Georgia has a right to "review the medical necessity" determinations of a "treating physician" before it must provide services, *id.* at 1248-52, 1257. Plaintiffs overlooked these requirements. Despite the fact that multiple treatment teams have had years and countless opportunities to recommend the Remedial Services as medically necessary, Plaintiffs never alleged that any provider has done so. Thus, Plaintiffs failed to state Medicaid claims in Counts I and II.

### 4. Plaintiffs fail to state a claim under §1396a(a)(43).

The "plain text" controls the interpretation of the Medicaid Act. *Gallardo v. Marstiller*, 596 U.S. 420, 428-30 (2022). Section 1396a(a)(43) says Georgia must "provide … such screening services *in all cases where they are requested*." §1396a(a)(43)(B)

(emphasis added). Georgia must then provide "corrective treatment the need for which is disclosed by" the requested "screening services." §1396a(a)(43)(C). Plaintiffs fail to allege that they requested screening services.

Against precedent, Plaintiffs want this Court to "discoun[t] the text of § 1396[a(a)(43)]and rel[y] … on policy arguments." *Gallardo*, 596 U.S. at 428-30. They assert that a request requirement undermines "'the goal'" of the statute. Opp. 33-34. But courts "must give effect to, not nullify, Congress' choice to include limiting language in some [Medicaid] provisions." *Gallardo*, 596 U.S. at 431.

"Even if the" text "were unclear," this Court "would still have to find for the" state. *Adams v. Sch. Bd.*, 57 F.4th 791, 815 (11th Cir. 2022) (en banc). Medicaid is a Spending Clause statute. *Supra* 16-17. Congress must "provide the States with a clear statement when imposing a condition on federal funding[.]" *Adams*, 57 F.4th at 815-16. Resort to "intended purpose" at best muddies the waters. *Troupe v. Barbour*, 2013 WL 12303126, at *5 (S.D. Miss.). But to find a violation, the text must *clearly* "require the state to seek out all Medicaid-eligible children and provide screenings and treatment without any concomitant responsibility … to request" them. *Id.* The text says no such thing. *Id.* at *4-5.

Plaintiffs didn't allege that they requested "a screening under Subsection (43)(B)." *Troupe*, 2013 WL 12303126, at *4. They assert that their "parents requested interperiodic screens," Opp. 34, but it isn't enough that physicians screened Plaintiffs in the past or that their parents "request[ed] … more intensive *services*." ¶¶39,

26

63. The statute requires that their *current need* for the *Remedial Services* was determined by a *professional* at a screening they *requested*. §1396a(a)(43); §1396d(r)(5); §1396d(a)(13)(C). Plaintiffs don't allege that "the need for" the Remedial Services was "disclosed" in any of their past "contacts with providers." §§1396a(a)(43)(B), (C); U.S.-Br.22 n.9. So, Plaintiffs had to allege that they requested and received other screens to determine whether the Remedial Services are what they need now. But they didn't. In short,"[i]f Plaintiffs never requested and received a screening under Subsection (43)(B), then Subsection (43)(C) imposes no requirement on the" State. *Troupe*, 2013 WL 12303126, at *4.

### 5.    Plaintiffs fail to state a claim under §1396a(a)(10)(A).

To support the §1396a(a)(10) claim, Plaintiffs rely on the same mistaken arguments above. Opp. 34-35. This Court should reject them. *See* Mot. 41.

### 6.    Plaintiffs fail to state a claim under §1396a(a)(8).

This Court should dismiss the §1396a(a)(8) claim. *See* Mot. 42-43. Section 1396a(a)(8) requires that Plaintiffs "make application for" the *Remedial Services* before those services must "be furnished with reasonable promptness." Plaintiffs concede that they didn't do so. Opp. 35. Their only response is that "Defendants cite no authority requiring [Plaintiffs] … to precisely specify services in a form not currently available."*Id.*. But the authority is the statute itself. §1396a(a)(8) ("make application for"). Even if there were no "infrastructure to provide the" Remedial Services, "Plaintiffs' claim would still fail because "the statute contains no

exception" to the request requirement. *Troupe*, 2013 WL 12303126, at *4. And the clear-statement rule forbids reading one in. *See Adams*, 57 F.4th at 815-16 & n.8.

## VI.   Plaintiffs fail to state ADA and Rehabilitation Act claims.

### A.   Plaintiffs abandoned the Rehabilitation Act claims by failing to address the sole-causation requirement.

As Defendants explained in their motion, Plaintiffs failed to state a claim under the Rehabilitation Act because they failed to allege that any discrimination occurred "*solely* by reason of her or his disability." 29 U.S.C. §794(a) (emphasis added); *see* Mot. 47, 49. The "solely by reason of" language under the Rehabilitation Act creates a "higher" "burden of establishing causation" than under the ADA. *Wade v. Fla. Dep't of Juv. Just.*, 745 Fed. App'x 894, 896 (11th Cir. 2018). Both Plaintiffs' response and the United States' brief lump together the ADA and Rehabilitation Act analyses without appreciating the different causation requirements. *See* Opp. 38-48; U.S.-Br. 4 n.3. Because Plaintiffs failed to respond to Defendants' sole-causation arguments, they abandoned their Rehabilitation Act claims. *Coyote*, 2012 WL 12948862, at *34. These claims should be dismissed for that reason alone.

### B.   Plaintiffs' ADA and Rehabilitation Act claims fail because they seek new benefits.

Plaintiffs don't dispute that they cannot use the ADA and Rehabilitation Act to require states to create new benefits. *See* Opp. 36-38. Instead, Plaintiffs and the United States argue that forcing states to create new benefits under the guise of the ADA and Rehabilitation Act is acceptable because Medicaid already requires states to provide them. *See* Opp. 38; U.S.-Br. 14-15. But Medicaid *doesn't* require

providing such benefits. *Supra* 16-27. And hitching the ADA and Rehabilitation Act claims to their Medicaid claims is effectively a concession that their ADA and Rehabilitation Act claims are not viable on their own.

Perhaps sensing weakness, Plaintiffs primarily argue that they only want a "reasonable modification of existing service systems" and "relocation" of benefits. Opp. 36. But this is false. Just saying that they want "relocation of intensive services," *id.*, is not enough to survive a motion to dismiss. *Disability Rts. Cal. v. Cnty. of Alameda*, 2021 WL 212900, at *12 (N.D. Cal.) (rejecting allegation that the plaintiffs wanted to "relocate services 'from institutions to community-based settings'"). Moreover, Plaintiffs seek new benefits. They say that the Remedial Services are currently not provided to "any child" in the state. ¶7. The Remedial Services are thus—*by Plaintiffs' own definition*—new benefits. ¶122 (existing services "are not … the Remedial Services"); ¶145 (same).

The two cases Plaintiffs cite don't help them. Opp. 36-37. In *Townsend v. Quasim*, the court dealt with *existing* benefits: The state used "community-based services to provide essential long term care to some disabled Medicaid recipients but not others." 328 F.3d 511, 513 (9th Cir. 2003). And the court agreed that "'[p]ublic entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons." *Id.* at 518.

*N.B. v. Hamos* is also inapposite. 2013 WL 6354152 (N.D. Ill.). That court dealt with plaintiffs who desired "appropriate treatment in a non-hospital setting" by

seeking "a modification of the place and manner in which the State currently makes services available to the plaintiffs." *Id.* at *8. But here, the crisis and residential care Plaintiffs identify (for when "less restrictive forms of treatment have been tried and found unsuccessful," ¶8 n.4), by definition, cannot be provided in outpatient settings. Mot. 49. And the law does not require "a state to implement" a new program "of the kind the plaintiff proposes" regardless of whether the new program would allow them to "deal better with possible crises." *Palmer*, 2019 WL 11253085, at *5-6.

Finally, Plaintiffs also argue that they simply want to modify the existing services (IC3 and IFI) to look like the Remedial Services that Plaintiffs want. Opp. 37-38. And The United States also tries to resuscitate Plaintiffs' complaint by suggesting that Plaintiffs "merely seek to expand the reach of existing services." U.S.-Br. 14. But none of this is true, as the complaint itself admits. *E.g.*, ¶¶7, 122, 145. Plaintiffs would "modify" Georgia's existing mental-health regime "in the same sense that the French Revolution modified … the French nobility"—"supplant[ing] them with a new regime entirely." *Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023) (cleaned up); *see also infra* 37. Again, neither the ADA nor Rehabilitation Act permits such supplanting. *See Palmer*, 2019 WL 11253085, at *5-6.

### C.    Plaintiffs fail to state an *Olmstead* claim.

To state an *Olmstead* claim, Plaintiffs must allege—at a minimum—that their doctors recommend community-based care, Plaintiffs don't oppose it, *and* the state

can reasonably accommodate them in the community. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999) (plurality). Here, Plaintiffs concede that D isn't currently in inpatient care and cannot assert an *Olmstead* claim. This is why D conflates the at-risk theory and an *Olmstead* claim. Opp. 44. Ultimately, A, B, and C also fail to state an *Olmstead* claim.

**1.** A and B fail to allege that *any* treating professionals have determined that outpatient placement is appropriate for them. *See* Mot. 46. Plaintiffs don't dispute this failure. Instead, they raise two arguments. Both fail.

First, Plaintiffs incorrectly argue that they "need not allege that a treatment provider recommended a particular community-based treatment to survive a motion to dismiss." Opp. 41. *Olmstead* never contemplated "driv[ing] those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." 527 U.S. at 610 (Kennedy, J., concurring in judgment). *Olmstead* held that it would be "inappropriate to remove a patient from the more restrictive setting" without "reasonable assessments of [the state's] own professionals." 527 U.S. at 602 (majority). The state is "entitled to rely on" its own doctors' assessment of whether outpatient care is appropriate. *Boyd v. Steckel*, 753 F. Supp. 2d 1163, 1174 (M.D. Ala. 2010). Without a "state treatment professional's opinion" finding community placement appropriate, Plaintiffs must at least allege that *some* "qualified exper[t] support[s] [their] contentions." *A.A. v. Buckner*, 2021 WL 5042466, at *8 (M.D. Ala.); *see also United States v. Mississippi*, 82 F.4th 387, 394

(5th Cir. 2023). Here, Plaintiffs fail to allege that *any* professional has found it appropriate for them to be placed in an outpatient setting. *Cf.* U.S.-Br. 8-9 n.6.

Plaintiffs mischaracterize (at 41) *Steimel v. Wernert* as holding that plaintiffs don't need to allege the determination of appropriateness by a treating professional. 823 F.3d 902 (7th Cir. 2016). That court *agreed* that a doctor's opinion of appropriateness was an "element[]" of an *Olmstead* claim. *Id.* at 914. The first "element[]" was simply not "disputed" in *Steimel. Id.* at 915. Here, Defendants dispute the first element. And Plaintiffs fail to allege that A's and B's treating professionals found outpatient placement appropriate. Plaintiffs remaining case—*M.J.*, 401 F. Supp. 3d at 12—similarly misreads *Steimel* and contradicts *Olmstead*.

Second, Plaintiffs failed to "plead their appropriateness for integrated community services" for A and B. Opp. 41. They argue that outpatient placement is appropriate for A and B now because they were *previously* discharged from inpatient care in the past. Opp. 41. But that A and B were discharged in the past says nothing about the type of care that's appropriate for them now. *See Boyd*, 753 F. Supp. 2d at 1174 n.17 (that a plaintiff "lived in the community for eleven years with a relative acting as primary caregiver, in and of itself" cannot establish that "community-based services are appropriate for his needs now").

**2.** Plaintiffs argue that C hasn't refused outpatient placement. Opp. 42. But the complaint says the opposite. C's treating professionals recommended discharge, but his mother refused to take him home. ¶53. To state an *Olmstead* claim,

the "affected person[]" must "not oppose" community-based placement and treatment. 527 U.S. at 607 (plurality). Both Plaintiffs and the United States rely on *United States v. Florida* to argue that non-opposition only asks "whether service recipients with disabilities would choose community-based services if they were actually available and accessible … not whether persons with disabilities (or, in this case their parents or guardians) would accept discharge … with inadequate access to community-based services." 682 F. Supp. 3d 1172, 1232 (S.D. Fla. 2023), *appeal pending* No. 23-12331 (11th Cir.). This formulation is too broad and strays far from *Olmstead* which dealt with the choice between residential treatment and *existing* community placement. 527 U.S. at 607 (plurality). *Olmstead* doesn't translate a desire for a hypothetical benefit into an ADA / Rehabilitation Act discrimination claim.

Nor is this a situation in which C must resort to seeking inpatient care to obtain the care he needs: C's treating professionals determined that C "no longer required" inpatient care. ¶53. But unsatisfied with the outpatient services that Georgia currently provides, C's mother insists that Georgia provide her preferred services. It is not even alleged that C.C. ever requested the Remedial Services. This is a disagreement about the standard of care and "protest about [the] medical judgments" are not cognizable under *Olmstead*. *Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 Fed. App'x 215, 221 (6th Cir. 2018); *Palmer*, 2019 WL 11253085, at *6 ("standard-of-care issue … is beyond the reach of *Olmstead*.").

### D.     Plaintiffs fail to state an at-risk claim.

Plaintiffs' at-risk theory for D fails for two reasons. *Cf.* Mot. 48-49. *First*, the at-risk theory isn't cognizable. Plaintiffs argue that because other courts have accepted it, so should this Court. *See* Opp. 45-46. But Plaintiffs present no argument—and abandoned any arguments—based on the text of the ADA, the Rehabilitation Act, and their implementing regulations. *Cf.* Mot. 48. The text unambiguously *doesn't* give rise to the at-risk theory. *See Mississippi*, 82 F.4th at 392.

What's left is Plaintiffs' naked appeal to non-binding authorities. *See* Opp. 45-46; DOJ-Br. 11-12. These cases are unpersuasive. Plaintiffs cite decisions that rely on DOJ's nonbinding guidance document. *See* Opp. 45-46; *see, e.g.*, *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460-61 (6th Cir. 2020). And the United States expressly appeals to its guidance document to argue that Plaintiffs' atextual at-risk theory is cognizable. DOJ-Br. 12-13 n.7. But this document disclaims any "legally binding effect" and "do[es] not establish legally enforceable responsibilities." DOJ Guidance, bit.ly/3UiSliL. This guidance document cannot impose substantive liability on the states. *See Mississippi*, 82 F.4th at 393-94; *Waskul*, 979 F.3d at 470 (Readler, J., concurring and dissenting in part).

Plaintiffs also rely on cases that accepted the at-risk theory after finding that "nothing in the plain language of the regulations" prohibits the at-risk theory. *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). This reasoning gets textual interpretation "exactly backwards." *Mississippi*, 82 F.4th at 392. Courts

may not "enhance the scope of a statute" simply "because [they] think it good pol-
icy or an implementation of Congress's unstated will." *Id.* at 393; *see also Rotkiske
v. Klemm*, 589 U.S. 8, 14 (2019). The United States nevertheless asks this Court — in
a throwaway footnote — to trust the "expert[s]," accord its interpretation of the in-
tegration mandate the disfavored *Auer* "deference," and conclude that the ADA
and Rehabilitation Act recognize the at-risk theory. DOJ-Br. 13 n.7. But "deference
'is not the answer to every question of interpreting an agency's rules.'" *Callahan v.
HHC*, 939 F.3d 1251, 1259 (11th Cir. 2019) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400,
2414 (2019)). "[T]he possibility of deference can arise only if a regulation is genu-
inely ambiguous." *Kisor*, 139 S. Ct. at 2414. This Court must "'exhaust'" the "'tra-
ditional tools of construction.'" *Callahan*, 939 F.3d at 1259. Traditional tools of con-
struction cannot justify the at-risk theory. *See Mississippi*, 82 F.4th at 392. And even
if there's any ambiguity, the agency's reading must be reasonable. *Callahan*, 939
F.3d at 1259.  The United States doesn't even try to explain how all these height-
ened pre-conditions for deference are satisfied. *See* U.S.-Br. 13 n.7.

Plaintiffs' attempt to distinguish the *Mississippi* decision also fails. Contrary
to Plaintiffs' mischaracterization (at 47), that decision turned on the statutory and
regulatory text, not only the specifics of Mississippi's mental-health system. *See* 82
F.4th at 391-92. Plaintiffs are also wrong to suggest that the Fifth Circuit said its
holding could be "consistent with other circuit decisions." Opp. 46. After rejecting
the theory as a matter of law, the Fifth Circuit simply went further to alternatively

hold that, "even if there is a bona fide claim … based on a 'risk of isolation,'" the United States' broad challenge to Mississippi's mental-health system without "individualized" assessments for "appropriate[ness]" failed even under other courts' cases. 82 F.4th at 396; *cf. Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008) ("alternative holdings are … as binding as solitary holdings"). Likewise here, Plaintiffs' so-called systemic challenge—without any individualized assessments—is too broad and should be dismissed.

*Second*, Plaintiffs fail to state a claim under the at-risk. theory. *See* Mot. 48-49. Other than saying that a new benefits program should be created, Plaintiffs still can't point to what existing services must be relocated for D. This failure is fatal. *See Disability Rts. Cal.*, 2021 WL 212900, at \*11. The ADA and Rehabilitation Act do "not provide a remedy for when government entities could generally do more to keep people from being institutionalized" or needing inpatient care. *Id.*

### E.   Plaintiffs fail to state any other discrimination claims.

Plaintiffs argue that they stated a claim regarding Defendants' alleged discrimination based on "co-occurring disabilities." Opp. 47. Although the complaint is vague, ¶¶222, 230, Plaintiffs *now* argue that "Defendants' service eligibility criteria" for the existing service (IFI and IC3) discriminate against them. Opp. 47. According to Plaintiffs, Defendants use "[o]verly restrictive diagnostic[s]" for IC3 and IFI. ¶¶159, 167. This theory fails. To start, A, B, and D all alleged that they *have*

received or were referred to IFI and/or IC3 despite having co-occurring conditions. ¶¶25, 28, 37, 40, 57, 62.

Only C alleged that he was denied IFI (but not IC3) "due to his concurrent Autism diagnosis." ¶50. This allegation fails because C failed to allege that changing the eligibility criteria for IFI would lead to C.C.'s changing her mind and agreeing to C's discharge. *See* ¶53 (alleging C.C. wants "Remedial Service," not IFI, as a condition for his discharge). Furthermore, as Plaintiffs concede, having Autism does not even preclude obtaining IFI. IFI can still be provided if "'there is clearly documented evidence of an acute psychiatric … disorder episode overlaying the diagnosis.'" ¶167 (quoting DBHDD, Provider Manual for Community Behavioral Providers Health Providers, Fiscal Year 2024, Quarter 3, at 89 (Dec. 1, 2023)). Plaintiffs' theory boils down to the allegation that these diagnostic requirements are "[o]verly restrictive" for IFI. But, again, the ADA and Rehabilitation Act do not allow Plaintiffs to impose their preferred standard of care on Georgia. *Olmstead*, 527 U.S. at 603 n.14 (majority); *Palmer*, 2019 WL 11253085, at *6.

Moreover, "[w]hile 'rules, policies, [and] practices' may be subject to reasonable modification, 'essential eligibility requirements' are not." *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1215 (N.D. Ala. 2020). If an individual cannot meet an eligibility requirement, "the only possible accommodation is to waive the essential requirement itself," which "would constitute a fundamental alteration in

the nature of the … program." *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 930 (8th Cir. 1994).

### F.  Plaintiffs seek to fundamentally alter Georgia's mental-health program.

There's no dispute that Plaintiffs seek to fundamentally alter Georgia's mental-health program by creating "heretofore unprovided services," *Rose v. Rhorer*, 2014 WL 1881623, at *4 (N.D. Cal.), and by forcing Georgia to "waive the essential requirement[s]" for existing programs, *Pottgen*, 40 F.3d at 930. Plaintiffs don't dispute this point. Instead, they argue that Defendants should be precluded from raising the fundamental-alteration argument at this stage. Opp. 48-49; *see also* U.S.-Br. 15-16. But "where the accommodation that the plaintiff seeks would transform the essential nature of the program on its face, resolution is appropriate at the pleading stage." *Shavelson v. Bonta*, 608 F. Supp. 3d 919, 928 (N.D. Cal. 2022) (ADA Title II and Rehabilitation Act case (like this one)).

### CONCLUSION

The Court should dismiss the complaint.

Dated: May 6, 2024    Respectfully submitted,

_/s/ Bryan K. Webb_     _/s/ Patrick Strawbridge_
Christopher M. Carr     Patrick Strawbridge*
 _Attorney General_    Consovoy McCarthy PLLC
 Georgia Bar No. 112505   Ten Post Office Square
Bryan K. Webb      8th Floor South PMB #706
 _Deputy Attorney General_  Boston, MA 02109
 Georgia Bar No. 743580   (617) 227-0548
Georgia Department of Law  patrick@consovoymccarthy.com
40 Capitol Square SW
Atlanta, Georgia, 30334    Frank H. Chang*
404-458-3408      C'Zar Bernstein*
bwebb@law.ga.gov     Consovoy McCarthy PLLC
          1600 Wilson Blvd., Suite 700
          Arlington, VA 22209
          (703) 243-9423
          frank@consovoymccarthy.com
          czar@consovoymccarthy.com
          *_pro hac vice_

_Attorneys for Defendants_

## **CERTIFICATE OF SERVICE**

I certify that I filed this document through the CM/ECF system.

_/s/ Patrick Strawbridge_

## **CERTIFICATE OF FONT**

I certify that this brief was prepared with Book Antiqua size 13 per LR 5.1.

_/s/ Patrick Strawbridge_