IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| ISAAC A., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:24-cv-37-AT |
| RUSSEL CARLSON, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

This is a putative class action in which children with serious emotional and behavioral disabilities allege that Georgia's relevant state health agencies have failed to provide legally required home and community-based mental health care. Plaintiffs allege that this failure has resulted in the unnecessary institutionalization of Plaintiffs and other similarly situated children; the deterioration of their conditions; the wrongful segregation of Plaintiffs from their families and communities; and numerous other harms. Plaintiffs assert claims under the Medicaid Act, 42 U.S.C. § 1396 *et seq*., the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).

Faced with serious and detailed allegations of violations of federal law, Defendants launch a slew of half-formed arguments, many of which are directly

contrary to binding legal authority. For the reasons below, Defendants' Motion to Dismiss [Doc. 32] is **DENIED** in full.

## I.    FACTUAL BACKGROUND[1]

### A.    The Parties

The Plaintiffs in this case are four individual children (Isaac, Zack, Leon, and Samuel) and one organization (the Georgia Advocacy Office).

The Individual Plaintiffs have been diagnosed with a constellation of mental health conditions — for example, Bi-polar Disorder, Oppositional Defiant Disorder ("ODD"), Disruptive Mood Dysregulation Disorder ("DMDD"), Attention Deficit Hyperactivity Disorder ("ADHD"), Reactive Attachment Disorder, and more. (Compl., Doc. 1 ¶¶ 25, 37, 47, 57). Each Individual Plaintiff meets the criteria for having "Serious Emotional Disturbance." (*Id.* ¶¶ 5, 24, 36, 47, 57). A child has "Serious Emotional Disturbance" if he has a "diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria" specified in the Diagnostic and Statistical Manual of Mental Disorders ("DSM") that results "in functional impairment which substantially interferes with or limits the child's role or functioning in family, school, or community activities." *See* Ctr. for Mental Health Servs., 58 Fed. Reg. 29422-02, 29425, 1993 WL 167366 (May 20, 1993).

Each Individual Plaintiff has experienced repeated emergency room visits and/or repeated admissions to psychiatric institutions over the course of his young life. (Compl., Doc. 1 ¶¶ 26–27, 38, 41, 49, 61) (alleging that: Isaac experienced 11

---

[1] An appendix of acronyms and abbreviations used in this Order is attached to this Order.

placements in psychiatric institutions by the time he was 8 years old; Zack had 16 admissions to psychiatric institutions in 2022 alone; Leon was institutionalized three times between 2020 and 2022; and Samuel has been hospitalized 10 times).

The Individual Plaintiffs allege that they need additional home and community-based services[2] to effectively treat their conditions. (*Id.* ¶¶ 11, 33, 44, 54, 64). Each Individual Plaintiff has received referrals for some form of these home and community-based services. (*Id.* ¶¶ 28, 40, 50, 52, 62). However, as alleged, Defendants have systematically failed to provide the required home and community-based services to Plaintiffs and other children like them. (*Id.* ¶¶ 1, 2). The Complaint includes specific allegations about Defendants' failure to provide such services to the Individual Plaintiffs. (*See, e.g.*, *id.* ¶ 60 (alleging that Samuel's parents called for Mobile Crisis Response services but received a police response instead); *id.* ¶ 52 (alleging that Leon was supposed to be discharged from a psychiatric residential treatment program in 90 days with access to intensive in-home services but Defendants had still not arranged these in-home services 18 months later)).

As a result of Defendants' alleged failure to provide the home and community-based services, Plaintiffs have suffered a series of harms: unnecessary institutionalizations, deterioration of their health conditions, increased treatment needs, avoidable trauma, repeated emergency room visits, relinquishment to child

---

[2] The particular home and community-based services at issue are outlined in the next section.

welfare systems, disruptions to family and community life, and more. (*Id.* ¶ 2). For example, without the needed home and community-based services, Isaac and Zack's mothers have been unable to care for them in the home; so, Isaac and Zack remain institutionalized, under the temporary custody of DFCS. (*Id.* ¶¶ 29, 31, 43). Both Isaac and Zack's mothers want them to return home — with the necessary services. (*Id.*) Meanwhile, Samuel's conditions (Reactive Attachment Disorder, DMDD, and ADHD) continue to deteriorate without the necessary home and community-based services. (*Id.* ¶ 63). As a result, Samuel's family is forced to keep him at home when he is not at school, for his own safety. (*Id.*)

The Individual Plaintiffs seek to represent a class of similarly situated children. Plaintiffs define the putative class as:

> [A]ll Medicaid-eligible children under the age of 21 residing in the State of Georgia with Serious Emotional Disturbance for whom the Remedial Services have not been provided and who (a) during the 12 month period before the filing of the Complaint or thereafter were admitted to a Psychiatric Institution, as defined in Paragraph 8, to obtain mental health care; or (b) visited a hospital emergency room seeking mental health care at least twice during the 12 month period before the filing of the Complaint, or within any span of 12 months thereafter.

(*Id.* ¶ 65).

In addition to the Individual Plaintiffs, there is one organizational Plaintiff. The Georgia Advocacy Office ("GAO") has, since 1977, been designated by the State of Georgia as an organization tasked with protecting the legal rights of individuals

with disabilities, including children. (*Id.* ¶ 66).[3] The Individual Plaintiffs and members of the proposed class are constituent members of GAO. (*Id.* ¶ 69).

On the opposing side are three Defendants, the heads of the three relevant Georgia health agencies. They are all sued in their official capacities. The first is Defendant Russel Carlson — the Commissioner of the Department of Community Health ("DCH"), the state agency responsible for administering the Georgia Medicaid Program.[4] (*Id.* ¶ 71). In his role as Commissioner of DCH, Defendant Carlson is charged with administering the Georgia Medicaid program and ensuring compliance with the Medicaid Act. (*Id.* ¶ 72).

The second is Defendant Kevin Tanner — the Commissioner of the Department of Behavioral Health and Developmental Disabilities ("DBHDD"). DBHDD is Georgia's public agency responsible for providing treatment and support services to children with mental illnesses, addictive diseases, and developmental and intellectual disabilities.[5] (*Id.* ¶ 74). In his role as Commissioner of DBHDD, Defendant Tanner directs and oversees the provision of publicly funded mental health services for children and ensures that DBHDD's programs and services comply with the ADA and Rehabilitation Act. (*Id.* ¶¶ 75–76).

---

[3] *See* Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801; Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15041; Rehabilitation Act of 1973, 29 U.S.C. § 794e.

[4] *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; O.C.G.A. § 49-4-14.

[5] *See* O.C.G.A. § 37-1-20.

The third is Defendant Candice Broce — the Commissioner of the Georgia Department of Human Services and the Director of the Georgia Division of Family and Children Services (collectively, "DFCS"), Georgia's child welfare agency.[6] (*Id.* ¶ 77). In her role as Commissioner of DFCS, Defendant Broce is responsible for (1) managing the care and treatment provided to youth in DFCS custody and (2) ensuring that children in DFCS custody receive care and treatment in accordance with the requirements of the ADA and the Rehabilitation Act. (*Id.* ¶¶ 78–79).

### B.   The Remedial Services

Plaintiffs allege that Defendants have failed to provide three particular home and community-based services, which Plaintiffs collectively refer to as the Remedial Services. The Court will use this descriptor as well. These three Remedial Services are: (1) Intensive Care Coordination; (2) Intensive In-Home Services; and (3) Mobile Crisis Response Services.

Intensive Care Coordination is a "team-based, collaborative process for developing and implementing individualized care plans for children and youth with complex needs and their families." (*Id.* ¶ 147). *See also* Substance Abuse & Mental Health Servs. Admin., *Joint CMCS and SAMHSA Informational Bulletin* (May 7, 2013) at 3.[7] Intensive Care Coordination involves a facilitator who organizes and coordinates a child's care plan. *Id.* The facilitator works with the child, the child's family, the child's health providers, and key members of the

---

[6] *See* O.C.G.A. § 49-5-8.

[7] https://www.medicaid.gov/federal-policy-guidance/downloads/cib-05-07-2013.pdf

child's formal and informal support network to develop and monitor an individualized care plan. *Id*. The facilitator will: ensure that a child is properly assessed; coordinate and arrange for services for the child (such as counseling or access to crisis services); ensure continued access to needed services; and monitor the child's progress. *Id*. Intensive Care Coordination is necessary to coordinate and oversee the delivery of services for children with Serious Emotional Disturbance who need or receive services from multiple providers or are involved with multiple child-serving systems. (Compl., Doc. 1 ¶ 148). Since 2013, the Center for Medicaid and CHIP Services ("CMCS") and the Substance Abuse and Mental Health Services Administration ("SAMHSA") have advised that Intensive Care Coordination is clinically effective in allowing children with Serious Emotional Disturbance to live in their homes and participate fully in family and community life, rather than be segregated in institutional settings. *See* Substance Abuse & Mental Health Servs. Admin., *Joint CMCS and SAMHSA Informational Bulletin* (May 7, 2013) at 1.

Georgia offers a service similar to Intensive Care Coordination called Intensive Customized Care Coordination ("IC3"), but only offers this service to a small subset of children. In 2008, Georgia implemented IC3 after receiving a "federal demonstration grant" that allowed Georgia and eight other states to compare effective ways of providing home and community-based care to Medicaid-enrolled children. (Compl., Doc. 1 ¶ 149). During the "demonstration" period, Georgia provided IC3 services to over 500 children and achieved significant clinical success, as well as significant per-capita savings. (*Id*.). For a time, Georgia

expanded the IC3 services to serve as many as 4,240 children — however, after a few years, that number dwindled. (*Id.* ¶ 150). Currently, only a tiny fraction (under 350 children) of Georgia's Medicaid-enrolled children with Serious Emotional Disturbance receive IC3 — far fewer than the number of children who need it. (*Id.* ¶¶ 152, 155). In addition, some of the IC3 care that is provided does not include the full scope of Intensive Care Coordination services. (*Id.* ¶ 158).

The second Remedial Service is Intensive In-Home Services. These services are "therapeutic interventions delivered to children and families in their homes and other community settings" to prevent out-of-home placements. (*Id.* ¶ 162). *See also* Substance Abuse & Mental Health Servs. Admin., *Joint CMCS and SAMHSA Informational Bulletin* at 4. These Intensive In-Home Services include "individual and family therapy," "behavioral interventions," and "skills training." *Id.* The service is developed by a team that ensures access to therapy provided by a licensed clinician and skills training provided by a paraprofessional. *Id.*

As alleged, Georgia does not adequately offer such Intensive In-Home Services. (Compl., Doc. 1 ¶ 163). Instead, Georgia offers a service called Intensive Family Intervention ("IFI"). IFI does not meet the requirements of Intensive In-Home Services because: it does not provide all the necessary treatments; it is time-limited (regardless of a child's ongoing needs) and is only provided for short periods of time; it excludes children who have co-occurring conditions (like Autism); and it is only provided to a small number of children. (*Id.* ¶¶ 163–168).

The third Remedial Service is Mobile Crisis Response Services. Mobile Crisis Response Services include a "crisis team" that is available 24/7 to children and their families to help defuse and de-escalate difficult mental health situations. (*Id*. ¶ 173). *See also* Substance Abuse & Mental Health Servs. Admin., *Joint CMCS and SAMHSA Informational Bulletin* at 5. The "crisis team" is comprised of professionals and paraprofessionals who are trained in crisis intervention skills and in serving as first responders to children and families needing help on an emergency basis. *Id*. Mobile Crisis Response Services should be provided in the home or in any setting where a crisis may be occurring. *Id*. In addition to resolving a given crisis, the "crisis team" works with the family to identify potential triggers of future crises and learn strategies for effectively dealing with potential future crises. *Id*. These services offer quick relief for a given crisis, meet families in an environment where they are comfortable, provide appropriate care, and avoid unnecessary law enforcement involvement and hospitalization. (Compl., Doc. 1 ¶ 174).

As alleged, Georgia does not deliver Mobile Crisis Response Services to children who need them. Crisis services are rarely available. (*Id*. ¶ 175). According to Dr. Michelle Zeannah of Behavioral Pediatricians of Rural Georgia, although there is a Georgia crisis phone line (the Georgia Crisis and Access Line or "GCAL"), families report that, often, no one actually comes to do an evaluation or respond to a crisis; that services come more than six hours after the family has called the crisis line; or that families are told to instead call law enforcement. (*Id*. ¶ 176). Data from

July 2019 to January 2023 shows that only 18.79% of all calls to GCAL involving a child resulted in the dispatch of a mobile crisis team to the requested location. (*Id.* ¶ 180).[8]

### C.    Background on the Relevant Statutes and Programs

Plaintiffs bring their claims under the Medicaid Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

### 1.  The Medicaid Act

In 1965, Congress enacted the Medicaid Act, 42 U.S.C. § 1396 *et seq.,* as Title XIX of the Social Security Act. Medicaid is a jointly financed federal–state cooperative program, designed to help states furnish low-income individuals with medical assistance, as well as rehabilitation and related services that allow those individuals to attain or retain capability for independence or self-care. *See* 42 U.S.C. § 1396-1; *see also Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011).

Participation by states in the Medicaid program is voluntary. *Moore*, 637 F.3d at 1232. All states, including Georgia, have opted to participate. States are reimbursed by the federal government for a significant portion of the cost of providing Medicaid benefits. *Id.* Once a state chooses to participate in Medicaid, it

---

[8] Plaintiffs refer to the services that Georgia currently provides — IC3, IFI, and the Georgia Crisis and Access Line — as "Specialty Services." (Compl., Doc. 1 ¶ 122). As alleged, these Specialty Services are not the equivalent of the requested Remedial Services. (*Id.* ¶¶ 122, 133, 134, 163–164, 175).

must comply with all requirements of the Medicaid Act and its implementing regulations and mandatory guidelines. *Id.*

One such mandatory requirement is that a participating state designate a single state agency to administer the Medicaid program and ensure that the program complies with all relevant laws and regulations. *See* 42 C.F.R. § 431.10(e). Georgia has done so with DCH.[9]

Another core requirement is that a participating state must submit a "state Medicaid plan" to the Secretary of Health and Human Services ("HHS") for approval. 42 U.S.C. § 1396a(a). The plan describes the administration of the Medicaid program and identifies the services Georgia will provide to eligible beneficiaries. *Id.* A state's plan must arrange for or provide certain mandatory services. *Id.*

One type of mandatory services that a state must provide is early and periodic screening, diagnostic and treatment services ("EPSDT services") for beneficiaries under age 21. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(a)(43), 1396d(r). A number of statutory provisions make up this EPSDT Mandate. EPSDT services include "screening services" that are designed to detect the existence of certain physical or mental illnesses or conditions. *See id.* § 1396d(r). These screening services include (1) periodic screenings at regular intervals and (2) "interperiodic" screenings that are indicated as necessary by

---

[9] *About Us*, Georgia Department of Community Health, https://dch.georgia.gov/about-us.

various professionals that interact with a child (such as doctors; health, developmental, or educational professionals; personnel working for state early intervention programs; or individuals in similar roles). *See* Ctrs. for Medicare & Medicaid Servs., *EPSDT-A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* (June 2014) at 4–6.[10]

Besides "screening services," EPSDT services includes all "health care, diagnostic services, treatments, and other measures described in subsection (a)" that are necessary to correct or ameliorate a child's "physical and mental illnesses and conditions" revealed by the screening services. *See* 42 U.S.C. § 1396d(r)(5). The services described in subsection (a) include "case management services," *see id.* § 1396d(a)(19), and rehabilitative services, *see id.* § 1396d(a)(13).

"Case management services" are services that will assist a child with gaining access to needed medical, social, educational, and other services — such as (1) providing assessments to determine a child's needs, (2) developing a specific care plan based on information collected through the assessments, (3) referrals to providers and scheduling appointments for the child, (4) monitoring and follow-up to ensure the care plan is effectively implemented, and more. *See id.* § 1396n.

Rehabilitative services include any "remedial services" provided in the home or another setting that are recommended by a physician (or other licensed

---

[10] https://www.medicaid.gov/medicaid/benefits/downloads/epsdt-coverage-guide.pdf

practitioner) for the "maximum reduction of physical or mental disability and restoration of [a child] to the best possible functional level." *Id.* § 1396d(a)(13)(C).

Plaintiffs assert that the above provisions encompass the three Remedial Services at issue in this case: Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response Services.

The purpose of the EPSDT Mandate is to ascertain children's physical and mental health conditions as early as possible and ensure eligible children receive services needed to correct or ameliorate defects and physical and mental illnesses and conditions. *See id.* § 1396d(r)(5). Even when a particular EPSDT service or treatment is not included in a state's Medicaid plan, the state must nevertheless provide that service or treatment if it is listed in § 1396d(a) of the Medicaid Act and/or is necessary to correct or ameliorate the child's condition. *Id.* § 1396a(a)(43)(C); 42 C.F.R. § 441.57.

In connection with its obligation to make EPSDT screening and treatment services generally available, Georgia is also required to:

- inform all eligible children and their families of the availability of EPSDT services, *see* 42 U.S.C. § 1396d(r);

- provide for and/or arranging screening services any time services are requested, *see id.* § 1396a(a)(43)(B));

- provide for and/or arrange for corrective treatment when the need for treatment is disclosed by screening services, *see id.* § 1396a(a)(43);

- make EPSDT services (and other medical assistance) available to eligible children "with reasonable promptness," *see id.* § 1396a(a)(8).[11]

### 2. The Americans with Disabilities Act

In 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id.* § 12101(a)(2).

One form of discrimination that is prohibited by the ADA is the needless segregation of persons with disabilities. *See id.* § 12101(a)(3). The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. Put succinctly, the ADA prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

---

[11] "Reasonable promptness" generally means that the treatment must be initiated within six months, at the latest. *See* 42 C.F.R. § 441.56(e) (explaining that states must "set standards for the timely provision of EPSDT services which meet reasonable standards of medical . . . practice . . . and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services").

ADA regulations require states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). An "integrated setting" is one that "enables individuals to interact with non-disabled peers to the fullest extent possible." *Id.* pt. 35, app. A. In administering programs, states are prohibited from using program eligibility criteria that discriminate against disabled individuals. *Id.* § 35.130(b)(3). Further, in administering programs, states must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the state can demonstrate that making the modifications would fundamentally alter the nature of the service program or activity. *Id.* § 35.130(b)(7).

### 3. Section 504 of the Rehabilitation Act of 1973

Section 504 of the Rehabilitation Act prohibits the exclusion of, and discrimination against, individuals with disabilities in any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

In administering programs and services, a recipient of federal financial assistance — like Georgia, under Medicaid — cannot afford disabled individuals less opportunity to access a benefit or service than nondisabled individuals. 28 C.F.R. § 41.51(b). And, like the ADA, the Rehabilitation Act requires recipients of federal financial assistance to administer programs and provided services in the most integrated setting appropriate to the needs of the disabled individual. *Id.* § 41.51(d). Also like the ADA, the Rehabilitation Act prohibits a funding recipient

from using program eligibility criteria that (a) discriminate against disabled individuals or (b) effectively defeat the objectives of the program with respect to disabled individuals. *Id.* § 41.51(b)(3), (b)(4).

### D.    Procedural History

Plaintiffs filed their Complaint on January 3, 2024. (Doc. 1). Plaintiffs assert four claims. In Count I, Plaintiffs allege that Defendant Carlson has violated the EPSDT Mandate of the Medicaid Act by failing to provide the children with and arrange for required Remedial Services. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r), 1396a(a)(43)(C). In Count II, Plaintiffs allege that Defendant Carlson has violated the reasonable promptness provision of the Medicaid Act by not providing the required services with reasonable promptness. *See id.* § 1396a(a)(8). In Counts III and IV, Plaintiffs allege that all three Defendants have violated the ADA and Section 504 of the Rehabilitation Act by, respectively, impermissibly segregating the Plaintiffs (and those similarly situated) in institutions and hospitals; putting the Plaintiffs at serious risk of segregation; impermissibly excluding the Plaintiffs from medically necessary services based on their disabilities; and discriminating against Plaintiffs based on their disabilities. Plaintiffs seek declaratory judgment and permanent injunctive relief. As injunctive relief, Plaintiffs ask the Court to require Defendants to:

- provide Plaintiffs (and putative class members) timely access to the Remedial Services;

- conduct professionally adequate assessments of Plaintiffs and class members who have experienced repeated admissions to

psychiatric institutions to determine whether the Remedial Services are necessary to treat their conditions;

- provide meaningful notice and information to putative class members and their families of the availability of Remedial Services;

- remove administrative barriers that prevent Plaintiffs and putative class members from receiving Remedial Services;

- ensure sufficient provider network capacity to deliver Remedial Services to Plaintiffs and putative class members on a timely basis;

- establish and implement policies to avoid subjecting Plaintiffs and putative class members to unnecessary segregation; and more.

In addition to declaratory and injunctive relief, Plaintiffs also seek attorneys' fees and costs.

Defendants moved to dismiss on March 4, 2024. (Doc. 32). Plaintiffs filed their response (Doc. 39), and Defendants replied (Doc. 43). On April 22, 2024, the United States submitted a Statement of Interest in support of certain arguments made by the Plaintiffs. (Doc. 41).

Having outlined the relevant parties, their alleged injuries, the relevant services, and the statutory background, the Court next provides the legal standard and then turns to Defendants' volley of arguments for dismissal.

## II.    LEGAL STANDARD

A party may move to dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). "Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279

(11th Cir. 2009). Where a defendant asserts a facial challenge, as Defendants do here, the Court takes the complaint's allegations as true and assesses whether the facts alleged sufficiently support a basis for subject matter jurisdiction. *Id.*

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing such a motion, a court must accept the complaint's factual allegations, though not its legal conclusions, as true. *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."

## III.  ANALYSIS

Defendants move to dismiss Plaintiffs' Complaint on the following grounds: standing; sovereign immunity; the anticommandeering principle; and failure to state Medicaid Act, ADA, and Rehabilitation Act claims. The Court addresses these arguments in turn.[12]

---

[12] The Court rejects up front Defendants' unnecessary argument that Plaintiffs' Complaint constitutes a "shotgun pleading." The Complaint is certainly thorough, but it includes allegations of specific, material facts that allow Defendants to determine the factual allegations intended to support each claim for relief. *See Pinson v. JPMorgan Chase Bank, N.A.*, 942 F.3d 1200, 1208 (11th Cir. 2019). The Complaint also provides notice of Plaintiffs' claims and the grounds for each. *Id.* If anything here is a "shotgun" filing, it is Defendants' Motion to Dismiss, which challenges Plaintiffs' Complaint by lodging a series of superficial arguments; ignoring well-settled Supreme Court and Eleventh Circuit authority; and misrepresenting Plaintiffs' allegations.

### A.    Standing

As discussed in Section I.A., the Plaintiffs here are four individuals and one organization. Each Individual Plaintiff has been diagnosed with an assortment of mental health conditions and meets the requirements for having Serious Emotional Disturbance. Each of the Individual Plaintiffs allege that Defendants' failure to provide the Remedial Service has caused him harm in the form of: unnecessary institutionalization, separation from family and community, a deterioration of his condition, avoidable trauma, and more.

For example, Isaac — who has been diagnosed with Bi-polar Disorder, OCD, ADHD, ODD, DMDD — alleges that Defendants failed to provide him with the necessary Remedial Services. (Compl., Doc. 1 ¶¶ 25, 27, 31, 33). As a result of Defendants' failure to provide Remedial Services, Isaac has been segregated from his family and his community, has experienced wrongful institutionalization (during which he suffered numerous instances of physical and chemical restraints), and has suffered avoidable trauma. (*Id.* ¶¶ 29–31, 33).

Zack — who has ADHD, Bi-polar Disorder, and DMDD — alleges that Defendants' failure to provide Remedial Services has caused him to suffer unnecessary institutionalization (including 16 admissions to psychiatric institutions); avoidable trauma (18 admissions to the ER); segregation from family and friends; and the worsening of his mental health conditions. (*Id.* ¶¶ 37, 38, 41, 43, 44).

Leon — who has DMDD, Generalized Anxiety Disorder, ADHD, and Autism — alleges that Defendants' failure to provide Remedial Services has caused him to suffer unnecessary institutionalization (three institutionalizations between November 2020 and January 2022) and unwarranted segregation from his family and community. (*Id.* ¶¶ 47, 49, 50, 51, 53, 54).

Finally, Samuel — who has Reactive Attachment Disorder, DMDD, and ADHD — alleges that Defendants' failure to provide Remedial Services has caused him avoidable trauma, repeated hospitalization, the deterioration of his conditions, segregation in his own home, and an inability to participate in family and community life. (*Id.* ¶¶ 57, 59, 61, 63, 64).

The Complaint further alleges that all Plaintiffs and putative class members have suffered the following harms: unnecessary institutionalization as a result of worsening of symptoms, deterioration of their mental health conditions, increased treatment needs, avoidable trauma, repeated mental health crises and emergency room visits, relinquishment to child welfare systems, juvenile justice involvement, and the damaging disruptions to Plaintiffs' participation in family and community life. (*Id.* ¶ 2).

***

A plaintiff bears the burden of demonstrating that he has standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("*Lujan II*")). Standing is determined at the time a plaintiff's complaint is filed. *Arcia v. Fla. Sec. of State*, 772 F.3d 1335, 1340 (11th

20

Cir. 2014). To demonstrate standing to pursue a particular form of relief, a plaintiff must show (1) that he suffered an injury in fact that is "concrete, particularized, and actual or imminent;" (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by the judicial relief sought. *Ramirez*, 594 U.S. at 423 (citing *Lujan II*, 504 U.S. at 560–61). When a plaintiff seeks prospective injunctive relief, he must demonstrate a "'real and immediate threat' of future injury." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1274–75 (11th Cir. 2003) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)).

### 1. The Individual Plaintiffs Have Suffered Cognizable Injuries

To support a cognizable injury in fact, a plaintiff must show that his injury is: (a) "concrete," meaning real and not abstract; (b) "particularized," meaning that it affects "the plaintiff in a personal and individual way," rather than being a generalized grievance; and (c) "actual or imminent, not speculative," meaning that the injury has already occurred or will likely occur soon. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Here, Plaintiffs' injuries are concrete. They allege a slew of "real" harms including: the deterioration of their conditions, avoidable trauma, wrongful institutionalization, and separation from their families and communities. (Compl., Doc. 1 ¶ 2). The Eleventh Circuit has long held that a plaintiff who experiences a deterioration of health conditions because the state failed to provide required services has suffered a concrete injury. *See Doe 1-13 ex rel. Doe, Sr. 1-13 v. Chiles*,

136 F.3d 709, 713 n.7 (11th Cir. 1998) (finding defendants' standing argument "meritless and unworthy of further discourse" where evidence showed that defendants' failure to provide Medicaid services in a timely fashion caused plaintiff to lose several skills and fail to develop others, and would continue to cause her harm each day she was denied services). In addition, the Supreme Court has long held that individuals who are stigmatized and separated from others because of their disabilities suffer cognizable stigmatic harm. *Hackler v. Mathews*, 465 U.S. 728, 739–40 (1984); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1114 (11th Cir. 2021) (finding that plaintiff, a deaf individual, adequately alleged cognizable stigmatic injury where the city published videos that were inaccessible to deaf individuals and failed to provide her requested accommodation). And the Supreme Court has recognized that the unjustified institutionalization of disabled individuals causes both cognizable stigmatic injury and social, developmental injury. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–601 (1999) ("[C]onfinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic dependence, educational advancement, and cultural enrichment."). Considering the thorough allegations in the Complaint alongside this longstanding legal authority, Plaintiffs plainly allege a concrete injury.

Besides being concrete, Plaintiffs' injuries are also particularized. Plaintiffs' injuries — e.g., the deteriorations of their conditions, the separations from their families and communities — plainly impact each of them in individualized ways.

For example, Isaac has suffered prolonged periods of institutionalization involving traumatic physical and chemical restraints and is currently institutionalized over 800 miles away from his family. (Compl., Doc. 1 ¶¶ 30–31). And Samuel's conditions (Reactive Attachment Disorder, DMDD, ADHD) continue to deteriorate without Remedial Services, and he has been confined in his own home, with an alarm on his bedroom door. (*Id.* ¶ 63).

The Court rejects Defendants' nonsensical arguments that Plaintiffs' injuries are "generalized grievances" simply because of the potential size of the class. A "generalized grievance" occurs where a plaintiff asserts an injury undifferentiated and common to all members of the public, *see Lujan II*, 504 U.S. at 575, or where the plaintiff seeks to compel the government to follow the law when he himself has suffered *no direct injury* in connection with the government's failure, *Commonwealth of Mass. v. Mellon*, 262 U.S. 447, 488 (1923) (explaining that a plaintiff must show "that he has sustained or is immediately in danger of sustaining some direct injury" and "not merely that he suffers in some indefinite way in common with people generally").

That is not the situation here. Plaintiffs do not allege indefinite injury common to all members of the public, but specific injuries (e.g., deterioration of each of their conditions) that they have and will continue to suffer because they are Medicaid-eligible children with severe emotional disturbance disorders who have allegedly been denied required Medicaid services. That there are possibly tens of thousands of putative class members here makes no difference. "[S]tanding is not

to be denied simply because many people suffer the same injury. . . . To deny standing to persons who are in fact injured simply because many others are also injured[] would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688 (1973). Courts "cannot accept that conclusion." *Id.* Defendants' contention that Plaintiffs assert generalized grievances crosses the line into frivolous territory. The Court cautions defense counsel to take care in making such unfounded arguments in the future. The Court expects better.[13]

Finally, Plaintiffs adequately allege that their injury is actual or imminent. Plaintiffs have alleged that they have suffered actual harm (e.g., the deterioration of their conditions), as well as ongoing, continuing harm. (Compl., Doc. 1 ¶¶ 33, 44, 54, 63, 64) (alleging that Plaintiffs' conditions will continue to deteriorate and that they will continue to experience wrongful and prolonged institutionalization). *See Chiles*, 136 F.3d at 713 n.7 (holding that plaintiff established future injury where a treating professional testified that plaintiff's conditions were worsening every day that she was denied Medicaid services). Accordingly, Plaintiffs

---

[13] Defendants' reliance on *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) is misguided. In that election case, Wood asserted no personal rights or distinct personal injury, as Plaintiffs do here, but merely sought to require the government to follow the law. *Id.* at 1312, 1314. Defendants' reliance on *Department of Education v. Brown*, 600 U.S. 551, 563–64 (2023), is similarly misplaced. There, the plaintiffs challenged the government's failure to adopt a benefits program that would benefit them. The situation is very different here, where Plaintiffs allege that they are *presently* entitled to receive medically necessary services under the Medicaid Act's *existing* provisions.

sufficiently allege that they have suffered cognizable injuries that are concrete, particularized, actual, and ongoing.[14]

### 2. The Individual Plaintiffs' Injuries Are Traceable to Defendants' Alleged Acts and Omissions

To meet the traceability requirement, a plaintiff must allege a causal connection between the plaintiff's injuries and the defendant's legal violation. *Lujan II*, 504 U.S. at 560. Traceability "is not an exacting standard" and even "harms that flow indirectly" from the defendant's actions can be "fairly traceable." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023); *see also Focus on the Fam.*, 344 F.3d at 1274–75 (finding that traceability requirement was met where record evidence showed that defendant was involved in the challenged action).

Here, Plaintiffs clearly allege adequate facts to support a causal connection between Defendants' alleged failure to provide Remedial Services — in violation of the Medicaid Act, the ADA, and the Rehabilitation Act — and their harms (e.g., wrongful institutionalization, deterioration of their conditions).

---

[14] In two short sentences, Defendants appear to suggest that Plaintiffs lack standing to challenge Defendants' failure to provide Mobile Crisis Response Services because these are emergency services and Plaintiffs do not allege a specific ongoing situation requiring a Mobile Crisis Response team. (MTD, Doc. 32-1 at 20). Yet, Plaintiffs are not required to point to a specific ongoing emergency situation awaiting a Mobile Crisis Response team. Plaintiffs *do allege* that Samuel D. (and other class members) received police responses instead of the Mobile Crisis Services to which he is allegedly entitled under Medicaid. (Compl., Doc. 1 ¶¶ 60, 172, 179, 180). The Complaint also relies on physician testimony that these Mobile Crisis Response Services are rarely available when needed, (*id*. ¶ 176), and that Defendants' failure to provide these services causes harm to class members and will continue to harm them going forward (*id*. ¶ 181). Defendants' cursory, confusing contention as to standing in connection with the Mobile Crisis Response Services is meritless at this juncture.

For example, the Complaint alleges:

- that Defendant Carlson, in his role as Commissioner of Georgia's sole state Medicaid agency (DCH), is responsible for administering the state Medicaid program and is responsible for ensuring that eligible children receive medically necessary services in compliance with the Medicaid Act (Compl., Doc. 1 ¶¶ 71–73, 80–99, 118);

- that Defendant Carlson's agency (DCH) has failed to provide eligible children (including the Plaintiffs) with Remedial Services that are required under Medicaid (*id.* ¶¶ 7, 11, 15, 29, 31, 41, 43, 53, 60–61, 210–217); and

- that, as a result of this failure to provide Remedial Services, Plaintiffs and putative class members have suffered harm (*id.* ¶¶ 2, 30, 33, 44, 54, 64).

In addition, the Complaint alleges:

- that all three Defendants (as heads of DCH, DBHDD, and DHS) are responsible for ensuring that the programs that they administer and the services they provide comply with the ADA and Section 504 of the Rehabilitation Act (*id.* ¶¶ 73–79, 100–114);

- that all Defendants have failed to provide Plaintiffs and class members Remedial Services and so have discriminated against them in violation of the ADA and Section 504 (*id.* ¶¶ 7, 11, 13–14, 115–134, 145–196, 219–233);

- that Plaintiffs and putative class members have suffered harm as a result of Defendants' discriminatory failure to provide Remedial Services (*id.* ¶¶ 2, 8, 13, 33, 44, 54, 64).

Where plaintiffs allege that the individuals who administer state Medicaid agencies have failed to provide requisite services in accordance with federal law, thereby harming the plaintiffs, those allegations meet the traceability requirement. *See M.G. v. N.Y. State Off. of Mental Health*, 572 F. Supp. 3d 1, 12–13 (S.D.N.Y.

2021) (finding traceability requirement met where class of formerly incarcerated individuals with mental disabilities alleged that defendants failed to adequately administer, oversee, and fund the state's mental health systems, thereby resulting in their unnecessary institutionalizations); *Murphy ex rel. Murphy v. Minn. Dep't of Hum. Servs.*, 260 F. Supp. 3d 1084, 1102 (D. Minn. 2017) (finding traceability requirement met where plaintiffs alleged that state agencies failed to properly administer disability services, thereby resulting in plaintiffs' wrongful segregation); *Parrales v. Dudek*, 2015 WL 13373978, at *4 (N.D. Fla. Dec. 24, 2015) (finding traceability requirement met where plaintiffs alleged that state Medicaid agency was responsible for administering long-term care program at issue, that state agency failed to inform plaintiffs of the programs' contours, and that the state thereby blocked plaintiffs from receiving legally required long-term care programs, causing them harm); *Timothy B. v. Kinsley*, 2024 WL 1350071, at *6 (M.D.N.C. Mar. 29, 2024) (finding traceability requirement met where plaintiffs alleged that North Carolina's state Medicaid agency failed to ensure that plaintiffs received child services in the most integrated setting, thereby resulting in the wrongful institutionalization of plaintiffs).

Defendants' contrary arguments are unsupported. They first contend that Plaintiffs fail to meet the traceability requirement because they rely solely "on Defendants' general 'regulatory responsibilities,' which is not enough." (MTD, Doc. 32-1 at 22). In support, Defendants cite dicta from *BBX Cap. v. Federal Deposit Insurance Corporation* — a case that is not about Medicaid services — stating that

"a plaintiff must allege how the agency's action or inaction caused the plaintiff's alleged injury" and that "[s]imply describing an agency's regulatory responsibilities is not enough." 956 F.3d 1304, 1314 (11th Cir. 2020) (holding that the plaintiff-company failed to allege that it sustained any injury traceable to an action or inaction of the Federal Reserve Board in connection with FDIC's rejection of golden parachute payments that the plaintiff-company wished to pay employees). Here, Plaintiffs *have* plainly alleged a clear causal link between Defendants' failure to provide required Remedial Services and their injury, unlike in *BBX Cap*. They have done far more that simply describe DCH, DBHDD and DHS's responsibilities. *See supra* at 26.

Second, Defendants argue that Plaintiffs' injuries are independently caused by their doctors' failure to make medical necessity determinations. (MTD, Doc. 32-1 at 22–23). But, first, no allegations in the Complaint support Defendants' assertion that doctors failed to make medical necessity determinations. Rather, the Complaint alleges that Plaintiffs and putative class members were denied medically home and community-based services that medical professionals recommended. (*See* Compl., Doc. 1 ¶¶ 2, 12, 13, 163, 188, 216, 222; *see also infra* at 64–66). Moreover, it makes little sense for doctors to have made medical necessity determinations for programs that Defendants did not make available. *See Rosie D. v. Romney,* 410 F. Supp. 2d 18, 45 (D. Mass. 2006) (noting that clinicians

hesitate to prescribe treatments that are not listed in Medicaid billing codes).[15] Finally, "standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty.*, 148 F.3d 1231, 1247–49 (11th Cir. 1998) (citing *Lujan II*, 504 U.S. at 560). Thus, even if it were true that Plaintiffs' doctors were somehow partially responsible for their injuries, that would not defeat traceability here. In short, Plaintiffs' have, at this juncture, adequately alleged that their injuries were caused by Defendants' failures to provide legally required Remedial Services.

### 3. The Individual Plaintiffs' Injuries Are Redressable by the Injunctive Relief Sought

"To determine whether an injury is redressable, [courts] consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024). If a favorable decision would significantly increase "the likelihood that the plaintiff would obtain relief that directly redresses" his injury, then the redressability requirement is met. *Mulhall v. UNITE HERE Loc. 355*, 618 F.3d 1279, 1290 (11th Cir. 2010).

Here, Plaintiffs seek a permanent injunction requiring Defendants to:

- provide and arrange for timely access to medically necessary Remedial Services;

---

[15] The Medicaid Act demands that the state Medicaid agency provide required services and also provide relevant criteria to guide clinicians in making medical assessment determinations. *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1259–60 (11th Cir. 2011) (noting that a state agency cannot outright refuse to provide required services to eligible children).

- conduct assessments of the class members who have experienced repeated admissions to psychiatric institutions to determine whether Remedial Services are necessary to treat their conditions in the community;

- establish and implement policies to ensure that class members receive Remedial Services and that they avoid unnecessary segregation and institutionalization;

- establish and implement policies to ensure class members receive comprehensive discharge planning upon discharge from psychiatric institutions, among other actions; and more.

(Compl., Doc. 1 ¶ 239).

A permanent injunction would undoubtedly "increase the likelihood" of Plaintiffs obtaining relief that would redress their injuries. Namely, if Defendants were to conduct assessments of class members who have experienced repeated institutionalizations; establish discharge planning policies; and generally implement policies to ensure that class members receive Remedial Services, then Plaintiffs would likely be able to remain in their homes; would not suffer wrongful separation from their families and communities; and their conditions would be less likely to deteriorate. Plaintiffs have alleged as much, and the Court accepts those allegations as true at this stage of the proceedings. (*See, e.g.*, *id.* ¶¶ 32–33, 43–44 (alleging that Isaac and Zack would likely be able to return home to their families if Remedial Services were provided)).

Defendants contend that an injunction requiring them to implement Remedial Services would not redress Plaintiffs' injury because Plaintiffs' doctors

*might hypothetically, possibly* determine such Remedial Services are not medically necessary. (MTD, Doc. 32-1 at 23–24).

Defendants are incorrect. First, Defendants' assertion runs contrary to the pleadings in the Complaint. (*See, e.g.*, Compl., Doc. 1, ¶¶ 15, 146, 198, 210) (alleging that the Remedial Services are necessary to correct or ameliorate Serious Emotional Disturbance in Plaintiffs and putative class members and alleging that Defendants' provision of Remedial Services would serve to ameliorate class members' conditions). Second, Defendants' argument that actions of a third-party (here, doctors) would preclude an injunction from redressing Plaintiffs' harm is entirely speculative. During discovery, the parties will have the opportunity to develop evidence regarding the role and impact of doctors' medical determinations on Plaintiffs' receiving Remedial Services. But for now, Plaintiffs have adequately alleged that a permanent injunction would result in their likely obtaining relief that would redress their injuries in whole or in part. *See Parrales v. Dudek*, 2015 WL 13373978, at *4 (finding that the redressability requirement was met where plaintiffs alleged that an order requiring Florida to provide home and community based services would allow plaintiffs to remain in the community and avoid institutionalization); *see also United States v. Fla.*, 682 F. Supp. 3d 1172, 1194–95 (S.D. Fla. 2023) (where plaintiffs alleged Florida was unjustifiably institutionalizing children, court found redressability requirement met after trial where evidence demonstrated that defendants' legal violations and systemic failings were a true impediment to children returning home).

#### 4. There Are No Prudential Standing Concerns

All of the Individual Plaintiffs — including Isaac and Zack — bring their claims through their mothers. (Compl., Doc. 1. ¶¶ 22, 34, 45, 55). As a result of Defendants' failure to provide the Remedial Services necessary to treat Isaac's and Zack's conditions, their mothers (A.A. and B.B.) were unable to support them in the home, and DFCS obtained temporary custody of these two Plaintiffs. (*Id*. ¶¶ 29, 43).

While a plaintiff must generally assert his own rights, a party may raise claims on behalf of another (i.e., as a "next friend") with whom they have a close relation if the third party is unable to protect his own interest. *Edmonson v. Leesville Concrete Co*., 500 U.S. 614, 629 (1991). Consistent with this understanding, Federal Rule of Civil Procedure 17 provides for a "general guardian" to bring suit on behalf of a minor. *See* Fed. R. Civ. P. 17(c)(1)(A). This guardian is often the minor's parent. Under Georgia law, a parent is the natural guardian of a minor child. O.C.G.A. § 29-2-3. Adoptive parents stand in the same shoes (and have the same rights and obligations) as biological parents. O.C.G.A. § 19-8-19(a)(2). Plainly, Plaintiffs' mothers can appropriately bring suit on behalf of Plaintiffs under Rule 17.

Despite this clear application, Defendants argue that Isaac and Zack's mothers lack "prudential standing" because DFCS has obtained *temporary* custody of these two Plaintiffs. In support, Defendants rely on *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004), *abrogated by Lexmark*

*International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118. In *Elk Grove*,

the Supreme Court found that a child's father lacked "prudential standing" to sue

on behalf of the child's religious freedom rights, because — pursuant to state court

custody orders — the child's *mother* was tasked with making final decisions about

the child's educational needs, and the mother did not want the child to be involved

in the litigation. Accordingly, the *Elk Grove* Court relied on the principle that

federal courts should "leave delicate issues of domestic relations to the state

courts." *Id.*

Defendants' argument and reliance on *Elk Grove* fails for a number of

reasons. To start, the concept of "prudential standing" rests on shaky ground.

"[T]he Supreme Court has walked back the concept of 'prudential standing.'"

*Wiand v. ATC Brokers Ltd.,* 96 F.4th 1303, 1313 (11th Cir. 2024) (Marcus, J.,

concurring) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

118, 127 n.3 (2014) (stating that "prudential standing" is an "inapt" label for many

"concept[s] . . . previously classified as [such])). The *Lexmark* Court emphasized

that "a federal court's 'obligation' to hear and decide" cases within its jurisdiction

"is 'virtually unflagging.'" *Lexmark*, 572 U.S. at 126 (citing *Sprint Commc'ns, Inc.

v. Jacobs*, 571 U.S. 69, 77 (2013)). The *Lexmark* Court therefore explained that a

federal court does not have the authority to decline to hear a legitimate case or

controversy that is before it based merely on "prudential" reasons, as the Court did

in *Elk Grove. Elk Grove*'s holding on the discredited concept of "prudential

standing" therefore carries little weight and is no basis for the Court to decline to hear Isaac and Zack's claims.

Moreover, even if *Elk Grove*'s prudential standing holding were good law, the facts of that case render its holding inapposite here. There, the case involved an underlying custody dispute between parents, and the father's efforts to assert religious freedom claims on behalf of his daughter — all in conflict with the terms of a state court custody order that allowed the mother to make determinations about the daughter's education. *Elk Grove*, 542 U.S. at 17–18. Here, conversely, Isaac and Zack's mothers remain their "general guardians," *see* Fed. R. Civ. P. 17(c), despite the temporary relinquishment of custody to DFCS. *See* O.C.G.A. § 15-11-212(b) (explaining that transfer of custody to DFCS *is temporary* and is conditioned on the understanding that a court shall direct the return of custody *to his parent or guardian* under specified circumstances or by order of the court). Additionally, here there is no custody dispute or "domestic relations" conflict, as there was in *Elk Grove*.

Finally, even if Isaac and Zack's mothers were not "general guardians" within the meaning of Rule 17, they would still be appropriate "next friends" able to sue on behalf of Isaac and Zack. An individual can sue as a "next friend," regardless of familial status, where the "next friend" (1) provides an adequate explanation as to why the real parties in interest cannot bring the suit themselves; (2) is dedicated to the minor's best interests; and (3) has some significant relationship with the minor. *Whitmore v. Arkansas*, 495 U.S. 149, 163–64 (1990).

Here, that test is clearly met. First, as minors, Isaac and Zack cannot sue on their own behalf. Second, their mothers are dedicated to their best interest. (Compl., Doc. 1, ¶¶ 30, 32, 39, 43) (alleging, e.g., that both Isaac and Zack's mothers wish to bring their children home to live with their families). Third, *as their mothers*, A.A. and B.B. clearly have a "significant" relationship with the children.

Accordingly, Defendants' prudential standing argument is legally and factually wrong. Moreover, Defendants raised this issue without pointing out that *Elk Grove* — the primary authority upon which their argument rests — has been abrogated. Indeed, Defendants' Motion fails to identify *Lexmark* at all. As a result, defense counsel is in ethically murky waters. *See* Georgia Legal Code of Ethics 3.3(a)(3) (noting that a lawyer shall not fail to disclose legal authority known to be directly adverse). The Court expects defense counsel to exercise greater care as this litigation proceeds. Similarly spurious arguments will not be well-received.

### 5. GAO Alleges Associational Standing

Organizations may have standing to sue on their own behalf or may have associational standing to sue on behalf of their members. *Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024). GAO relies on associational standing here. To benefit from associational standing, an organization must establish three elements: (1) the organization's members must otherwise have standing to sue, (2) the interests the lawsuit seeks to protect must be germane to the organization's purpose, and (3) the claims can be resolved and the requested relief granted without the participation of individual members. *Id.*

GAO is a private nonprofit that has been designated by the State of Georgia, under various federal laws, as the statewide advocacy organization dedicated to protecting the legal rights of individuals with disabilities. *See* 42 U.S.C. § 10801; 42 U.S.C. § 15041; 29 U.S.C. § 794e. Under federal law, GAO has the authority and obligation to pursue legal remedies necessary to protect the rights of individuals with disabilities. *Id.*

Considering the associational standing factors outlined above, the Court concludes that the first factor is easily met. The Complaint alleges that the Individual Plaintiffs are constituent members of GAO. (Compl., Doc. 1 ¶ 69). The Court has already determined that the Individual Plaintiffs have standing.

Second, GAO's purpose is protecting the legal rights of individuals with disabilities. (*Id.* ¶ 66–67). *See also* 42 U.S.C. § 10801; 42 U.S.C. § 15041; 29 U.S.C. § 794e. This lawsuit seeks to protect the legal rights of Medicaid-eligible children with serious emotional and mental health disorders and ensure nondiscriminatory access to EPSDT services in integrated settings. (Compl., Doc. 1 ¶ 239). Therefore, the second associational standing requirement is met.

Third, the Medicaid Act, ADA, and Section 504 claims at issue in this case can be resolved, and relief granted, without the participation of individual GAO members. Plaintiffs seek systemic relief — that is, they ask the Court to require Defendants to establish and implement policies that will ensure that Remedial Services are made available to Plaintiffs and class members. (*Id.*) (requesting that the Court issue injunction requiring Defendants to, e.g., establish comprehensive

discharge policies for children being discharged from Psychiatric Institutions, provide adequate notice of available services to disabled children and their families, and ensure sufficient provider network capacity to deliver Remedial Services).

Considering GAO's plainly systemic challenge, Defendants' contention that individual members' participation will be required because members must each establish medical necessity is without merit. If the Court were to grant Plaintiffs' requested systemic relief, then Defendants would comply and provide and arrange access to the Remedial Services. Then, class members' treatment professionals would comprehensively assess, refer, and arrange for each child's service needs. If, at that time, any individual child was denied existing services based on a determination that the services are not medically necessary for the child, the child can pursue an administrative appeal under 42 U.S.C. §1396a(a)(3) (explaining that an eligible individual must be afforded a fair hearing where their claim for medical assistance has been denied).

GAO has previously brought lawsuits in this district seeking systemic relief. See *GAO v. Jackson*, 2019 WL 12498011, at *2 n.1 (N.D. Ga. Sept. 23, 2019) (finding that GAO had standing to pursue systemic relief on behalf of women held in solitary confinement in South Fulton Jail), *order vacated*, *appeal dismissed by* 4 F.4th 1200 (11th Cir. 2021), *appeal dismissed as moot*, 33 F.4th 1325 (11th Cir. 2022); *GAO v. Reese*, No. 1:15-cv-3372 (N.D. Ga. Apr. 25, 2016) (allowing GAO to pursue lawsuit attempting to gain records related to abuse and neglect at skilled

nursing facilities). Beyond GAO, "the standing of protection and advocacy systems as representatives of the segment of our society afflicted with mental illness is well-established in the law." *Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999) (collecting cases).

In arguing that this case would require the individual participation of GAO's members, Defendants erroneously rely on *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019). That case involved claims brought under the Individuals with Disabilities in Education Act (IDEA), a statute that generally requires individual exhaustion of administrative procedures as a precondition to bringing suit, except where systemic violations are alleged. The plaintiffs in *City of Springfield* failed to allege facts supporting a systemic violation of the IDEA. *Id.* at 27–28. As a result, the First Circuit found that resolving the claims required individualized determinations (about whether each student had administratively exhausted) and thus the association lacked standing. The Medicaid Act, unlike the IDEA, does not include an administrative exhaustion requirement and further, unlike in *City of Springfield,* the Plaintiffs here have properly alleged systemic violations. The allegations in the Complaint demonstrate that GAO has organizational standing to pursue its requested relief.

### B.    Sovereign Immunity

The doctrine of sovereign immunity shields states from being sued without their consent. This doctrine flows from the Eleventh Amendment, which states: "The Judicial power of the United States shall not be construed to extend to any

suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As applied, the Supreme Court has also long held that the doctrine of sovereign immunity encompasses suits against states by *their own citizens. Hans. v. Louisiana*, 134 U.S. 1, 15 (1890).

That said, sovereign immunity is not an impenetrable shield. There are exceptions that allow citizens to sue states in certain circumstances. One exception allows suits when the state itself consents to being sued. *Id.* at 17 ("Undoubtedly, a state may be sued by its own consent[.]"). A second exception allows suits where Congress abrogates a state's sovereign immunity, unequivocally and "pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Tennessee v. Lane*, 541 U.S. 509, 517–518 (2004). A third exception allows citizens to sue states under *Ex parte Young* — a doctrine that allows suits against state officials in their official capacities, where there is an ongoing violation of federal law, and where the plaintiff seeks only injunctive and/or declaratory relief. *Summit Med. Assoc., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). This third exception is at issue here.

*Ex parte Young* creates a legal "fiction," in the sense that it draws a line between the state and its officers when its officers are violating federal law. 209 U.S. 123 (1908). *Id.* Where a plaintiff seeks to compel state officers to comply with federal law, such a suit is not seen as against the state and is, therefore, not barred by the Eleventh Amendment. *Id.* at 1337 (citing *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 114 n.25 (1984)); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) (O'Connor, J., concurring) ("The *Young* doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and . . . the State cannot cloak the officer in its sovereign immunity.").

In weighing whether *Ex parte Young* applies, a court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring)). "As long as the plaintiff alleges ongoing violations of federal law and seeks injunctive or declaratory relief, or both, against state officials in their official capacity, plaintiffs usually face no hurdles in clearing *Ex parte Young*." *Curling v. Sec'y of Ga.*, 761 Fed. App'x. 927, 931 (11th Cir. 2019).

Although *Ex parte Young* is not the highest of bars, it still can be a bar. The Supreme Court has carved out at least three circumstances under which courts should not apply the *Ex parte Young* doctrine. First, the doctrine does not apply when "the state is the real, substantial party of interest." *Pennhurst*, 465 U.S. at 101 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464). Second, *Ex parte Young* does not apply when state officers are sued to enforce federal statutes that contain comprehensive enforcement mechanisms. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). ("[W]here Congress has prescribed a detailed

remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based on *Ex parte Young*."). Third, *Ex parte Young* does not apply when a suit implicates "special sovereignty interests," like in cases involving Native American tribes. *Coeur d'Alene*, 521 U.S. at 281. ("An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction. However, this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty issues.").

Considering the above authority, the Court finds that the *Ex parte Young* exception to sovereign immunity applies here, and so Plaintiffs have properly sued Defendants. Plaintiffs plainly allege ongoing violations of federal law, and seek only prospective injunctive and declaratory relief. (Compl., Doc. 1 ¶¶ 234–239).

Courts of Appeals, including the Eleventh Circuit, have permitted plaintiffs to proceed under *Ex parte Young* in cases involving the Medicaid Act. *See Doe 1-13 ex rel. Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 720 (11th Cir. 1998) (finding that plaintiffs' suit "fits neatly within the *Ex parte Young* exception," where they seek to enjoin state officials from continuing violations of the Medicaid Act); *Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002) (holding that plaintiffs' action — against the secretary of the North Carolina Department of Health and Human Services and the director of the North Carolina Division of Medical Assistance for an alleged denial of dental care prescribed by the Medicaid Act — fell within the *Ex parte*

*Young* exception); *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 238 (1st Cir. 2002) (holding that the Eleventh Amendment does not protect state officials from federal suits for prospective relief under the Medicaid Act); *Westside Mothers v. Haveman*, 289 F.3d 852, 862 (6th Cir. 2002) (allowing plaintiffs to proceed under *Ex parte Young* against state officials accused of failing to provide Michigan children with medical services required by the Medicaid Act); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1287 (10th Cir. 1999) (holding that *Ex parte Young* precludes defendants' Eleventh Amendment immunity defense).

Likewise, courts, including the Eleventh Circuit, have reached the same conclusion in cases involving Title II of the ADA. *See Miller v. King*, 384 F.3d 1248, 1264 (11th Cir. 2004) (holding that "the Eleventh Amendment does not bar ADA suits under Title II for prospective injunctive relief against state officials in their official capacities"), *vacated and superseded on other grounds*, 499 F.3d 1149 (11th Cir. 2006); *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1187 (9th Cir. 2003); *Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002) (holding that "an official who violates Title II of the ADA does not represent 'the state' for purposes of the Eleventh Amendment, yet he or she nevertheless may be held responsible in an official capacity for violating Title II"); *Randolph v. Rodgers*, 253 F.3d 342, 348 (8th Cir. 2001) (holding that the district court did not err in allowing plaintiff to proceed under *Ex parte Young* to seek prospective injunctive relief on his ADA claim against a prison official in her official capacity); *McCarthy v. Hawkins*, 381 F.3d 407, 414 (5th Cir. 2004) (joining the Second, Sixth, Seventh, Eighth, and

Ninth Circuits in holding that plaintiffs' *Ex parte Young* suit to enforce Title II of the ADA could proceed).

Notwithstanding this wealth of authority, Defendants contend *Ex parte Young* does not apply to Plaintiffs' ADA and Medicaid Act claims because, according to Defendants: (1) Plaintiffs cannot point to officials with the relevant enforcement authority, and (2) the State of Georgia is the real party of interest. The Court addresses these arguments in turn.

Defendants argue, first, that *Ex parte Young* should not apply because Plaintiffs cannot point to any officials with relevant enforcement authority. Defendants are mistaken. For the *Ex parte Young* doctrine to apply, the state official sued for an ongoing violation of federal law "must have some connection with the enforcement of the act." *Young*, 209 U.S. at 157. ("The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists."); *Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) (explaining that *Ex parte Young* permits suits against state officials "when those officers are 'responsible for' a challenged action and have 'some connection' to the unconstitutional act at issue") (citing *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988)).

Here, Plaintiffs have sufficiently alleged that each Defendant (each the head of the relevant state agency) is responsible for the failure to comply with the

relevant federal laws — the Medicaid Act, the ADA, and Section 504 of the Rehabilitation Act. First, Defendant Carlson's agency, the Georgia DCH, is the single state agency tasked with the responsibility for administering Georgia's Medicaid program. (Compl., Doc. 1 ¶ 71). As Commissioner, Defendant Carlson directs and oversees DCH's operations, ensuring the program's compliance with the Medicaid Act and the ADA. (*Id.* ¶¶ 72–73). Second, Defendant Tanner's agency, the Georgia DBHDD, administers and supervises state programs for mental health, developmental disabilities, and addictive diseases. O.C.G.A. § 37-1-20. Defendant Tanner directs and oversees mental health services and is tasked with ensuring that all programs and services comply with the ADA. (Compl., Doc. 1 ¶¶ 75–76). Finally, Defendant Broce, as commissioner of the Georgia DHS and director of Georgia's DFCS, is head of the state's child welfare agency and is tasked with managing the care and treatment of children in DFCS custody. O.C.G.A. § 49-5-8. She is responsible for ensuring that the children in DFCS custody, all of whom are eligible for Medicaid, receive care and services in compliance with the ADA. (Compl., Doc. 1 ¶¶ 78–79).

Based on the above, this is clearly not a case in which the three Defendants lack any "enforcement authority . . . that a federal court might enjoin [them] from exercising." *Whole Women's Health v. Jackson*, 595 U.S. 30, 43 (2021) (dismissing the Texas attorney general as a defendant where petitioners failed to identify "any enforcement authority," while holding that sovereign immunity did not bar suit against a number of state licensing officials). Rather, these Defendants are

precisely the individuals with the requisite enforcement authority necessary to address Plaintiffs' allegations that Georgia's state agencies are failing to provide services required under the Medicaid Act, and failing to provide those services in the most integrated settings and in a nondiscriminatory manner, consistent with the ADA and the Rehabilitation Act.

Defendants' next argument against the application of *Ex parte Young* is that the State of Georgia is the "real party of interest." In asserting that the State is the real party of interest, Defendants claim Plaintiffs' demands implicate "special sovereignty interests." (MTD, Doc. 32-1 at 17) (citing *Coeur d'Alene,* 521 U.S. at 287–88 (holding that the Eleventh Amendment barred the Coeur d'Alene Tribe's action seeking prospective injunctive relief to establish ownership over submerged lands within the 1873 boundaries of the Tribe's reservation) ("[T]his case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* at 281)). *Coeur d'Alene* is inapplicable here. That case, which involved special sovereignty interests of a native tribe, has been read narrowly and courts have consistently found that it does not apply in the present context involving Medicaid claims. *See J.B. ex rel. Hart,* 186 F.3d at 1287 ("A state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex parte Young*."); *Antrican,* 290 F.3d at 190 ("Although North Carolina may retain a special sovereignty interest in choosing whether to participate in the Medicaid program, once it elects to participate, it is

not entitled to assert that interest to insulate itself from the requirements of the federal program.").

Defendants also claim that *Ex parte Young* cannot be invoked because Plaintiffs' requested relief would require "specific performance of a contract," and Plaintiffs' demands would "expend itself on the public treasury" and "interfere with public administration" of the state's program. (MTD, Doc. 32-1 at 18). However, Plaintiffs do not seek any type of "specific performance." Rather, Plaintiffs seek an injunction barring Defendants from continuing to violate the Medicaid Act, ADA, and Rehabilitation Act. And while the Court can order Defendants to adequately provide and arrange for each required EPSDT service in a manner that is effective and reasonably prompt, as required by the Medicaid Act, the "statute and regulations afford [a state] discretion as to how to" meet its obligation to provide those services. *Katie A. ex rel. Ludin v. Los Angeles County,* 481 F.3d 1150, 1159 (9th Cir. 2007). Situations involving specific performance do not involve such discretion.

As to the "expense on the public treasury" point, it is well-settled that the Eleventh Amendment does not bar prospective injunctive relief simply because that relief may result in costs to the state. *Edelman v. Jordan*, 415 U.S. 651, 668 (1974) ("Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex parte Young*."); *Milliken v. Bradley,* 433 U.S. 267, 289 (1977) (noting that *Ex parte Young* "permits federal

courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury").

Finally, Defendants assert that the rights Plaintiffs seek to enforce are discretionary, not ministerial, and so not subject to *Ex parte Young*. (MTD, Doc. 32-1 at 19). Again, Defendants' argument runs up against well-settled legal authority. Complying with mandates of federal law is not discretionary. The Medicaid Act demands that state Medicaid agencies provide and arrange for the provision of EPSDT services to Medicaid-eligible children under 21, and provide those required services with reasonable promptness. 42 U.S.C. §§ 1396a(a)(43), 1396a(a)(8). And Title II of the ADA prohibits discrimination on the basis of disability. *Id*. § 12132; *Olmstead*, 527 U.S at 597 (finding that unjustified isolation or segregation of people with disabilities constitutes discrimination in violation of the ADA). Under the ADA, Defendants are *required* to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

If Plaintiffs' allegations are proven true — that children remain institutionalized because Defendants fail to comply with certain Medicaid mandates and because of Defendants' ongoing failure to secure more integrated alternatives — this Court could direct affirmative action, since each Defendant, having a duty to perform, "refuses or neglects to take such action." *See Antrican,* 290 F.3d at 191 (permitting an *Ex parte Young* challenge to North Carolina's Medicaid program to proceed where plaintiffs sought an order requiring officials

to comply with the mandates of federal law); *Lewis v. N.M. Dep't of Health*, 261 F.3d 970, 976 (10th Cir. 2011) (allowing an *Ex parte Young* challenge to New Mexico's Medicaid program, over an argument that the claim impacted discretionary acts by state officials).

In sum, and for all the above reasons, Plaintiffs' Medicaid Act, ADA, and Section 504 claims fall squarely within *Ex parte Young*. The doctrine permits their suit against Defendants Tanner, Broce, and Carlson in their official capacities for prospective, injunctive and declaratory relief. The Eleventh Amendment presents no bar.

### C.    The Anticommandeering Principle

Defendants next argue that the Court cannot award Plaintiffs an injunction mandating that Defendants provide the Remedial Services because doing so would violate the "anticommandeering doctrine."

"The anticommandeering doctrine . . . is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.,* the decision to withhold from Congress the power to issue orders directly to the States." *N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). This doctrine follows from the Tenth Amendment's mandate that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *See* U.S. Const. amend. X. Although Congress "has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the

Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992).

Although this doctrine is "simple and basic," *see N.J. Thoroughbred Horsemen's Ass'n,* 584 U.S. at 471, it was recognized by the Supreme Court only recently in 1992. *See New York*, 505 U.S. at 174–75 (invalidating provision of an act that would compel states to either take title to nuclear waste or enact particular state-level waste regulations). Since that time, the Supreme Court has invalidated provisions of a few federal laws that impermissibly "commandeer" a state's legislative or administrative apparatus for federal purposes. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 933 (1997) (invaliding federal legislation compelling state law enforcement officers to perform federally mandated background checks on handgun purchasers); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) (holding that Affordable Care Act's new Medicaid expansion program to childless adults violated the anticommandeering doctrine because it coerced states to adopt Medicaid expansion by threatening to withhold states' existing Medicaid funds).

At the same time, it is well settled that Congress may, under the Spending Clause, grant federal funds to the states and may "condition such a grant upon the States' taking certain actions that Congress could not require them to take." *Sebelius*, 567 U.S. at 576 (internal quotation omitted); *id.* at 577 (noting that "Congress may use its spending power to create incentives for States to act in

accordance with federal policies"); *see also, e.g.*, *South Dakota v. Dole*, 483 U.S. 203, 211–12 (1987) (upholding federal statute that conditioned the provision of federal highway funds on states raising their drinking age to 21).

The Supreme Court has characterized such "Spending Clause legislation" as "much in the nature of a contract." *Sebelius*, 567 U.S. at 576–77 (emphasis omitted) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]n return for federal funds, the States agree to comply with federally imposed conditions.")). Accordingly, the legitimacy of Congress' exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. Consistent with this understanding, Congress' broad spending powers do not include "surprising participating States with post-acceptance or 'retroactive' conditions." *Sebelius*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25).

Here, Georgia has voluntarily and knowingly chosen to participate in Medicaid with full knowledge of the Medicaid Act provisions at issue in this case. As the *Sebelius* Court acknowledged, the original Medicaid Act required states to provide medical assistance to low-income children. 42 U.S.C. § 1396a(a)(10). The original Medicaid Act included the "reasonable promptness" provision at issue in this case. *See* Social Security Act of 1965, Pub. L. No. 89-97, § 121, 79 Stat. 343-44 (1965) (enacting 42 U.S.C. § 1396a(a)(8));[16] *see also Pennhurst*, 451 U.S. at 18

---

[16] The Social Security Act includes the original Medicaid provisions.

(explaining that a similar "reasonable promptness" provision in another Social Security Act program was an example of an appropriate condition imposed by Congress on the states). Another provision of the original Medicaid Act expressly reserved the right to "alter, amend, or repeal any provision" of the statute. 42 U.S.C. § 1304. Congress has, over the years, altered and expanded the boundaries of the Medicaid Act. *Sebelius*, 567 U.S. at 583 (noting that § 1304 entitles Congress to "make adjustments to the Medicaid program as it develop[s]"). For example, Congress added EPSDT provisions at issue in this case in 1967. *See* Social Security Act Amendments of 1967, Pub. L. No. 90-248, § 302(a), 81 Stat. 929 (1967). The State of Georgia has continued to participate in the program for decades since the EPSDT provisions were added.

In short, the State of Georgia knew what it was agreeing to when it decided to participate in Medicaid. This is not a situation, as the Court found in *Sebelius*, where the United States has "surprised" the State of Georgia with any new programs or "post-acceptance" conditions. *Sebelius*, 567 U.S. at 584. Rather, Plaintiffs here seek to enforce provisions that are longstanding. As to the "commandeering" of Georgia's legislative apparatus, it bears repeating that, while Georgia must comply with the Medicaid Act — and so must provide all required EPSDT service in a manner that is effective and reasonably prompt — the "statute and regulations afford [Georgia] discretion as to how to" meet its obligation to provide those services. *Katie A.*, 481 F.3d at 1159. Considering this discretion, demanding compliance with the Medicaid Act's requirements would not

51

improperly "commandeer" Georgia's legislative or administrative apparatus. An injunction ordering Defendants to provide services required under the Medicaid Act — and provide those integrated services in a nondiscriminatory manner consistent with the ADA and Section 504 — would not violate the anticommandeering doctrine.

### D.    Claims Under the Medicaid Act

#### 1.    Whether the Provisions of the Medicaid Act at Issue Here Are Enforceable Via Section 1983

Plaintiffs bring their Medicaid Act claims through § 1983. Defendant Carlson argues that Plaintiffs may not pursue their Medicaid Act claims via § 1983.

Section 1983 does not itself create any substantive rights, but instead provides a method for redress for the "deprivation of any rights, privileges, or immunities secured by the Constitution *and laws*" of the United States. *See* 42 U.S.C. § 1983 (emphasis added); *Barfield v Brierton*, 883 F.2d 923, 934 (11th Cir. 1989). Accordingly, § 1983 provides a cause of action not only for violations of the Constitution, but also for the violations of federal statutes. *Maine v. Thiboutot,* 448 U.S. 1, 4 (1980) (allowing plaintiffs to seek redress for violations of the Social Security Act via § 1983); *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 175 (2023) (reaffirming *Thiboutot* and finding that plaintiffs could seek redress for violations of the Federal Nursing Home Reform Act via § 1983).

That said, a plaintiff may only pursue violations of a federal statute under § 1983 if (1) the statutory provisions at issue unambiguously create enforceable rights and (2) Congress did not foreclose § 1983 enforcement in the statute itself.

*Talevski*, 599 U.S. at 193–94; *see also Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990).

### a. The Relevant Statutory Provisions Unambiguously Create Enforceable Rights

Accordingly, the Court first considers whether the relevant Medicaid provisions here unambiguously create § 1983-enforceable rights. The Supreme Court's decision in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), "establishes the standard for analyzing whether Spending Clause statutes [like Medicaid] give rise to individual rights." *Talevski*, 599 U.S. at 193 (Barrett, J., concurring); *id.* at 183. In applying *Gonzaga*, a court asks whether the "text and structure" of the statute unambiguously confer federal rights. *Id.* In answering this question, a court considers: whether the statutory provisions are phrased in terms of the persons benefitted, whether the statute uses explicit rights-creating terms, and whether the provisions have an individual rather than aggregate focus. *Id.* (internal citations omitted). In considering these factors, a court should be mindful that, for Spending Clause statutes, § 1983 actions are the exception, not the rule. *Id.* at 183. This is because the typical remedy for state noncompliance with a Spending Clause statute is for the government to terminate the funds, rather than a private cause of action. *Id.*

Here, Plaintiffs rely on a number of statutory provisions that provide two different, well-recognized statutory rights.

The first rights-creating provision is § 1396a(a)(10)(A). Under § 1396a(a)(10)(A), Georgia "must" make certain medical assistance available to

children under 21. Related statutory provisions flesh out this right. Specifically, § 1396d(a)(4)(B) then explains that one type of "medical assistance" that a state "*must*" provide is EPSDT services for individuals under 21. And under § 1396d(r)(5), these EPSDT services include all health care, diagnostic services, and treatments "necessary . . . to correct or ameliorate . . . conditions" discovered through screening services. Importantly, even where particular EPSDT services or treatments are not included in a state's Medicaid plan, *the state must provide a service if it is necessary to correct or ameliorate the child's condition. See* 42 U.S.C. § 1396d(r)(5). And, finally, in providing the required EPSDT services, Georgia "must" arrange for (either directly or through referrals to appropriate agencies or organizations) necessary corrective treatment disclosed by screening services. *See id.* § 1396a(a)(43)(C). So, taking these provisions together, eligible individuals under 21 "must" be provided with health care and treatments necessary to correct or ameliorate their conditions, as arranged for by the state and *regardless* of whether the service is included in the state's Medicaid plan.

The second rights-provision is § 1396a(a)(8). Under § 1396a(a)(8), Georgia "must" furnish the required EPSDT services with "reasonable promptness."

As discussed more below, these two provisions create § 1983-enforceable rights in eligible children under 21 to (1) receive EPSDT care necessary to correct or ameliorate their conditions and (2) receive that care with "reasonable promptness."

These relevant statutory provisions are plainly "phrased in terms of persons benefitted" — here, financially eligible children under 21. *See* 42 U.S.C. § 1396a(a)(10)(A) (noting that the state plan must provide for EPSDT medical assistance to "all individuals" under 21 who are financially eligible). The "individual focus" in the text of the relevant provisions is plain. *See id.* § 1396d(a)(4)(B) (noting that EPSDT services are required to be provided "for *individuals* who are eligible under the plan and are under the age of 21") (emphasis added); *id.* § 1396a(a)(8) (mandating that the state must provide EPSDT services "with reasonable promptness to *all eligible individuals*") (emphasis added). Accordingly, the text of the statute uses "individual-centric" language with an "unmistakable focus on the benefited class." *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 284, 287). This focus on the benefitted class is consistent with the purpose of the Medicaid Act, which is to enable states to provide medical assistance and rehabilitation services to low-income children and disabled individuals. *See* 42 U.S.C. § 1396-1.

In addition, the relevant provisions include rights-creating language. Section 1396a(a)(10)(A) mandates that a state "*must provide*" EPSDT services to eligible individuals. This is explicit rights-creating language comparable to the "no person shall" in Titles VI and IX of the Civil Rights Act. See *Gonzaga*, 536 U.S. at 287 (explaining that the "no person shall . . . be subjected to discrimination" language of Title VI and IX was an example of individual "rights-creating" language). Similarly, § 1396a(a)(8) mandates that services "must" be provided with

reasonable promptness. Again, this mandatory language is rights-creating. In light of this mandatory and individual-centric language, there can be no doubt that Congress intended to create a federal right for the identified class, i.e., low-income children under 21.[17]

While the Supreme Court has not specifically addressed the question of whether the EPSDT provisions of the Medicaid Act create enforceable rights, it has held that the Boren Amendment to the Medicaid Act creates § 1983-enforceable rights. *Wilder*, 496 U.S. at 512, 518 (finding that statutory provisions created enforceable rights for health care providers to sue under § 1983 to receive reasonable reimbursement rates).

As to the two relevant rights-creating EPSDT provisions — § 1396a(a)(10)(A) and § 1396a(a)(8) — every court of appeals that has addressed this issue has determined that these provisions create enforceable rights. *See, e.g.*, *Bryson v.*

---

[17] The Supreme Court's most recent decision applying this analysis, *see Talevski,* 599 U.S. at 183–84, did not ask whether the statutory provisions at issue were "too vague and amorphous" to be judicially enforceable, as earlier cases did, *see Blessing v. Freestone*, 520 U.S. 329, 340–341 (1997). *Tavelski* did not mention, let alone apply, the *Blessing* test. Accordingly, the Court has not done so here. That said, for good measure, the Court finds that the two rights-creating provisions at issue here — § 1396a(a)(10)(A) and § 1396a(a)(8) — are neither vague nor amorphous. Section 1396a(a)(10)(A) specifically defines what care and services must be made available, and in what manner, via its references to § 1396d(a)(4)(B) (EPSDT service provision), 1396d(r)(5) (EPSDT definition and clarification that services do not have to be listed in the state plan), and § 1396a(a)(43)(C) (confirmation that Georgia must "arrange" such EPSDT services). And § 1396a(a)(8) makes a similarly specific promise — that services be furnished with reasonable promptness. The regulations make clear that the standard for reasonable promptness is within 45–90 days. 42 C.F.R. § 435.912(c)(3). Numerous courts of appeals have found that these two provisions are not too vague to be judicially enforceable. *See Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 448 (6th Cir. 2020) (collecting cases); *S.D.*, 391 F.3d at 605; *see also infra* at 57–58.

*Shumway*, 308 F.3d 79, 89 (1st Cir. 2002) (holding that § 1396a(a)(8) creates right enforceable via § 1983)[18]; *Sabree ex rel. Sabree v. Richman,* 367 F.3d 180, 192 (3d Cir. 2004) (holding that medical assistance and reasonable promptness provisions of the Medicaid Act, *see* 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(8), confer privately enforceable rights under § 1983); *Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007) (holding that § 1396a(a)(8) creates § 1983-enforceable right); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5th Cir. 2004) (holding that § 1396a(a)(10)(A) creates a § 1983-enforceable right) ("Thus, for all of the forgoing reasons we conclude that the EPSDT treatment provisions of the Medicaid Act contains the 'rights-creating language critical to showing the requisite congressional intent to confer a new right.'"); *Romano v. Greenstein*, 721 F.3d 373, 379 (5th Cir. 2013) (holding that § 1396a(a)(8) — the reasonable promptness provision — creates a § 1983-enforceable right); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 448 (6th Cir. 2020) (holding that both § 1396a(a)(8) and § 1396a(a)(10) create § 1983-enforceable rights); *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (holding that § 1396a(a)(10) creates a private right of action enforceable under § 1983); *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016) (affirming grant of a preliminary injunction against the state in a suit brought by Medicaid beneficiaries who were seeking to enforce § 1396a(a)(8));

---

[18] While *Shumway* was pre-*Gonzaga*, it has since been cited with approval. *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 73 (1st Cir. 2005).

*Pediatric Specialty Care, Inc. v. Ark. Dep't of Hum. Servs.*, 293 F.3d 472, 479 (8th Cir. 2002) (assessing § 1396a(a)(10), and "hold[ing] that the plaintiffs have a[] federal right to EPSDT services that is enforceable in a § 1983 action"); *Watson v. Weeks*, 436 F.3d 1152, 1159 (9th Cir. 2006) (holding that § 1396a(a)(10)(A) creates a § 1983-enforceable right); *Ball v. Rodgers*, 492 F.3d 1094, 1109 (9th Cir. 2007) (recognizing that § 1396a(a)(8) satisfies the "rights-creating" standard set out in *Gonzaga*); *Mandy R. ex rel. Mr. & Mrs. R. v. Owens*, 464 F.3d 1139, 1142 (10th Cir. 2006) (assuming that the individual plaintiffs could sue to enforce their rights under § 1396a(a)(8) and § 1396a(a)(10) via § 1983); *Doe 1-13 ex rel. Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 719 (11th Cir. 1998) (pre-*Gonzaga*, finding that § 1396a(a)(8) created a right enforceable via § 1983).[19]

Additionally, courts in this district have repeatedly held that the relevant EPSDT provisions are enforceable through § 1983. *See William v. Horton*, 2016 WL 6582682, at *5 (N.D. Ga. Nov. 7, 2016); *Hunter v. Medows*, 2009 WL 5062451, at *2–3 (N.D. Ga. 2009); *Kenny A. v. Perdue*, 218 F.R.D. 277, 293–94 (N.D. Ga. 2003).

In short, consistent with every circuit that has addressed these provisions — including the Eleventh, at least with respect to § 1396a(a)(8)'s reasonable

---

[19] Defendants argue that the Eleventh Circuit's decision in *Chiles* is not good law since it was issued before *Gonzaga*. But nothing in *Gonzaga* directly abrogated or overruled the Eleventh Circuit's decision in *Chiles*. And *Chiles* is consistent with the decisions of every other court of appeals that has addressed rights enforceable under § 1396a(a)(8) post-*Gonzaga*. The Court therefore finds that *Chiles* constitutes binding precedent on this issue, at least relative to § 1396a(a)(8), and the Court must follow it.

promptness provision — the Court concludes that § 1396a(a)(10)(A) and § 1396a(a)(8) unambiguously create rights enforceable via § 1983.[20]

### b. Congress Did Not Intend to Preclude Section 1983 Suits

"Even if a statutory provision unambiguously secures rights, a defendant may defeat the presumption by demonstrating that Congress did not intend that § 1983 be available to enforce those rights." *Talevski,* 599 U.S. at 186 (cleaned up). For evidence of such intent, the court looks to the statute creating the right (here, Medicaid). *Id*. A statute could expressly prohibit the use of § 1983 to bring claims. *Id*. That is not the case here. Medicaid includes no such prohibition.

Absent such an express prohibition, a defendant "must show that Congress issued the same command implicitly by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id*. (citing *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005) (internal quotations omitted)). In this assessment, the ultimate question is "whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under § 1983, such that a court must infer that Congress did not intend to make available the under § 1983 remedy for these newly-created rights."

---

[20] In arguing that the relevant Medicaid provisions do not create enforceable rights, Defendants cite to *Armstrong v. Exceptional Child Center, Inc.,* 575 U.S. 320 (2015). That case is plainly inapplicable because it involved different statutory provisions, asserted by a different type of plaintiff, and under a wholly different theory. The plaintiffs in *Armstrong* were Medicaid providers (*not* Medicaid beneficiaries) who relied on the Supremacy Clause (*not* § 1983) and § 1396a(a)(30) of Medicaid (*not* the provisions at issue here). *See O.B. v. Norwood*, 170 F.Supp.3d 1186, 1191–92 (N.D. Ill. 2016) *aff'd,* 838 F.3d 837 (7th Cir. 2016) (rejecting defendants' similar *Armstrong* argument).

*Id.* at 187 (citing *Rancho Palos Verdes*, 544 U.S. at 120 (internal quotations omitted)).

In a case involving different provisions of the Medicaid Act related to reimbursement rates for healthcare providers, the Supreme Court held that "Congress did not foreclose a private judicial remedy under § 1983" in the Medicaid Act. *Wilder*, 496 U.S. at 523. The *Wilder* Court also explained that the Medicaid Act does not contain an administrative scheme that could be "considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983." *Id.* at 522; *see also Waskul*, 979 F. 3d at 448 (6th Cir. 2020) ("Congress did not explicitly foreclose relief or provide a comprehensive remedial scheme."); *Doe*, 501 F.3d at 356–57 (4th Cir. 2007) (same); *Sabree,* 367 F.3d at 193 (3d Cir. 2004) (same).

Considering the binding Supreme Court authority, as well as the wealth of circuit authority, the Court concludes that Congress did not preclude § 1983-enforcement of Medicaid Act claims.[21]

In sum, the relevant statutory provisions create § 1983-enforceable rights and Congress did not preclude § 1983-enforcement of Medicaid Act claims. Therefore, Plaintiffs may bring their Medicaid Act claims via § 1983.

---

[21] Defendants also briefly argue that there is no cause of action under § 1983 because this lawsuit is against the state, not a "person." But the Supreme Court has long held that "a state official in his or her official capacity, when sued for injunctive relief, [is] a person under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989).

### 2. Whether Plaintiffs Adequately Allege the Elements of Their Medicaid Act Claims

#### a. Plaintiffs Adequately Allege That the Services Are Medically Necessary

In Count I, Plaintiffs allege that Defendant Carlson violated the EPSDT mandate of the Medicaid Act. As discussed *infra* at 10–14, 53–54, there are a few connected statutory provisions that make up the EPSDT Mandate.

Under § 1396a(a)(10)(A), Georgia must make certain "medical assistance" available to eligible children under 21. One type of "medical assistance" that Defendant Carlson must provide is EPSDT services. 42 U.S.C. § 1396d(a)(4)(B). EPSDT services include all health care, diagnostic services, treatments, and other measures described in subsection (a) that are "necessary . . . to correct or ameliorate . . . conditions" discovered through screening services. *Id.* § 1396d(r)(5). One listed service that a state must provide under subsection (a) is "case management services," *id.* § 1396d(a)(19),[22] which Plaintiffs contend encompasses Intensive Care Coordination. Under subsection (a), a state must also provide rehabilitative services including "any medical or remedial service (provided in a facility, a home, or other setting) recommended by a physician . . . for the maximum reduction of physical or mental disability and restoration of an

---

[22] "Case management services" are services that will assist individuals with gaining access to needed medical, social, educational, and other services — such as assessment to determine a child's needs, developing a specific care plan based on information collected through the assessment, referrals to providers and scheduling appointments for the child, monitoring and follow-up to ensure the care plan is effectively implemented, and more. 42 U.S.C. § 1396n.

individual to the best possible functional level." *Id.* § 1396d(a)(13). Plaintiffs contend that this provision encompasses both Intensive In-Home Care and Mobile Crisis Response Services. Finally, in providing these services that are "necessary to correct or ameliorate" children's conditions, Defendant Carlson must arrange for such care — either directly or through referrals to appropriate agencies. *Id.* § 1396a(a)(43)(C).

Considering these statutory provisions, Plaintiffs must first allege that they are eligible to receive the EPSDT services. *See id.* § 1396a(a)(10)(A). Second, they must allege that the services they seek are covered EPSDT services that are necessary to correct or ameliorate their conditions. *See id.* §§ 1396d(a)(4)(B); 1396d(r)(5). Third, in a systemic case like this one, Plaintiffs must allege that Defendant Carlson has not made the required EPSDT services available to them. *See id.* § 1396a(a)(10)(A) (stating that a state plan "must" make available certain medical assistance).

Here, the Plaintiffs have adequately alleged as much in specific detail. First, the Complaint alleges that the Individual Plaintiffs are both eligible and enrolled in Medicaid. (Compl., Doc. 1 ¶¶ 9, 22, 34, 45 ,55, 65, 197, 200).

 Second, Plaintiffs have alleged that the Remedial Services are covered EPSDT services. (*Id.* ¶¶ 1, 15, 146, 161, 172) (alleging, e.g., that Intensive In-Home Services are coverable under Medicaid). And the Complaint includes specific allegations as to each Plaintiff, demonstrating why the Intensive Care Coordination, Intensive In-Home Services, and Mobile Crisis Response Services

are necessary to correct or ameliorate their conditions. (*See, e.g.*, *id.* ¶¶ 24–33 (alleging that Isaac's mental health conditions — Bi-polar Disorder, OCD, ADHD, DMDD, and ODD — impair his day-to-day functioning at home, school, and in the community, but that the State's provision of Remedial Services would allow him to return to his family home); *id.* ¶¶ 57–64 (alleging that Samuel's conditions — Reactive Attachment Disorder, DMDD, and ADHD — are deteriorating without the State's provision of the necessary Remedial Services); *id.* ¶¶ 47–54 (alleging that Leon's DMDD, GAD, ADHD, and Autism impair his functioning at home, at school, and in the community and that he needs Remedial Services to be able to return home); *see also id.* ¶¶ 198, 210 (alleging that class members require Remedial Services to correct or ameliorate their conditions and avoid unnecessary institutionalization)).

Finally, the Complaint includes specific allegations demonstrating that, despite each Plaintiff's need for Remedial Services, Defendant Carlson has failed to make these services available to each Plaintiff, and more generally to all putative class members. (*Id.*, *e.g.*, ¶ 60 (alleging that Samuel's parents tried calling for a Mobile Crisis Response Services but received a police response instead); *id.* ¶ 41 (alleging that, in 2022, Zack was admitted to the ER 18 times and had 16 admissions to psychiatric institutions but was never provided with any Remedial Services upon discharge); *id.* ¶ 52 (alleging that, in 2022, Leon's preliminary discharge plan was to return home after 90 days with referral to In Home Services but that Georgia has still not arranged these services after 18 months); *id.* ¶ 27

(alleging that Isaac was discharged from psychiatric institutions 11 times and was never provided with Intensive Care Coordination, Intensive In-Home Services, or access to Mobile Crisis Response Services)).

Considering the thorough allegations, Plaintiffs plainly state a claim in alleging that Defendant Carlson violated the EPSDT Mandate.

Notwithstanding these thorough allegations, Defendant Carlson contends that Plaintiffs fail to state a claim because they have not alleged that doctors prescribed the Remedial Services as medically necessary for each of the Plaintiffs. (MTD, Doc. 32-1 at 38–39). Defendant Carlson is wrong for three reasons.

*First*, each Plaintiff *has in fact* alleged that treatment professionals or clinicians referred them to some form of Remedial Services or the closest version of a Remedial Service that Georgia offered. (Compl., Doc. 1 ¶ 28 (alleging that Isaac was referred to IFI); *id*. ¶ 40 (alleging that Zack was referred to and received IC3 and IFI); *id*. ¶ 50, 52 (alleging that Leon's doctor referred him to IFI and that Leon's discharge plan referred him to in-home services); *id*. ¶ 62 (alleging that Samuel was referred to IFI)).

*Second*, Defendant Carlson cites to no legal authority holding that plaintiffs bringing a systemic case must specifically allege that doctors prescribed the services sought in order to state a claim. Of course, a clinician must determine that a service is "medically necessary" before a child can receive such a service. *See Moore,* 673 F.3d at 1233 (11th Cir. 2011) (explaining that states must only provide services or treatments that are medically necessary); O.C.G.A. § 49-4-169.1(4)

(defining medically necessary services as services/treatments prescribed by a licensed practitioner which correct or ameliorate defects). But a complaint clearly alleging that services are medically necessary need not include each and every specific doctor's referral. Defendant Carlson's attempt to invent a new pleading requirement — based on no legal authority and in contravention of the Rule 8 pleading standard — falls flat.

*Third*, in this systemic case, Plaintiffs allege that Defendant Carlson consistently fails to offer the required services to most eligible children. (Compl., Doc. 1 ¶¶ 145, 163, 170, 175, 176, 179, 181). With respect to IC3 services and the IFI services, Plaintiffs allege that Defendant Carlson fails to provide these services to all but a tiny fraction of children by creating barriers like overly restrictive diagnostic exclusions (for example, barring children with Autism, as with Leon), or by simply failing to ensure the required assessment while in state custody. (*Id.* ¶¶ 146–160, 167). Moreover, Plaintiffs allege that Defendant Carlson fails to maintain a provider network for required services (*id.* ¶ 11); fails to provide families with information about required services (*id.* ¶ 12); fails to assess children in state custody to determine whether they need services (*id.*); and fails to ensure appropriate discharge plans (*id.*). The Court at this juncture must treat as true the Complaint's allegations that Defendant Carlson essentially did not make available the required Remedial Services to most children who needed them. It bucks all logic to expect that clinicians would have prescribed Remedial Services when (1) those services were not practically available, and (2) Georgia did not ensure that

clinicians had the opportunity to assess children to determine if they might need such services.

Consequently, the Court finds that Plaintiffs have adequately plead that the Remedial Services were medically necessary and rejects Defendant Carlson's argument to the contrary.

### b. Plaintiffs Adequately Allege That the Need for Remedial Services Was Disclosed by Screenings

In Count I of the Complaint, Plaintiffs allege that Defendant Carlson is violating the EPSDT Mandate to provide and arrange for necessary EPSDT services (specifically the identified Remedial Services) in violation of a number of statutory provisions that together require the State to provide necessary EPSDT services, including 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(1)(A). One of those provisions is § 1396a(a)(43). Under this section, Georgia's Medicaid plan must provide for:

> (A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance . . . of the availability of early and periodic screening, diagnostic, and treatment services . . . ,

> (B) providing or arranging for the provision of such screening services in all cases where they are requested, [and]

> (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services . . . .

42 U.S.C. § 1396a(a)(43). As a part of Count I, Plaintiffs cite subsection (C) and the requirement that the State arrange for corrective treatment, the need for which has been revealed by screening services.

66

Defendants argue that Plaintiffs cannot pursue a violation of § 1396a(a)(43)(C) — an aspect of their EPSDT Mandate claim — because they did not "formally request screenings" and so there is no "corrective treatment . . . disclosed by such child screening services." (MTD, Doc. 32-1 at 40–41).

Defendant Carlson is mistaken for this reason: Plaintiffs are not required to formally request screenings in order to receive screenings. All that matters is that Plaintiffs have received "screening services" that have disclosed the need for "corrective treatment." 42 U.S.C. § 1396a(a)(43)(C).

As discussed at length above, the Medicaid Act requires that Georgia make EPSDT services available to children under 21. *See id.* § 1396a(a)(10)(A); 1396d(a)(4)(B). In making EPSDT services available, Georgia *must* provide two types of screening services: (1) "periodic" pre-set check-ups that occur at regular intervals and (2) "interperiodic" screens that occur as needed. *See id.* § 1396d(r)(1); *see also* Ctrs. for Medicare & Medicaid Servs., *EPSDT-A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents*.

As to "periodic" screenings, Georgia has the responsibility to ensure that all eligible children (and their families) are informed of both (a) the availability of screening services and (b) "*that a formal request for an EPSDT screening service is not required.*" *Id.* at 4 (emphasis added). "Periodic" screening services include a comprehensive assessment of mental health. *Id.*

As to "interperiodic" screening services, various professionals — doctors; health, developmental, or educational professionals; personnel working for state

early intervention programs; teachers, or individuals in similar roles — may determine that "interperiodic" screening is necessary for a particular child based on their contact with the child. *Id.* at 5.

Importantly, for both types of screenings, a child (or their family) *does not have to request such screening services* in order to obtain them. Certainly, if such screening services are requested, Georgia must provide or arrange for the provision of such screening services. *See* 42 U.S.C. § 1396a(a)(43)(B). But a request is not a *necessary condition* of the provision of screening services. A reading of the statutory provisions together makes that clear. As does the plain text of § 1396a(a)(43)(C) (noting that a state's Medicaid plan must provide for the arranging of "corrective treatment the need for which *is disclosed by* such child health screening services" (emphasis added)).[23]

Courts have consistently found that states must affirmatively engage in outreach to inform eligible families of EPSDT screenings and services rather than wait for a child (or his parent) to request services. *See Stanton v. Bond*, 504 F.2d 1246, 1251 (7th Cir. 1974) ("The mandatory obligation upon each participating state to aggressively notify, seek out and screen persons under 21 in order to detect health problems and to pursue those problems with the needed treatment is made unambiguously clear by the 1967 act and by the interpretative regulations and

---

[23] The use of the word "and" in § 1396a(a)(43)(C) makes it clear that a state must inform eligible individuals and their families of the availability of EPSDT services *and* provide/arrange for screening services when requested *and also* arrange for corrective treatment when screening services disclose a need for treatment.

guidelines."); *Emily Q. v. Bonta*, 208 F. Supp. 2d 1078, 1095–96 (C.D. Cal. 2001) ("[A] state is supposed to seek out eligible individuals and inform them of the benefits of prevention and the health services and assistance available."); *John B. v. Goetz*, 879 F. Supp. 2d 787, 805 (M.D. Tenn. 2010) ("[F]ederal law requires that the State engage in outreach to inform the patients of EPSDT. The Court agreed that Tennessee may have a 'harder road to hoe' than some other states, but that does not mean that the entrenched attitudes of providers and patients can be used as a shield against liability for failure to implement EPSDT requirements."); *Alberto N. v. Hawkins*, 2007 WL 8429756, at *7 (E.D. Tex. June 8, 2007) ("[T]he Fifth Circuit recognized that the Medicaid Act mandates Texas Medicaid to *affirmatively* remedy the health problems of Texas children participating in the Medicaid program.") (emphasis added) (citing *Mitchell v. Johnston,* 701 F.2d 337, 347–48 (5th Cir. 1983)). Indeed, as the Seventh Circuit put it:

> Senate and House Committee reports emphasized the need for extending outreach efforts to create awareness of existing health care services, to stimulate the use of these services, and to make services available so that young people can receive medical care before health problems become chronic and irreversible damage occurs . . . .
>
> It is difficult enough to activate the average affluent adult to seek medical assistance until he is virtually laid low. It is utterly beyond belief to expect that children of needy parents will volunteer themselves or that their parents will voluntarily deliver them to the providers of health services for early medical screening and diagnosis. By the time an Indiana child is brought for treatment it may too often be on a stretcher. This is hardly the goal of "early and periodic screening and diagnosis." **EPSDT programs must be brought to the recipients**; the recipients will not ordinarily go to the programs until it is too late to accomplish the congressional purpose.

69

*Stanton*, 504 F.2d at 1249, 1251 (emphasis added).

So, having explained why eligible individuals — like Plaintiffs — need not formally request screening services to receive them, the Court considers whether the facts alleged in the Complaint demonstrate that screenings have disclosed the need for corrective treatments for each of the Plaintiffs. 42 U.S.C. § 1396a(a)(43)(C).

The Complaint plainly includes sufficient factual allegations. For example, as to Issac, the Complaint alleges that screenings have led to a series of mental health diagnoses (Bi-polar Disorder, OCD, ADHD, DMDD, and ODD) and that screenings led to a referral to Georgia's IFI program. (Compl., Doc. 1 ¶¶ 25, 28). As discussed *supra* in Section III.D.2.a. at 64, the other Plaintiffs have similarly received screenings that disclosed a need for corrective services. Moreover, reading the allegations collectively, the inescapable facts that all Plaintiffs and putative class members (1) have been diagnosed with Serious Emotional Disturbance and (2) have been hospitalized and/or institutionalized (over and over again) is indicative that screenings have shown a need for corrective services.

Once again, the Court rejects Defendants' legally untethered argument. Plaintiffs may rely on § 1396a(a)(43)(C)'s requirement that Georgia arrange for corrective treatments in support of Count I.[24]

---

[24] Defendants' arguments on pages 41–43 of their Motion simply repeat their prior arguments that Plaintiffs fail to allege (1) that the Remedial Services were medically necessary; (2) that healthcare professionals prescribed them Remedial Services treatment; and (3) that screenings disclosed the need for corrective treatment. The Court has already considered — and rejected — these arguments. *See supra* at 61–70.

### E.    Claims under the ADA and the Rehabilitation Act

"[H]istorically, society has tended to isolate and segregate individuals with disabilities," and these biases "continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Recognizing this bias, Congress passed the ADA, which requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. The text of the law explicitly recognizes "segregation" as a "form[] of discrimination." *Id.* § 12101(a)(5).

The Rehabilitation Act similarly mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).[25]

---

[25] "Discrimination claims under the ADA and the Rehabilitation Act are governed by the same standards, and the two claims are generally discussed together." *J.S., III ex rel. J.S. Jr. v. Hous. Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017) (holding that disabled plaintiff's removal from classroom was cognizable discrimination claim under both ADA and Rehabilitation Act) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)); *see also Gaylor v. Ga. Dep't of Nat. Res.*, 2013 WL 4790158, at *7 (N.D. Ga. Sept. 6, 2013) ("The pleading requirements for a cause of action under Title II of the ADA and § 504 of the RA are essentially the same."). The Eleventh Circuit "rel[ies] on cases construing Title II and § 504 interchangeably." *Silberman v. Mia. Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019) (quoting *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010)). "However, the burden of establishing causation is higher under the Rehabilitation Act, requiring proof that the individual was discriminated against solely by reason of her disability, while the ADA requires a lesser showing of but-for causation." *Wade v. Fla. Dep't of Juv. Just.*, 745 F. App'x 894, 896 (11th Cir. 2018) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)).

The Supreme Court operationalized the antidiscrimination mandate of the ADA in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). There, the *Olmstead* Court explicitly recognized "undue institutionalization" as a form of illegal discrimination.[26] The ADA's implementing regulations already required public entities to "administer programs, and activities in the most integrated setting appropriate" to the individual's needs. 28 C.F.R. § 35.130(d). But *Olmstead* went a step further by requiring states to provide community-based treatment, rather than institutionalization, for disabled individuals when (1) treating professionals determine that such placement is appropriate; (2) the affected persons do not oppose such treatment; and (3) the placement can be reasonably accommodated, based on the state's resources and the needs of other disabled individuals. *Olmstead*, 527 U.S. at 607.

### 1. Whether Plaintiffs Sufficiently State a Claim Under the ADA and Rehabilitation Act

#### a. Plaintiffs Adequately Allege *Olmstead* Claims

The four Individual Plaintiffs — Isaac, Zack, Leon, and Samuel — have sufficiently stated *Olmstead* claims at this juncture because they have alleged that (1) treating professionals have determined community-based placement is appropriate; (2) neither they nor their parents oppose such treatment; and (3)

---

[26] The *Olmstead* court noted that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." And, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600–601.

providing the required treatment in a community-based setting would be a reasonable modification of Georgia's existing mental health care scheme. Defendants have launched a volley of attacks against Plaintiffs' adequately plead *Olmstead* claims, contending that each Plaintiff fails to satisfy all three prima facie elements of the claim — appropriateness, non-opposition, and reasonable accommodation. None of these contentions succeed.

The first element is appropriateness. Plaintiffs have adequately identified that treating professionals have recommended community-based treatment (with the appropriate services) for Isaac, Zack, Leon, and Samuel.

For example, Isaac — who "had experienced approximately 11 placements in Psychiatric Institutions" by age 8 — was "referred to an existing service called Intensive Family Intervention" in 2022. (Compl., Doc. 1 ¶ 27). His "longest period of institutionalization — more than 8 months in duration — came after he entered [DFCS] custody *and despite being recommended for discharge*." (*Id.* ¶ 30 (emphasis added)). He was finally discharged "without the Remedial Services" but, as of the filing of the Complaint, had been again admitted into "a Georgia funded out-of-state Psychiatric Institution *more than 800 miles away from the family*." (*Id.* ¶ 31 (emphasis added)). In short, Plaintiffs sufficiently allege that Isaac would be appropriately treated in the community if not for Defendants' failures to provide Remedial Services.

Zack has faced similar circumstances: he has been repeatedly recommended for community-based services, but the deficiencies in these services have led to his

re-institutionalization. Between 2018 and 2020, Zack was referred to and received the existing IC3 service, as well as IFI which, "while still not sufficient to meet his needs," decreased the frequency of his psychiatric admissions and thus "demonstrated that he can be appropriately served in the community." (*Id.* ¶ 40– 41). After these services were discontinued in 2021, Zack was admitted to the emergency room 18 times and to psychiatric institutions 16 times. (*Id.* ¶ 41). Accordingly, the Complaint adequately alleges that Zack has been referred to community-based services, that those services were helpful when provided, and that Zack could be treated in the community if Defendants were to adequately provide the home and community-based services he needs. Currently, DFCS has temporary custody of Zack and he remains institutionalized. (*Id.* ¶ 43).

Leon and Samuel have similarly alleged that treating professionals have determined community-based treatment appropriate for them. One of Leon's treating clinicians recommended that he receive IFI care. (*Id.* ¶ 50). However, Leon's mother was not able to obtain this service because of Leon's concurrent autism diagnosis. (*Id.*). In addition, when Leon was institutionalized in 2022, his preliminary discharge plan stated that he was to return home in 90 days "*with referrals to intensive in-home services.*" (*Id.* ¶ 52). Yet, he was not discharged because the community-based services were not provided. (*Id.* ¶ 53). Samuel has also been referred to IFI services. (*Id.* ¶ 62). Moreover, while Samuel remains at home, he lives in near-segregation because he is not receiving the home and community based services he needs. (*Id.* ¶ 63). In short, community-based

care has been recommended and determined to be appropriate for all four children.

Notwithstanding these allegations, Defendants argue that Isaac and Zack "fail to allege that they are being held in inpatient care *despite* their physicians' recommendations that they be placed in [the] community" — in other words, that they have not established that community-based treatment is appropriate for their needs. (MTD, Doc. 32-1 at 46). Defendants have overlooked the thorough allegations in the Complaint, which clearly articulate that Isaac and Zack have been institutionalized despite professional determinations that discharge and community care would be appropriate. (Compl., Doc. 1 ¶¶ 30–31, 39–43). As alleged, it is shortcomings in the existing community-based services — not the absence of a physician recommendation — that have made discharge impossible. (*Id.*) Certainly, the allegations are sufficient to survive at the motion to dismiss stage. *See Ga. Advoc. Off. v. Georgia*, 447 F. Supp. 3d 1311, 1323 (N.D. Ga. 2020) (holding that expert determination is not required for *Olmstead* claim to survive motion to dismiss).

Furthermore, to the degree to which Defendants contend that Isaac and Zack need a recommendation from a state treatment professional to receive community-based treatment, that position does not reflect settled law. "Although the Supreme Court in *Olmstead* noted that a State 'generally may rely on the reasonable assessments of its own professionals,' it did not hold that such a determination was required to state a claim." *United States v. Georgia*, 461 F. Supp. 3d 1315, 1323

(N.D. Ga. 2020) (quoting *Olmstead*, 521 U.S. at 602).[27] In fact, "courts around the country have repeatedly rejected Defendant[s'] argument." *Id.* (collecting cases); *see also Kritner ex rel. J.K. v. Ala. Dep't Hum. Res.*, 2025 WL 451836, at *9 (M.D. Ala. Feb. 10, 2025) ("[I]t is not clear whether *Olmstead* even requires a specific determination by *any* medical professional that an individual with mental illness may receive services in a less restrictive setting . . . ." (quoting *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) (emphasis in original))).

In short, Plaintiffs have adequately alleged the first element of an *Olmstead* claim: that treating professionals have determined community-based placement is appropriate.

The second element is non-opposition. The allegations in the Complaint evince no opposition to community-based placement, and so Plaintiffs satisfy the second element of the *Olmstead* claim. For example, "Isaac's mother . . . wishes to bring her son home with services that are necessary to treat his mental health conditions." (Compl., Doc. 1 ¶ 32). Zack's mother "wants [him] to come home so that he can live with his family and be the big brother he wants to be." (*Id.* ¶ 43). Leon's mother has "continued to insist on the provision of services in his home and community," but has been met with inadequate transition plans for her son. (*Id.* ¶ 53). And "Samuel's mother has repeatedly sought intensive mental health

---

[27] Defendants' own cited authority (MTD, Doc. 32-1 at 46) even supports this contention. *See A.A. ex rel. Carroll v. Buckner*, 2021 WL 5042466, at *8 (M.D. Ala. Oct. 29, 2021) ("[A] state treatment professional's opinion is not required to state a claim where, as here, the Plaintiffs are bringing an *Olmstead* claim . . . . However, that conclusion does not also mean that no allegation of any professional's determination is required.").

services in order to keep her son safely at home." (*Id.* ¶ 63). None of these sentiments reflect opposition to community-based treatment.

Nevertheless, Defendants contend that Leon cannot state an *Olmstead* claim because his mother C.C. "opposed [his] return under [his] 'transition plan.'" (MTD, Doc. 32-1 at 8). But Defendants selectively leave out that C.C. "was reluctant to accept any transition plan *that did not provide intensive home and community-based services*." (Compl., Doc. 1 ¶ 53 (emphasis added)). "The relevant question is whether service recipients with disabilities would choose community-based services *if they were actually available and accessible*." *United States v. Florida*, 682 F. Supp. 3d 1172, 1232 (S.D. Fla. 2023), *appeal docketed* No. 23-12331 (11th Cir. July 17, 2023) (emphasis added). That is not the case for Leon, as the community-based options offered to him are insufficient to meet his medical needs. (Compl., Doc. 1 ¶ 52–54). Plaintiffs adequately allege the second element of an *Olmstead* claim.

The third element of an *Olmstead* claim is reasonable modification. Plaintiffs have sufficiently alleged that their proposed relief would "reasonably modify" the State of Georgia's existing mental healthcare scheme, such that it falls within the scope of permissible relief under *Olmstead*. Plaintiffs indicate that the Remedial Services, when "provided in a highly coordinated and child-centered way, is widely recognized by professionals, States, and the Centers for Medicare & Medicaid Services ("CMS") as clinically effective [and] *more cost-effective* than institutional placements." (*Id.* ¶ 1 (emphasis added)). As discussed more below, the

Remedial Services that Plaintiffs request are reasonable modifications of three existing Specialty Services, accepting the Complaint's allegations as true at this juncture. *See infra* at 87–90.

***

Finally, unrelated to any particular element of an *Olmstead* claim, Defendants assert that Samuel cannot state an *Olmstead* claim because "his family has been forced to keep [him] at home when not at school," rather than in a psychiatric institution. (*Id.* ¶ 63). Thus, they contend, the integration mandate does not apply to Samuel. But neither the text nor interpretation of that regulation cabin its applicability to patients in psychiatric institutions. *See* 28 C.F.R. § 35.130(d) (requiring programs and treatment "in the most integrated setting appropriate"); *see also Steimel v. Wernert*, 823 F.3d 902, 914 (7th Cir. 2016) ("Based on the purpose and text of the ADA, the text of the integration mandate, the Supreme Court's rationale in *Olmstead,* and the DOJ Guidance . . . the integration mandate is implicated where the state's policies have . . . segregated persons with disabilities within their homes."). And, as discussed below, *Olmstead* also applies to patients who have not yet been admitted to psychiatric institutions but who are at serious risk of institutionalization.

### b. Plaintiffs' At-Risk Claims are Cognizable

Courts across the country have contemplated the idea that mentally ill patients are also harmed — and thus *Olmstead*'s mandate applicable — when they are at *serious risk* of institutionalization, even if they have not yet been admitted

into a psychiatric institution. *Olmstead* stands for the fundamental proposition that the "unjustified institutional isolation of persons with disabilities is a form of discrimination." 527 U.S. at 600. On that premise, the integration mandate embodied in the ADA and *Olmstead* "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003). Allowing plaintiffs to state *Olmstead* claims when they are concretely "at-risk" of institutionalization avoids this catch-22.

Further, recognizing at-risk claims under the ADA is also consistent with the broader principle that "injunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'" *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)).

Six of the seven appeals court to have considered such "at-risk" claims have held them sufficient to support an *Olmstead* claim.[28] *See Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426 (6th Cir. 2020); *Steimel*, 823 F.3d at 902 (7th Cir. 2016); *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012); *Fisher*, 335 F.3d at 1175. *But see United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023).

---

[28] The Eleventh Circuit has not yet determined the cognizability of "at-risk" claims. However, the Court acknowledges that this issue, among others, is currently before the Circuit in *United States v. Florida*, Appeal No. 23-12331.

Numerous district courts within the Eleventh Circuit have agreed,[29] including this one. *See, e.g.*, *Ga. Advoc. Off.*, 447 F. Supp. 3d at 1323 ("At this stage, Plaintiffs need only allege that the proposed class members are at risk of institutionalization."); *Royal ex rel. Royal v. Cook*, 2012 WL 2326115, at *8 (N.D. Ga. June 19, 2012) ("Plaintiff may succeed on his ADA claim if the Defendant's action places him at a 'high risk' of premature entry into institutional isolation."); *Hunter ex rel. Lynah v. Cook*, 2011 WL 4500009, at *5 (N.D. Ga. Sept. 27, 2011) (same).

Opposite this weight of authority, only the Fifth Circuit has held that such at-risk claims are not cognizable. *See United States v. Mississippi*, 82 F.4th 387 (5th Cir. 2023). There, the Fifth Circuit held that "[n]othing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a *risk of institutionalization*, without actual institutionalization, constitutes actionable discrimination." *Id.* at 392.

Defendants urge the Court to follow the Fifth Circuit's decision but make no argument as to why this Court should follow the minority analysis instead of the robust consensus.

---

[29] *United States v. Florida*, 682 F. Supp. 3d at 1185 ("The *Olmstead* ruling has been found to cover both institutionalized individuals as well as those who are at serious risk of institutional placement."); *Meza ex rel. Hernandez v. Marstiller*, 2023 WL 2648180, at *5 (M.D. Fla. Mar. 27, 2023); *Parrales v. Dudek*, 2015 WL 13373978, at *5 (N.D. Fla. Dec. 24, 2015); *A.R. v. Dudek*, 2014 WL 11531370, at *7 (S.D. Fla. Nov. 13, 2014), *R&R adopted* 2014 WL 11531887 (S.D. Fla. Dec. 29, 2014); *Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1326 (M.D. Fla. 2011).

Having considered the positions of the appellate courts on this issue, this Court concludes that the majority position is more consistent with the text and purpose of the ADA. The mandate of the ADA is the "elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). And, as *Olmstead* articulated, the forced choice between subpar care and institutionalization reflects the very discrimination the ADA sought to eliminate: "In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." 527 U.S. at 601; *see also Waskul*, 979 F.3d at 460 (6th Cir. 2020) ("[I]ndividuals with disabilities are subjected to discrimination when they are forced to choose between forgoing necessary medical services while remaining in the community or receiving necessary medical services while institutionalized—not just when they are actually institutionalized."). In this way, when children are substantially at risk of institutionalization, that risk is precisely the type of insidious discrimination that the ADA was enacted to prevent.

In *United States v. Mississippi*, 82 F.4th at 392, the Fifth Circuit critiqued the Tenth Circuit's conclusion "that neither the statute nor the regulation 'prohibited'" an at-risk claim because, according to the Fifth Circuit, that "reasoning [got] statutory interpretation exactly backwards." Yet, it is not simply that the ADA and *Olmstead* do not *foreclose* at-risk claims. Rather, the recognition

that a substantial risk of institutionalization is itself a form of discrimination is the more accurate reading of *Olmstead* and the ADA's integration mandate, both of which sought to prevent unnecessary institutionalization — not to encourage it for the sake of checking off a legal prerequisite. This Court will thus follow the vast majority of other courts and acknowledge the cognizability of at-risk claims under *Olmstead*.[30]

Defendants finally contend that, even if an at-risk claim were viable, Plaintiffs do not adequately state one because they "fail to allege 'with particularity which services' Defendants must relocate to an outpatient setting from an inpatient setting" for Samuel. (MTD, Doc. 32-1 at 49 (quoting *Disability Rts. Cal. v. County of Alameda*, 2021 WL 212900, at *12 (N.D. Cal. Jan. 21, 2021))). This contention misunderstands the function of the at-risk claim. Samuel is not required to allege that Defendants must "relocate" a particular inpatient service to an outpatient setting. The ADA and Rehabilitation Act do not require a plaintiff to allege that the community service he seeks must be an exact match for an existing service provided in an institutional setting:

> Nothing in the regulations promulgated under the ADA or the Rehabilitation Act or in the Court's decision in *Olmstead* conditions the viability of a Title II or section 504 claim on proof that the services

---

[30] In addressing the robust consensus on this issue, Defendants erroneously imply that courts that have recognized at-risk claims as cognizable do so by improperly departing from the text of the law and regulations, and instead "rely[ing] on DOJ's nonbinding guidance document." (Reply, Doc. 43 at 34). But it is not necessary to consult DOJ's guidance to hold that a serious risk of institutionalization is precisely the type of discrimination countenanced by *Olmstead*. *See, e.g.*, *Fisher*, 335 F.3d at 1181; *United States v. Florida*, 682 F. Supp. 3d at 1185–86; *Haddad*, 784 F. Supp. 2d at 1326.

> a plaintiff wishes to receive in a community-integrated setting already exist in exactly the same form in the institutional setting.

*Trautenberg v. Levine*, 2006 WL 8433551, at *11 (S.D. Fla. Mar. 31, 2006) (quoting *Radaszewski v. Maram*, 383 F.3d 599, 611 (7th Cir. 2004)). Rather, Samuel may state a cognizable at-risk claim by seeking a "reasonable modification" of existing community-based services, as necessary to mitigate the serious risk of his repeated institutionalization. He does so here. *See infra* at 87–90 (assessing reasonability of proposed relief); *see also Trautenberg*, 2006 WL 8433551, at *11.

### c. Plaintiffs Sufficiently Allege Discrimination Based on Co-Occurring Disabilities

As this Court determined above, the Plaintiffs have stated cognizable *Olmstead* claims given their unnecessary institutionalization, or serious risk thereof. Plaintiffs further allege that "Defendants' service criteria and administrative methods prevent Children with co-occurring conditions from obtaining [the required] services when and where they need them . . . lead[ing] to the worsening of their mental health conditions, and unnecessary institutionalization or other out-of-home placement." (Compl., Doc. 1 ¶ 195). In response, Defendants contend that Plaintiffs' assertion of discrimination based on co-occurring disabilities "doesn't fit with Defendants' alleged failure to provide the Remedial Services to *any* child." (MTD, Doc. 32-1 at 49).

This framing fundamentally misunderstands the well-settled law under *Olmstead*: the unwarranted isolation of disabled people is discrimination. And when children are excluded from community-based mental health services based

on diagnostic criteria — and are thus institutionalized — because of their co-occurring mental health conditions, the administration of those services is discriminatory. *See, e.g.*, *Belton v. Georgia*, 2012 WL 1080304, at *11 (N.D. Ga. Mar. 30, 2012) ("[T]he State has offered its residents a 'one size fits all' mental health care program . . . [which] runs afoul of the ADA and [its] obligation to make reasonable modifications to its services to provide disabled persons with meaningful access to them."). That is precisely what Plaintiffs have alleged here,[31] and those allegations of discrimination based on co-occurring disabilities are more than sufficient to survive at the motion to dismiss stage.[32]

---

[31] (*See, e.g.*, Compl., Doc. 1 ¶ 50 (describing how Leon's mother was "repeatedly told [by IFI providers] that they could not serve him due to his concurrent Autism diagnosis"); *id.* ¶ 159 (noting that the "provider manual [for IC3] explicitly excludes children who have mental health conditions and mild intellectual or developmental disabilities, including 'autistic disorder'"); *id.* ¶ 167 (alleging that "youth with Autism Spectrum Disorders including Asperger's Disorder, Intellectual/Developmental Disabilities, Neurocognitive Disorder; or Traumatic Brain Injury are denied access to IFI" without specific episode "overlaying the diagnosis")).

[32] Defendants make a similar attack on Plaintiffs' Rehabilitation Act claims, asserting they "failed to allege that any discrimination occurred '*solely* by reason of her or his disability,'" as the statute requires. (Reply, Doc. 43 at 30 (emphasis in original)); *see also* 29 U.S.C. § 794(a). "[T]he more likely explanation[]," according to Defendants, "is that the state determined that the remedial services aren't medically necessary for those with co-occurring conditions." (MTD, Doc. 32-1 at 49–50 (quoting *Iqbal*, 556 U.S. at 681–83)). However, no allegations in the Complaint support Defendants' alternative explanation. At this stage, Plaintiffs have satisfied the pleading standard by adequately alleging that the discrimination occurred because of the Plaintiffs' and class members' disabilities, and for no other reason. *See also Jones v. Ga. Dep't of Cmty. Health*, 2022 WL 4462036 (11th Cir. Sept. 26, 2022) (finding plaintiff's allegation that she was fired days after she took extended leave for injury "sufficient to satisfy either [the ADA or Rehabilitation Act causation] standard at the motion-to-dismiss stage").

### 2. Whether the Scope of Requested Relief Is Permissible Under the ADA and *Olmstead*

Having addressed Defendants' concerns as to the sufficient pleading of Plaintiffs' claims under the ADA and Section 504 of the Rehabilitation Act, the Court now turns to their two contentions against the scope of the requested relief, i.e., provision of the Remedial Services. First, Defendants contend that providing the Remedial Services would force the state to create a new benefit, rather than making a reasonable accommodation or modification to the existing benefits scheme. Because neither the ADA nor the Rehabilitation Act "requires the state to create *new* entitlements, benefits, or services," Defendants argue that Plaintiffs' claim for this relief is not cognizable under either law. (MTD, Doc. 32-1 at 44 (emphasis in original)). In a similar argument, Defendants allege that requiring provision of the Remedial Services would "fundamentally alter" the state's mental health program, which *Olmstead* explicitly excluded from the commands of the ADA. (*Id.* at 50). These two standards, though conceptually related, are legally distinct. As the Supreme Court articulated in *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), the ADA requires entities to make modifications at one end of the spectrum ("reasonable"), but not those extreme changes ("fundamental" or "substantial") at the other end:

> *Davis* thus struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.

*Alexander v. Choate*, 469 U.S. 287, 300 (1985). In short, the two inquiries reflect the limitations of what the ADA requires of states under *Olmstead*.

As a premise issue, neither the "reasonable modification" nor "fundamental alteration" inquiry is appropriately adjudicated at the motion to dismiss stage. "The reasonable-modification inquiry in Title II–ADA cases is 'a highly fact-specific inquiry.'" *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007) (quoting *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir.1997)). As a result, "[c]ircuit courts have held that this inquiry is often inappropriate for summary judgment, much less for a motion to dismiss." *Huddleston v. Metro. Atlanta Rapid Transit Auth.*, 2024 WL 4347882 at *3 (N.D. Ga. Sept. 30, 2024); *see also Foulke v. Morgan*, 2021 WL 12170573 at *6 (N.D. Fla. Apr. 27, 2021) (holding court could not decide, on motion to dismiss, "whether any modification of [the at-issue] procedures was reasonable"). The same is true of the fundamental alteration inquiry. *See, e.g.*, *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097, 1111 (11th Cir. 2022) ("[T]he fundamental-inquiry analysis rested on fact questions . . . ."); *M.J. v. District of Columbia*, 401 F.Supp.3d 1, 14 (D.D.C. 2019) (collecting cases). In other words, the Court could conclude its analysis here. It need not determine at this juncture if the proposed relief constitutes either a "reasonable modification" or "fundamental alteration" of the existing accommodation scheme. For the sake of completeness, however, the Court will examine each contention in turn.

### a. The Remedial Services Are a Reasonable Modification

To refresh, states must provide community-based treatment for disabled individuals when (1) treating professionals determine that such placement is appropriate; (2) the affected persons do not oppose such treatment; and (3) the placement can be reasonably accommodated. *Olmstead*, 527 U.S. at 607. Defendants contend that the requested relief runs afoul of the third requirement because Plaintiffs seek "new Remedial Services that they say Defendants currently 'do[] not provide' to 'any child.'" (MTD, Doc. 32-1 at 44–45 (quoting Compl., Doc. 1 ¶¶ 7, 223–239)).

Plaintiffs' "*prima facie* burden of identifying a reasonable modification is not a 'heavy one.'" *United States v. Florida*, 682 F. Supp. 3d at 1236 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003)). In assessing whether a requested modification is reasonable, "the Court must consider 'among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization to implement it.'" *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 469 F. Supp. 3d 1280, 1304 (M.D. Fla. 2020) (quoting *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995)), *aff'd* 50 F.4th 1097 (11th Cir. 2022).

Defendants, conversely, contend that providing the Remedial Services would require the state to establish a new benefit, which Justice Kennedy's concurring opinion in *Olmstead* explicitly disclaims. *Olmstead*, 527 U.S. at 612 (Kennedy, J., concurring). It is true that "a State may not be forced to create a

community-treatment program where none exists." *Id.* at 613. But that is not the case here. Defendants themselves admit that "Georgia's Medicaid plan already includes 'three Specialty Services' that *sound* like the Remedial Services." (MTD, Doc. 32-1 at 5 (emphasis in original)). Defendants thus seem to simultaneously allege that the proposed Remedial Services are both novel and redundant.

Further, Plaintiffs articulate how each of the Remedial Services expands upon a corresponding Specialty Service currently offered by the state. (Resp., Doc. 39 at 37; *see also id.* at 29 n.14). As discussed *supra* at 83–84, certain "restrictive diagnostic exclusions" limit the reach of IC3, which Intensive Care Coordination — though it provides admittedly similar coordination services — would avoid, according to Plaintiffs. (Compl., Doc. 1 ¶¶ 159–160). Plaintiffs allege that Intensive In-Home Services provides a similar expansion to IFI: while IFI is "short-term" and "crisis-focused intervention," the proposed Intensive In-Home Services would expand the timeframe of therapeutic intervention to not merely defuse, but also prevent, behavioral health crises. (*Id.* ¶¶ 162–167). Plaintiffs' proposed Mobile Crisis Response Services similarly have the potential to cure the asserted shortcomings with the Georgia Crisis and Access Line, including lack of response and delay. (*Id.* ¶¶ 173–180).

By explaining with particularity how each proposed Remedial Service would build upon existing Specialty Services, Plaintiffs have adequately met their prima facie burden to establish that the requested relief would constitute a "reasonable

modification" of the existing mental healthcare scheme — *not* the creation of a new benefit.

Plaintiffs further assert that the Remedial Services, "provided in a highly coordinated and child-centered way, [are] widely recognized by professionals, States, and the Centers for Medicare & Medicaid Services ("CMS") as clinically effective, more cost-effective than institutional placements, and capable of preventing harmful out-of-home placement." (Compl., Doc. 1 ¶ 1). In other words, "the effectiveness of the modification" supports its reasonableness. *A.L. ex rel. D.L.*, 469 F. Supp. 3d at 1304. Defendants point out that, under *Olmstead*, "the law does not impose on states 'a standard of care' for whatever medical services they render." (MTD, Doc. 32-1 at 44 (quoting *Olmstead*, 527 U.S. at 603 n.14)). But, as the Court has already held, Plaintiffs have met their burden at this initial juncture to allege that these services are required under Medicaid. *See supra* at 61–71.

"[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. . . . [O]nce the plaintiff has done this, []he has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." *See Henrietta D.*, 331 F.3d at 280; *see also Brown v. District of Columbia*, 928 F.3d 1070, 1078 (D.C. Cir. 2019) ("[O]ther circuits have put the burden of establishing the unreasonableness of a requested accommodation on the State.").

Here, Defendants have not even offered any particularized argument that the requested Remedial Services would be cost-prohibitive, infeasible, or even more expensive, for the State of Georgia. *See, e.g.*, *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1303–1304 (M.D. Fla. 2010) (providing in-home nursing services is a reasonable modification of nursing home placement, especially because of cost neutrality). In short, Plaintiffs have adequately alleged that provision of the Remedial Services would be a "reasonable modification" of the state's existing children's mental healthcare scheme.

### b.  The Remedial Services Would Not Constitute a Fundamental Alteration

As the Supreme Court articulated in *Davis*, states must make reasonable modifications to comply with the ADA, but need not make fundamental alterations. *Davis*, 442 U.S. at 410–13. Having explained *supra* that the requested relief constitutes a reasonable modification of the state's existing mental health care scheme, the Court now addresses whether providing the Remedial Services would fundamentally alter it such that the state cannot be compelled to do so.

The fundamental alteration inquiry "allow[s] the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Olmstead*, 527 U.S. at 584. The state bears the burden of proving a proposed alteration is unreasonable. *See, e.g.*, *A.L. ex rel. D.L.*, 50 F.4th at 1111 (holding "defendant[] bore the burden of proof on the fundamental-alteration inquiry").

90

Two cases shed light on how to evaluate a "fundamental alteration." In *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682–91 (2001), the Supreme Court held that a golf tournament could not deny a contestant use of a golf cart to traverse the 18-hole golf course, because use of the cart did not "constitute a fundamental alteration . . . [of] an essential aspect of the game" nor would it undermine the tournament's requirement that non-disabled players walk the course. Relying on that analysis, the Eleventh Circuit rejected a plaintiff's request that the Disney parks reinstate a "skip-the-line" pass for disabled visitors. *A.L. ex rel. D.L.*, 50 F.4th at 1103, 1110–12. According to the Eleventh Circuit, courts must undertake the factual analysis of whether a proposed modification would affect core parts of the program at issue. There, the district court correctly

> considered whether the requested modification would affect merely peripheral aspects of Disney's parks or aspects essential to Disney's services and determined that the fundamental-inquiry analysis rested on fact questions, particularly whether and to what degree [the] requested modification would impact wait times for rides and to what extent wait times for rides are essential to Disney's services.

*Id.* at 1111; *see also In re Ga. S. Bill 202*, 2023 WL 5334615, at *9 (N.D. Ga. Aug. 18, 2023) ("The Court must consider whether the plaintiff's requested accommodation would eliminate an 'essential aspect' of the program . . . or simply inconvenience it, while 'keeping in mind the 'basic purpose' of the policy or program at issue, and weighing the benefits to the plaintiff against the burdens on the defendant.'" (quoting *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1267 (11th Cir. 2019)).

Given these controlling precedents, and based on the allegations in the Complaint, the Court does not find, at this juncture, the proposed Remedial Services to be a fundamental alteration of the existing healthcare scheme. *See A.L. ex rel. D.L.*, 50 F.4th at 1111.

Numerous district court decisions in this circuit support this holding. In *Belton v. Georgia*, the district court held that requiring the state to provide group homes with staff proficient in American Sign Language was not a fundamental alteration of its disability services. Rather, the proposed relief merely "str[ove] to ensure that Deaf persons have access to 'the same service provided to hearing persons, but provided with communication modes that permit them to actually utilize those services'" and because it imposed no "undue financial burden." *Belton*, 2013 WL 4551307, at *2 (N.D. Ga. Aug. 27, 2013). The same could be said of the Remedial Services here, which seek to expand wraparound mental health services such that they actually prevent the unnecessary institutionalization of children. *See also Haddad*, 784 F. Supp. 2d at 1303 (provision of in-home nursing care without first requiring institutionalization in nursing home was not a fundamental alteration, in part because state submitted no evidence as to burden). In short, expanding the State of Georgia's mental health care scheme to include the Remedial Services would hardly "eliminate an 'essential part' of the program," but rather would serve its "basic purpose" — providing effective mental health care to the children of Georgia and preventing their unnecessary segregation. *In re Ga. S. Bill 202*, 2023 WL 5334615, at *9.

Defendants put forth two contentions to cast the Remedial Services as a "fundamental alteration" of the existing mental healthcare scheme. First, they assert that the proposed remedy would "create new programs that provide heretofore unprovided services to assist disabled persons." (MTD, Doc. 32-1 at 50 (quoting *Rose v. Rhorer*, 2014 WL 1881623, at *4 (N.D. Cal. May 9, 2014))). The Court has already found, *see supra* at 87–89, that each of the proposed Remedial Services would merely expand upon existing Specialty Services. The idea that the Plaintiffs seek to create a new program or benefit is, again, unavailing at this early juncture.

Next, Defendants allege "[s]weeping institution-wide directives . . . are never 'narrowly tailored'" and are "far more than the reasonable modification" required by law. (MTD, Doc. 32-1 at 50 (quoting *United States v. Mississippi*, 82 F.4th at 400; *Choate*, 469 U.S. at 300 (discussing *Davis*, 442 U.S. at 410))). But Defendants' reliance on these cases to cast the requested relief as a "fundamental alteration" is misplaced. In *Mississippi*, the Fifth Circuit held that "the district court's institutional reform *injunction* was overly broad," i.e., not narrowly tailored. 82 F.4th at 398 (emphasis added). That makes sense: narrow tailoring is the standard for injunctive relief. But it is not the standard for evaluating a fundamental alteration under *Olmstead*. And, in fact, because the Fifth Circuit held that the plaintiff's at-risk claims were not cognizable under *Olmstead* to begin with, as discussed *supra* at 80, it never reached the fundamental alteration inquiry.

In *Davis*, meanwhile, a woman with a hearing disability requested admission to a nursing school program even after the program determined the disability would interfere with her ability to safely care for patients. 442 U.S. at 400–404. There, the Supreme Court held that the plaintiff's requested relief — "close, individual attention by a nursing instructor" — was "a fundamental alteration in the nature of the program" because the plaintiff "would not receive even a rough equivalent of the training a nursing program normally gives." *Id.* at 409–410. In short, the requested relief was impermissible *not* because it was "far more than the 'modification' the regulation requires," but because it would "substantially lower[]" the standards of the nursing curriculum, thus fundamentally altering the nature of the program provided. *Id.* at 410, 413. And the Supreme Court came to that finding only because of the district court's extensive factual findings and bench trial.

In short, Defendants' argument that requiring them to provide the Remedial Services would be an impermissible alteration of the existing programs is both premature and erroneous, based on the facts alleged. Moreover, Defendants' assertion appears to misunderstand the fundamental alteration inquiry. Looking only to the Complaint, the Court finds on an initial basis that Plaintiffs adequately alleged that their requested relief constitutes a reasonable accommodation but does not stray into the territory of a fundamental alteration.

***

As discussed above, Plaintiffs' ADA and Rehabilitation Act claims survive Defendants' myriad arguments for dismissal. Plaintiffs sufficiently state their *Olmstead* claims, including at-risk claims. They have also plausibly alleged that the relief they seek involves reasonable modifications, but not fundamental alterations, of the State of Georgia's existing services for children with significant mental health needs.

## IV.    CONCLUSION

Having addressed and rejected Defendants' passel of arguments, the Court **DENIES IN FULL** their Motion to Dismiss [Doc. 32]. Consistent with the Court's prior scheduling Order (Doc. 38), the parties **SHALL** conduct the Early Planning Conference, submit the JPRDP, and exchange initial disclosures within 14 days of this Order. Defendants' Answer **SHALL** be due within 14 days of this Order.

**IT IS SO ORDERED** this 25 day of March 2025.

_____
**Honorable Amy Totenberg**
**United States District Judge**